UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MICHELLE SPENCE-JONES,

                        Plaintiff,

      -against-

                              No. 12 Civ. 24253 (DMM) (DLB)

STATE ATTORNEY KATHERINE FERNANDEZ
RUNDLE, MAYOR TOMÁS REGALADO,
ASSISTANT STATE ATTORNEY WILLIAM
RICHARD SCRUGGS, and INVESTIGATOR
ROBERT FIELDER,

                        Defendants.

## **AMENDED COMPLAINT**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................ 1

JURISDICTION AND VENUE ............................................................................... 4

JURY DEMAND ..................................................................................................... 5

PARTIES ................................................................................................................. 5

STATEMENT OF FACTS ....................................................................................... 6

    *Spence-Jones Is Elected Commissioner; Popular with Her Constituents,
    Unpopular with Regalado* ................................................................................ 6

    *The Office of the State Attorney: Rundle for Over 19 Years* ............................ 8

    *Regalado and Rundle: A Team* ........................................................................ 8

    *Scruggs' History of Troubled Prosecutions* ................................................... 12

        *The Costa Rica Fiasco: Scruggs Is Criminally Charged* .................... 13

        *The Waco Fiasco: Scruggs Is "Clearly Negligent"* ........................... 13

        *Rundle Hires Scruggs As Her Special Assistant* ................................ 14

        *The Gaston Smith Fiasco: "Very Unprofessional" Withholding of
        Evidence* ............................................................................................... 15

        *The Berry/Smith Fiasco: More Withholding of Evidence from the Defense* ........ 16

    *Defendants Prepare Their Scheme to Arrest Spence-Jones and Kick Her off the
    Commission* ...................................................................................................... 16

    *Spence-Jones is Elected, Sworn-In, and Promptly Arrested and Suspended* ................... 19

        *Spence-Jones is Elected* ..................................................................... 19

        *Governor Crist* ................................................................................... 21

        *Regalado Prepares For Spence-Jones' Arrest, and Tries To Destroy a
        Photograph* .......................................................................................... 22

        *Rundle Times Spence-Jones' Arrest for Right After She Is Sworn-In* ................... 23

ii

*Rundle Defames Spence-Jones* ........................................................................ 24

*Crist Suspends Spence-Jones (Suspension #1)* ............................................. 26

*Rundle and Regalado Attempt to Manipulate the Composition of the Commission* ....................................................................................................... 27

*The Importance of Waiting Until Spence-Jones Was Sworn In Before Arresting and Suspending Her* ................................................................. 27

*A Snag: No Quorum to Replace Spence-Jones; a Ten-Day Deadline Expires* ..... 29

*Rundle Tries to Manipulate the Commission* .......................................... 30

*Rundle and Regalado Team Up to Pressure Gonzalez and Manipulate the Commission* ..................................................................................... 30

*Regalado Tries to Manipulate Bru and the Commission* ...................... 31

*The Carey-Shuler Charge: Baseless and Based on Fabricated Evidence* ...................... 33

*Carey-Shuler Authorizes $50,000 to Karym* ........................................ 35

*MMAP Approves the Funding to Karym* ............................................... 35

*The SAO Defendants Hide the Evidence from Carey-Shuler* ............... 38

*Carey-Shuler's Sworn Statement: More Lies from the SAO* ................ 41

*Acting as Police Officers, Rundle, Scruggs and Fielder File a False Arrest Affidavit* .... 42

*The SAO's False Carey-Shuler Information* ................................................... 44

*The SAO Defendants Attempt to Hide the Evidence from Spence-Jones* ........................... 44

*A Few, Non-Lawyers in the Community Investigate, and Quickly Realize There is No Legitimate Carey-Shuler Case* .......................................................... 44

*Spence-Jones is Re-Elected; Crist Suspends Her Again (Suspension #2)* ...................... 46

*A Second Race Against Time; District 5 Loses Its Vote Again; "Magic City" For Regalado* ............................................................................................. 48

*Spence-Jones and Her Constituents Sue to Regain the Commission Seat* ........................ 51

iii

*A Third Race Against Time; the SAO Indicts; Crist Suspends Spence-Jones Again (Suspension #3)* ........................................................................... 52

*The Codina Case: Another Case, Another Fraud* ............................................... 54

 *The Renaming of Southeast Second Ave.* ................................................. 55

 *A City of Miami Benefit in the Lyric Theater* ......................................... 56

 *The SAO Defendants Intimidate and Falsely Accuse Codina* ............................. 59

 *The SAO Defendants Lie to and Manipulate Codina* ............................................. 60

 *Codina Is Duped, by the SAO* ............................................................ 61

*Defendants Defame, Arrest, and Attempt to Humiliate Spence-Jones* ............................. 63

*Scruggs' Personal Vendetta Against Raben; Rundle: "Boys Will Be Boys"* ................... 65

*Raben Deposes Carey-Shuler; Carey-Shuler Learns She Was Deceived; the SAO Defendants Continue to Pursue the Fraudulent Case* ................................... 66

*Codina Also Learns He Was Deceived; the Extraordinary Codina Deposition; Scruggs Doubles-Down on His Lies* .................................................................... 67

*The Trial: the Codina Case Is Exposed to the World as a Fraud* ..................................... 71

*Regalado-Rundle's Back-Door Meeting; Machinations to Extend the Carey-Shuler Case* ................................................................................... 72

*Rundle/Scruggs Defame Spence-Jones and Raben in an Outrageous "Closeout Memo," then Send the Defamatory Memo to the Miami Press Corps* ................................ 76

*A Political Conspiracy* ........................................................................ 80

*Carey-Shuler and Codina Identify the True Source of the Fraud: the SAO* ..................... 80

*Two Years in the Wilderness: A Public Servant in Ruins* ................................... 81

AS AND FOR A FIRST CLAIM FOR RELIEF 42 U.S.C. § 1983, Fabrication/ Concealment of Evidence in Carey-Shuler Case (Against SAO Defendants) ............................. 83

AS AND FOR A SECOND CLAIM FOR RELIEF 42 U.S.C. § 1983, Fabrication/ Concealment of Evidence in Codina Case (Against SAO Defendants) ....................................... 85

AS AND FOR A THIRD CLAIM FOR RELIEF 42 U.S.C. § 1983, False Arrest for Carey-Shuler Case (Against SAO Defendants) .................................................................. 86

AS AND FOR A FOURTH CLAIM FOR RELIEF 42 U.S.C. § 1983, Malicious Prosecution and Seizure for Carey-Shuler Case (Against SAO Defenants) ................................. 87

AS AND FOR A FIFTH CLAIM FOR RELIEF 42 U.S.C. § 1983, Malicious Prosecution and Seizure for Codina Case (Against SAO Defendants) ...................................... 88

AS AND FOR A SIXTH CLAIM FOR RELIEF 42 U.S.C. § 1983, First Amendment Retaliation (Against SAO Defendants) ....................................................................... 89

AS AND FOR A SEVENTH CLAIM FOR RELIEF 42 U.S.C. § 1983, Civil Rights Conspiracy (Against all Defendants) ............................................................... 90

AS AND FOR AN EIGHTH CLAIM FOR RELIEF 42 U.S.C. § 1983, Supervisory Liability (Against Rundle) ..................................................................................... 93

AS AND FOR A NINTH CLAIM FOR RELIEF Civil RICO, 18 U.S.C. § 1962(c) (Against all Defendants) .................................................................................. 94

 *The Enterprise* ............................................................................................... 94

 *The Enterprise's Conduct and Participation in Racketeering Activity* ............................. 94

 *Pattern of Racketeering Activity – Mail and Wire Fraud* ................................................ 97

 *Relationship of Pattern of Racketeering Activity to Enterprise* ........................................ 99

AS AND FOR A TENTH CLAIM FOR RELIEF Civil RICO Conspiracy, 18 U.S.C. § 1962(d) (Against all Defendants) ........................................................................... 100

AS AND FOR AN ELEVENTH CLAIM FOR RELIEF 42 U.S.C. § 1983, Retaliatory Inducement to Prosecute (Against Regalado) .............................................................. 100

AS AND FOR A TWELFTH CLAIM FOR RELIEF 42 U.S.C. § 1983, Due Process/Stigma Plus (Against SAO Defendants) ..................................................... 102

AS AND FOR A THIRTEENTH CLAIM FOR RELIEF Florida RICO, Title 45, § 772.103(3) (Against all Defendants) ........................................................................ 104

 *The Enterprise* ............................................................................................... 104

 *The Enterprise's Conduct and Participation in Racketeering Activity* ............................. 104

 *Pattern of Racketeering Activity – Tampering with a Witness* ...................................... 107

*Pattern of Racketeering Activity – Tampering with or fabricating physical evidence*................................................................................................ 108

*Relationship of Pattern of Racketeering Activity to Enterprise* ..................................... 108

AS AND FOR A FOURTEENTH CLAIM FOR RELIEF Florida RICO, Title 45, §772.103(4) (Against all Defendants)............................................................................. 110

AS AND FOR A FIFTEENTH CLAIM FOR RELIEF Florida Common Law/ False Arrest for Carey-Shuler Case (Against SAO Defendants).................................. 111

AS AND FOR A SIXTEENTH CLAIM FOR RELIEF Florida Common Law/ Malicious Prosecution for Carey-Shuler Case (Against SAO Defendants)............................ 111

AS AND FOR A SEVENTEENTH CLAIM FOR RELIEF Florida Common Law/ Malicious Prosecution for Codina Case (Against SAO Defendants) ......................... 112

AS AND FOR AN EIGHTEENTH CLAIM FOR RELIEF Florida Common Law/ Intentional Infliction of Emotional Distress (Against all Defendants) ....................... 113

AS AND FOR A NINETEENTH CLAIM FOR RELIEF Florida Common Law/Negligent Hiring, Discipline, Training, Retention, and Supervision (Against Rundle)............................ 113

PRAYER FOR RELIEF .................................................................................................115

Plaintiff Michelle Spence-Jones ("Spence-Jones" or "Plaintiff"), by her attorneys Emery Celli Brinckerhoff & Abady LLP, Charles J. Ogletree, and Ray Taseff, P.A., for her Complaint alleges as follows:

## PRELIMINARY STATEMENT

1.      This case arises from a shocking, nefarious scheme by Miami Mayor Tomás Regalado and State Attorney Katherine Fernandez Rundle to remove Commissioner Michelle Spence-Jones from her elected position as Miami City Commissioner.  Serving as the investigatory, police, and prosecutorial arm of the Mayor, Rundle, aided by assistant prosecutor Richard Scruggs and investigator Robert Fielder, manufactured false evidence, hid and withheld exculpatory evidence, intimidated and manipulated witnesses, defamed Spence-Jones, and repeatedly attempted to manipulate the political process, in a corrupt attempt to remove, arrest, imprison, and forever ruin a dedicated Miami public servant.  And when the scheme unraveled, when the witnesses realized they had been lied to, when the exonerative evidence could no longer be suppressed, Rundle and her team covered up their own wrongdoing, recklessly and falsely accusing Spence-Jones and her well-respected defense counsel of yet more crimes, to the entire world.[1]

2.      The primary players in this fraudulent enterprise were, first, the Mayor of Miami, Tomás Regalado, Spence-Jones' political rival, who was unable to control Spence-Jones' critical vote on the powerful Miami City Commission.  Second, State Attorney Katherine Fernandez Rundle, Regalado's friend and political ally, who shared a web of cozy connections and dealings with the Mayor.  Rundle took a personal interest in the downfall of Spence-Jones, repeatedly defaming her in public, overseeing her investigations and arrests, and manipulating the criminal process and interfering in internal Commission politics to keep Spence-Jones off the

_____
[1] A summary timeline of the scheme is attached as Exhibit A to the Complaint.

1

Commission.  In the notorious assistant prosecutor Richard Scruggs, Rundle found the perfect

right-hand man to destroy Spence-Jones.  Scruggs had been criminally charged by a foreign

government, found "clearly negligent" by the U.S. Department of Justice for his handling of the

Waco investigation, criticized by Florida courts for "very unprofessional" conduct and

withholding of evidence from the defense, and even carried a personal vendetta against Spence-

Jones' defense lawyer.  In their efforts, Rundle and Scruggs were aided by their investigator,

Robert Fielder.

   3. This civil rights action seeks damages for defendants' conspiracy, a

conspiracy that involved, *inter alia*, manufacturing evidence and concocting baseless corruption

charges in two separate cases: the Armando Codina case, and the Barbara Carey-Shuler case.

   4. In the Codina case, the Office of the State Attorney for Miami-Dade

County (SAO) told Codina that Spence-Jones was a thief, had stolen his money, and had induced

him to contribute to a non-existent charity as part of a non-existent charity event.  Each and

every statement was a deliberate lie.  There was a charity, there was a charity event, the money

was deposited with one of the most well-respected foundations in Florida, and Spence-Jones

stole nothing.  But it took years to unravel these lies, years while Spence-Jones remained falsely

accused of bribery and grand theft, years while she remained off the Commission.  When Codina

finally learned about the SAO's deception, he publicly pronounced the prosecutor a "serial liar."

   5. In the Carey-Shuler case, the SAO had definitive proof—including

handwritten drafts—that Miami Dade County Commissioner Carey-Shuler had authorized

payment to a company affiliated with Spence-Jones for a neighborhood rebuilding project.

Instead, the SAO hid the documents and falsely told Carey-Shuler that Spence-Jones had forged

her name and stolen from Miami-Dade County, too.  It took years to unravel these lies, years of

persistent, dogged investigation by Spence-Jones' lawyer, Peter Raben, years while Spence-Jones remained falsely accused of grand theft, years while she remained off the Commission.  As Carey-Shuler's lawyer later said after defendants' scheme unraveled, the SAO "lied to her [Carey-Shuler]," too.

6.      Defendants perpetrated quite a scheme: two contrived political corruption cases, both relying on a star witness the SAO Defendants lied to and manipulated, both who later learned that prosecutors tricked and defrauded them.  But the goal in both cases was the same: remove Spence-Jones from the Commission, and ruin her as a potent political force and rival of the Mayor.

7.      What was the ultimate result of this fraudulent scheme?  In the Codina case, after an over two-week trial, a jury acquitted Spence-Jones in fewer than 90 minutes.  In the Carey-Shuler case, even after Carey-Shuler learned the truth and testified under oath there was *no* theft, defendants dragged the case for over *a year*, in a Regalado-induced bid to keep Spence-Jones off the Commission for as long as possible.  Then the SAO tried to extort Spence-Jones to make a public admission that the prosecution was "fair," as a condition of dismissing the fraudulent case.

8.      When defendants were finally forced to dismiss the non-existent Carey-Shuler case, they lied again, in the now-infamous "Closeout Memo" accusing Spence-Jones and Raben of forging and planting the Carey-Shuler drafts into an "empty" file—another defamatory attempt to ruin Spence-Jones' good name and cover up defendants' own fraudulent scheme.

9.      Even by the sometimes sordid standards of Miami politics, the Rundle-Regalado conspiracy stands out for its brazenness.  As a result of defendants' prosecution-laden brand of power politics, Spence-Jones' life was virtually destroyed.  She lost her liberty, her job,

her reputation.  Her constituents lost a powerful voice for the people of Miami.  For nearly two

long, lonely years, Michelle Spence-Jones fought to reclaim her liberty and her good name.

Now, it is time the people who perpetrated this outrageous injustice finally be held to account.

10.     Spence-Jones brings this civil rights action seeking damages for

defendants' violations of her rights, privileges, and immunities under the United States

Constitution, the Civil Rights Act of 1871, 42 U.S.C. § 1983, the Racketeer Influenced and

Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 ("RICO") and its Florida counterpart, the

Civil Remedies for Criminal Practices Act ("Florida RICO"), Title 45 of the Florida Code, §

772.101-19, and Florida common law.

## JURISDICTION AND VENUE

11.     This action arises under the First, Fourth and Fourteenth Amendments to

the United States Constitution, 42 U.S.C. §§ 1983 and 1988, 18 U.S.C. §§ 1961-1968, Title 45 of

the Florida Code, § 772.104, and Florida common law.

12.     The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331,

1343(a) (3) and (4), 1367(a), and the doctrine of supplemental jurisdiction.

13.     A substantial part of the acts complained of occurred in the Southern

District of Florida, and venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b).

14.     On February 14, 2012, pursuant to Chapter 768, Florida Statutes, Plaintiff

served by certified mail a written Notice of Intent to File a Claim upon the Office of the State

Attorney, 1350 N.W. 12 Ave, Miami, Florida and the Department of Financial Services, 200 East

Gaines Street, Tallahassee, Florida.

15.      At least six months have elapsed since the service of the notice of claim,

and adjustment or payment of the claim has been neglected or refused.

4

## JURY DEMAND

16.     Plaintiff demands a trial by jury.

## PARTIES

17.     Plaintiff Michelle Spence-Jones is a resident of Miami, Florida and the City Commissioner representing District 5 in Miami.

18.     Defendant Katherine Fernandez Rundle was at all times relevant hereto the State Attorney for Miami-Dade County.  She personally led and directed the fraudulent investigations, arrests, seizures, detention, imprisonment, and prosecutions of Spence-Jones.  She led frequent meetings and conference calls concerning the Spence-Jones conspiracy.  On information and belief, a number of phone calls and emails between Rundle, Scruggs and others advancing the conspiracy crossed state lines.  She is being sued in her personal capacity.

19.     Defendant William Richard Scruggs was at all times relevant hereto the Special Assistant to the State Attorney for Public Corruption, at the Office of the State Attorney for Miami-Dade County, employed by Rundle.  Scruggs' appointment was unusual: rather than reporting through the normal chain of command at the SAO, he reported directly to Rundle.  He directed and participated in the fraudulent investigations, arrests, seizures, detention, imprisonment, and prosecutions of Spence-Jones.  He is being sued in his personal capacity.

20.     Throughout the Carey-Shuler and the Codina cases set forth below, Rundle and Scruggs not only directed the prosecutions.  They ran and directed the criminal investigations, arrests, seizures, and imprisonment of Spence-Jones, serving the traditional functions and role of the police.  Rundle and/or Scruggs interviewed witnesses and took witness statements, gathered, manipulated, and hid evidence, and ordered Spence-Jones' arrests, seizures, detention, and imprisonment.

21.     Defendant Robert Fielder was at all times relevant hereto a State Attorney Investigator at the Office of the State Attorney for Miami-Dade County, employed by Rundle, and acting within the scope of his employment as such.  Prior to joining the State Attorney's Office, he was a police officer with the City of Miami Police Department for twenty-nine years. Fielder was the lead investigator in both cases against Spence-Jones.  Fielder was no independent investigator working for a police department or agency outside the SAO.  To the contrary, he worked at the speed, pleasure, and direction of Rundle and Scruggs, at the SAO.  He participated in and furthered the fraudulent investigations, arrests, seizures, detention, imprisonment, and prosecutions of Spence-Jones.  He is being sued in his personal capacity.

22.     Rundle, Scruggs and Fielder will be collectively referred to herein as the "SAO Defendants."

23.     Defendant Tomás Regalado is the Mayor of the City of Miami, acting under color of state law.  He is being sued in his personal capacity.

## STATEMENT OF FACTS

***Spence-Jones Is Elected Commissioner; Popular with Her Constituents, Unpopular with Regalado***

24.     In 2005, Spence-Jones was elected Commissioner for District 5 in the City of Miami.

25.     In that election, Spence-Jones defeated Richard Dunn in a run-off vote.

26.     The Miami City Commission ("Commission") is a powerful and important legislative body in Miami.  The Commission can pass ordinances and adopt regulations.

27.     There are only five commissioners in Miami, each serving one of five districts in the City of Miami.

28.     Commissioners are re-elected every four years.

29.     District 5 is largely African-American, and one of the poorest districts in the City of Miami.

30.     Spence-Jones, who is also African-American, was a powerful voice for her community.  She quickly developed a reputation for independence and loyalty to her constituents, often fighting powerful, moneyed, and entrenched interests for the sake of what she believed to be the good of her District and the City.

31.     From late 2001 through 2009, Manny Diaz was the Mayor of Miami. During part of his tenure, and before Spence-Jones was elected a Commissioner, she worked for Mayor Diaz as a city employee.

32.     When Spence-Jones became Commissioner in 2005, she and Mayor Diaz were political allies.

33.     For example, Spence-Jones and Diaz worked together on low-income housing and economic development projects in Spence-Jones' district and on parks initiatives.

34.     Regalado also served as a City Commissioner during the 2005-2009 period.

35.     Regalado came from a somewhat different school of politics than Spence-Jones, a school based on friendship, patronage, and political favors.

36.     Regalado and Diaz became political enemies, and fought frequently during Regalado's tenure on the Commission.

37.     Regalado was known as "Dr. No" on the dais: if Diaz and Spence-Jones favored a Commission resolution or ordinance, Regalado was likely to vote "no."

38.     The Commission had a delicate balance of power during the 2005-2009 period.  A majority of three out of five votes was necessary to carry an item, and Spence-Jones

was usually the swing vote on major issues before the Commission.  Commissioners Angel

Gonzalez and Joe Sanchez were usually on the side of Mayor Diaz; Regalado and Marc Sarnoff

(elected in November 2006) were usually on the other side.  With Spence-Jones' swing vote,

Mayor Diaz' initiatives usually carried the day.

39.     In short, Spence-Jones was often the key vote on the Commission, on

important issues such as the Marlins stadium.

### The Office of the State Attorney: Rundle for Over 19 Years

40.     The Miami-Dade Office of the State Attorney, 11th Judicial Circuit, is the

prosecutorial office in Miami-Dade County, which includes the City of Miami.

41.     On March 12, 1993, after being appointed to succeed Janet Reno (who left

the position to become President Clinton's Attorney General), Kathleen Fernandez Rundle

became the State Attorney, the top official at the SAO.

42.     Rundle's office, however, is an elected position.  Since 1993, Rundle has

been dependent on votes to maintain and continue her position as the State Attorney.

43.     Rundle has now been the State Attorney in charge of the SAO for over

nineteen years.  Rundle is the employer of all SAO employees, including Scruggs and Fielder.

44.     As the State Attorney, Rundle has had responsibility for overseeing every

aspect of the SAO, including investigations run by Scruggs.  Scruggs was a high-ranking

prosecutor in the SAO's public corruption unit until shortly after the SAO's high-profile losses in

the two cases against Michelle Spence-Jones.

### Regalado and Rundle: A Team

45.     Rundle was and is a close political ally of Regalado.  They shared political

interests, staff, and as set forth below, have enjoyed a mutually beneficial relationship.

46.     For example, Rundle and Regalado shared the same campaign consultant, Armando Gutierrez.  Gutierrez was a long-time campaign consultant for Rundle.  Gutierrez was Regalado's campaign manager in his Mayoral race.

47.     Rundle's close family friend, Ada Rojas, was also Regalado's Community Relations Coordinator.

48.     On information and belief, Regalado attended a fundraiser for Rundle, and they have appeared together at press conferences and other functions in Miami.

49.     On information and belief, Regalado has previously promoted Rundle on the radio, and Rundle appeared on Regalado's radio program.  A popular Mayor, Regalado was an important politician whose voters, constituency, and support were very useful to Rundle, herself an elected official.

50.     Regalado and Rundle's special relationship has apparently progressed to the point of mutually beneficial, and highly questionable, *quid pro quo* arrangements.

51.     For example, Rundle has repeatedly refused to properly investigate allegations of criminality concerning Regalado.

52.     In October 1999, Rundle closed out an investigation into allegations of grand theft based on the alleged misuse of a gas credit card by then-Commissioner Regalado.

53.     When Regalado first learned of the investigation he panicked, recognizing that he was in legal and political jeopardy.

54.     The SAO's investigation found evidence of a "serious" issue concerning numerous charges to Regalado's City-issued gas credit card from outside Miami's borders, charges for which Regalado had no explanation, as well as a "discrepancy" in the amount of gas purchases as compared to the miles driven.

9

55.     Yet Rundle closed the investigation without charging Regalado.  She justified some of the discrepancies as caused by Regalado's use of a gas-guzzling utility vehicle.

56.     This was hardly the only time Rundle used her office to help Regalado. For example, during street protests over the Elian Gonzalez case, then-Commissioner Regalado assaulted a Miami police officer.  Although the incident was videotaped and the videotape was widely circulated in the news media, Rundle did not direct any arrest, notwithstanding probable cause to charge Regalado with a crime.

57.     Regalado was only too happy to return the favor.  For example, Regalado secretly pressed for a Commission resolution to rename a 56-block road in the heart of Miami in Rundle's honor.

58.     In 2008, the Florida State legislature passed a bill renaming of a portion of NW/SW 12th Avenue in Miami as "Katherine Fernandez Rundle Avenue."

59.     The Miami City Commission was required to ratify the renaming before the Florida Department of Transportation could post the new street signs.

60.     The Commission did not ratify the bill in 2008, 2009, or 2010.

61.     After the issue lay fallow for three years, Rundle's office secretly asked Regalado to ensure that the Commission ratify the bill.

62.     On January 18, 2011, Regalado secretly emailed the Deputy City Manager for the City of Miami to have the City Commission pass a resolution naming the avenue after Rundle.

63.     In his email, Regalado pressed to "place [the Resolution] in the consent agenda for [the] next commission meeting."

10

64.     Per Regalado's demand, the item was placed on the March 10, 2011 City Commission agenda.

65.     When questioned by the *Miami Herald*, however, Regalado falsely denied having any role in the renaming of "Katherine Fernandez Rundle Avenue."

66.     Ultimately, Regalado's role was revealed when the press obtained his January 18, 2011 email.

67.     On March 10, 2011, the Commission voted 3-0 to approve the renaming of Katherine Fernandez Rundle Avenue.  Rundle was the chief prosecutor in the jurisdiction that included the Mayor and the Commission.

68.     Just months after Regalado shepherded the renaming of "Katherine Fernandez Rundle Avenue," Regalado was once again in criminal jeopardy.

69.     In September 2011, after an investigation into campaign finance violations by Mayor Regalado and Raquel Regalado, his daughter and campaign finance manager, the Florida Department of Law Enforcement (FDLE) issued a report detailing the findings from its investigation.

70.     The FDLE investigation revealed blatant and criminal campaign violations that included forging campaign finance reports.

71.     A Forensic Auditor with the Miami-Dade Commission on Ethics and Public Trust (COE) outlined six violations of Chapter 106, Florida Statutes by Regalado and his daughter.

72.     COE Director Joseph Centorino (a former prosecutor at the SAO) and SAO Assistant State Attorney Howard Rosen both believed that Regalado had acted "in apparent willful disregard for the rule of law."

11

73.     Rundle had previously recused herself from investigations of other politicians with whom she was close, including then-Mayor Joe Carollo, former City Manager Donald Warshaw, and then-City Commissioner Johnny Winton.

74.     But Rundle did not recuse herself in the Regalado case.

75.     To the contrary, Rundle assumed responsibility for the investigation of her friend, ally, and recent road-renaming benefactor.

76.     Despite substantial evidence of Regalado's criminal wrongdoing, and the opinions of the Director of the Miami-Dade Commission on Ethics and Public Trust and her own Assistant State Attorney, Rundle did not file charges against Regalado.

77.     Instead, Mayor Regalado and Raquel Regalado "agreed to pay a fine that was agreed at $5,000 each for the violations enumerated," as a civil penalty, without any criminal charge.

78.     Rundle took no steps to force Regalado to resign.

79.     In marked contrast, when Rundle believed that then-Miami-Dade County Commissioner Bruce Kaplan had violated financial disclosure rules, she extracted Kaplan's resignation and a promise not to seek reelection as part of a plea bargain.

80.     In short, even as Rundle concocted a false bribery charge against Spence-Jones related to a street naming, *see infra*, Rundle herself failed to pursue any criminal charges against the very Mayor who had just helped rename an avenue after *herself*, notwithstanding his "apparent willful disregard for the rule of law."

### *Scruggs' History of Troubled Prosecutions*

81.     Rundle's right-hand man in the Spence-Jones cases, Richard Scruggs, was the Special Assistant to the State Attorney for Public Corruption, at the SAO.

12

82.     Scruggs himself had a long and troubled history of prosecutorial misconduct and unprofessionalism.

### The Costa Rica Fiasco: Scruggs Is Criminally Charged

83.     For example, in 1993, the Costa Rican government filed criminal charges against Scruggs.

84.     The charges stemmed from then-U.S. Deputy Attorney General Scruggs' involvement in a botched attempt to extradite the suspected leader of a cocaine smuggling operation, Israel Abel.

85.     Abel claimed that Scruggs kidnapped him in Costa Rica; the Costa Rican government agreed.

86.     In 1993, the Costa Rican government filed three protests against the American government.

87.     The Costa Rican government also filed criminal charges against Scruggs.

88.     To date, Scruggs has refused to return to Costa Rica to face those criminal charges.

### The Waco Fiasco: Scruggs Is "Clearly Negligent"

89.     In addition, the United States Department of Justice (DOJ) castigated Scruggs for his failure, as a Deputy Attorney General, to perform a proper investigation into the 1993 confrontation between the FBI and the Branch Davidians in Waco, Texas.

90.     Scruggs was the principal author of an October 1993 DOJ report into the confrontation, known as the "Scruggs Report." Among other findings, the "Scruggs Report" concluded that pyrotechnic devices used by the FBI during the raid were "nonincendiary." Scruggs also repeatedly told members of the House Committee on Government Reform and

13

Oversight and the House Judiciary Committee that no pyrotechnic devices were used at Waco in 1993.

91.     The Scruggs Report was false.

92.     In November 2000, the DOJ Office of Special Counsel prepared a final report regarding the Waco stand-off.

93.     The final DOJ report was a scathing critique of Scruggs: "The failure of the Scruggs team to discover and report that the FBI used pyrotechnic tear gas rounds was the result of initiating the investigation with the assumption that the FBI had done nothing wrong, was inconsistent with the responsibility to conduct a thorough and complete investigation, and was clearly negligent."

### Rundle Hires Scruggs As Her Special Assistant

94.     Notwithstanding the above, in 2003, Rundle hired Scruggs to work in the SAO.  Rundle decided that Scruggs—an apparent fugitive whom DOJ had declared "clearly negligent"—should be her Special Assistant to the State Attorney for Public Corruption.

95.     The appointment was somewhat unusual.  Rundle hired Scruggs outside the regular chain of command within the SAO, instead hiring him as her own special assistant in public corruption cases.  As a result, there was a direct chain of command from Scruggs to Rundle, and Scruggs reported directly to Rundle.

96.     Rundle knew that Scruggs was an unethical prosecutor who did whatever it took to secure a conviction.  At least one high-level official at the SAO admitted that there have been numerous complaints about Scruggs' misconduct.  On information and belief, Rundle has refused to act on those complaints.

97.     Indeed, Rundle was judicious in assigning Scruggs to cases: Where Rundle investigated and prosecuted a high-level political opponent (as in the Spence-Jones case), she generally assigned the case to Scruggs.  Yet where the target of an SAO investigation was Rundle's political ally, Rundle would ensure Scruggs was not on the case.

***The Gaston Smith Fiasco: "Very Unprofessional" Withholding of Evidence***

98.     In 2009, working for Rundle, Scruggs was again castigated, this time by Florida Circuit Court Judge Beatrice Butchko, for his role in the Rev. Gaston Smith case.

99.     Judge Butchko reprimanded Scruggs for his involvement in an investigation where a Miami-Dade police detective, Detective Garcia (also involved in the Spence-Jones investigation) had unlawfully secretly recorded conversations between criminal defense attorneys, their client, and the prosecution.  *See Florida v. Smith*, No. F08003920, slip op. at 11 (Fla. Cir. Ct. Dec. 4, 2009).  When Scruggs learned of the secret taping, he did not promptly disclose the information to the defense.

100.    Judge Butchko called Scruggs' failure to disclose the secret recordings "very unprofessional." *Id.* at 12.

101.    Judge Butchko stated that Scruggs' failure to document the date when the secret recordings were disclosed to him was "unacceptable." *Id.* at 12.

102.    In further foreshadowing of his later misconduct in the Carey-Shuler case, Scruggs admitted that he "avoid[ed] . . . a full disclosure of his boxes" by directing a reporter to what Scruggs allegedly "thought was relevant." *Id.* at 17.

103.    The court expressed disbelief that Scruggs "testified in court that [he] intentionally tried to get around complying with a lawful public records request, because [he

15

does not] like the practice." *Id.* at 16.  Judge Butchko described Scruggs' violation of the Florida

Public Records Act as "very bad."

   104. Judge Butchko also stressed that it was "very improper" for Scruggs to

discuss the case with reporters on matters unrelated to the prosecution of Smith.  *Id.* at 17.

   ***The Berry/Smith Fiasco: More Withholding of Evidence from the Defense***

   105. In 2012, Scruggs was involved in yet another case involving a failure to

disclose important evidence to the defense.

   106. Cliff Berry, Inc. and Jeffrey C. Smith were found guilty of two counts of

grand theft.  The defendants later filed an appeal, *inter alia*, because Scruggs failed to disclose

that the testimony by the State's key witness had changed substantially from deposition to trial.

   107. The Florida Third District Court of Appeal reversed the criminal

conviction against the defendants because, *inter alia*, Scruggs and the SAO "failed to notify the

defense that [the key prosecution witness'] testimony had changed until after [he] began

testifying" at trial, violating a Florida disclosure rule.  *See Cliff Berry, Inc. v. Florida*, No. 3D09-

389, 2012 WL 10846, at *12, 14, 16 (Fla. Dist. Ct. App. Jan. 4, 2012).

   108. The appellate court noted that Scruggs was quite aware of the changes to

the key witness' testimony before the witness took the stand, but failed to notify the defense until

after the witness had begun testifying.  *See id.* at *12.  Even then, the disclosure was not made on

the record and included only a general statement regarding the changes to the testimony.  *See id.*

**Defendants Prepare Their Scheme to Arrest Spence-Jones and Kick Her off the**
**Commission**

   109. With this understanding of Regalado, Rundle, and Scruggs, we turn to the

defendants' scheme to remove Spence-Jones from the Commission and eliminate her as an

opponent of the Mayor.

110.    In the fall of 2009, then-Commissioner Regalado was running to be Mayor of the City of Miami, and Spence-Jones was running for re-election as a District 5 Commissioner, both elections to occur on November 3, 2009.

111.    Regalado was not merely running for Mayor.  Aided by Rundle and the SAO, Regalado was also scheming to control the Commission.

112.    On multiple occasions in the fall of 2009, during election season, the SAO's office contacted the City of Miami Office of the City Attorney concerning numerous internal Commission matters, including the procedure for filling a vacancy on the City Commission under the Miami City Charter, how many Commissioners would constitute a quorum sufficient to replace any Commissioners that were suspended, and when an elected Commissioner's term of office officially begins.

113.    The SAO had no legitimate reason to contact the Office of the City Attorney about any of these questions.

114.    For example, in or about August/September 2009, SAO Chief Deputy Jose Arrojo contacted a high-level lawyer at the Office of the City Attorney to schedule a meeting.

115.    At the SAO, Arrojo was the Chief Assistant of Special Prosecutions, reporting directly to Rundle.

116.    Arrojo requested that the meeting be discreet and secret.

117.    At the meeting, Arrojo asked pointed questions concerning the Miami City Charter's provisions for filling a vacancy on the City Commission, including the appointment process, special elections, and how many Commissioners would constitute a quorum.

118.    This meeting was unusual and unprecedented.

119.     After the "discreet" Arrojo meeting, another SAO prosecutor, Angelica Zayas, an appellate attorney at the SAO, called a high-level lawyer at the Office of the City Attorney, again with questions concerning the Miami City Charter's provisions for filling vacancies on the City Commission.  Specifically, Zayas was concerned about whether two Commissioners could constitute a quorum sufficient to appoint other Commissioners.

120.     On information and belief, Rundle personally directed Arrojo and Zayas to make these inquiries.

121.     In the weeks preceding the November 3, 2009 election, Rundle herself called the City Attorney for the City of Miami, Julie Bru.  Ms. Bru was the highest ranking lawyer in the legal office for the City of Miami.

122.     Rundle asked Bru, *inter alia*, exactly when a City Commissioner takes office after an election pursuant to the Miami City Charter.  (Under the Charter, a Commissioner takes office five days after the canvas of the ballots).

123.     Rundle had no legitimate reason to call Bru about any of these internal Commission matters.

124.     The SAO had no legitimate reason to call the Office of the City Attorney about any of these internal Commission matters.

125.     In these various conversations, the Office of the City Attorney informed Rundle and her team that, under the Miami City Charter, if a Commissioner were suspended prior to the November 3, 2009 election, the suspension would only be in effect until the seat was filled in that election.  In addition, if a Commissioner were suspended in between the election and the swearing-in, the suspension would only be in effect for the few days until the swearing-

18

in.  However, if a Commissioner were suspended *after* the swearing-in, the suspension would be in effect until the next general election, a year away.

126.    For example, if Spence-Jones were elected on November 3, 2009 and took office on November 12, 2009, she would have to be suspended *after* taking office on November 12, 2009 in order for the suspension to be in effect for a year.  If, however, she were suspended before November 12, the suspension would only last until November 12, at which point she would re-take her suspended seat.

127.    Rundle was keen to know exactly when Spence-Jones would take office. Rundle asked pointed questions as to the precise date after the election that a Commissioner would officially take office.

128.    While Rundle and her team were carefully preparing the timing for Spence-Jones' arrest and suspension from the Commission, Regalado was preparing for Spence-Jones' arrest as well.

129.    For example, on information and belief in August 2009, long before Spence-Jones' arrest, Regalado attended a meeting of the South Florida AFL-CIO in Miami. There, Regalado told the union members that Spence-Jones was "going to jail."

### Spence-Jones is Elected, Sworn-In, and Promptly Arrested and Suspended

130.    On November 3, 2009, Regalado was elected Mayor of the City of Miami.

### Spence-Jones Is Elected

131.    On November 3, 2009, elections for Commissioner were held for Districts 3, 4, and 5 in the City of Miami.  As of November 3, 2009, the state of the Commission was as follows:

132. District 1: Angel Gonzales, who represented District 1, remained a Commissioner and was not up for re-election in November 2009.  Gonzales was a Regalado opponent.

133. District 2: Marc Sarnoff, who represented District 2, remained a Commissioner and was not up for re-election in November 2009.  Sarnoff was a Regalado ally.

134. District 3: On November 3, 2009, Frank Carollo was elected Commissioner for District 3, which had been represented by Joe Sanchez.

135. District 4, which had been represented by Regalado, had no winner by majority vote.  A run-off election between Francis Suarez and Manuel Reyes—who each received between 40% and 45% of the vote—was necessary.

136. District 5: On November 3, 2009, Spence-Jones was re-elected to a four-year term as a Commissioner for District 5, with an overwhelming 82.63% of the vote.

137. Thus, after the November 3, 2009 election, Spence-Jones and Gonzales— both rivals of the Mayor—were slated to fill two seats, Carollo was slated to fill the third, and Sarnoff, a Regalado ally, was slated to fill the fourth.  The remaining seat, District 4, remained open, pending a run-off election.

138. Spence-Jones was due to be sworn into office on November 12, 2009.

139. Defendants, however, had other plans.

140. Regalado and Rundle, with the assistance of Scruggs and Fielder, conspired to arrest Spence-Jones in order to remove Regalado's political opponent from elected office.

141.    Regalado was a driving force behind the scheme to fabricate false charges to remove Spence-Jones from office and continue to pursue those charges even where there was no evidence supporting them.

142.    As part of this fraudulent conspiracy, Rundle, Scruggs and Fielder, *inter alia*, (i) concocted baseless charges by hiding relevant evidence from Carey-Shuler, the critical prosecution witness in the Carey-Shuler case, to cause her to provide unknowingly false testimony; (ii) used that false testimony to file a false arrest affidavit and issue a November 12, 2009 arrest warrant for Spence-Jones; (iii) timed the arrest for maximum political impact; and (iv) planned with the Governor of Florida to ensure that Spence-Jones was removed from office immediately upon being arrested.

143.    The scheme involved not only the Carey-Shuler and Codina frauds which are extensively detailed *infra*, but has also included other baseless investigations of Spence-Jones by the SAO Defendants, over a period of a number of years, in a desperate attempt to produce any evidence which could lead to Spence-Jones' removal from office.

### *Governor Crist*

144.    Days before an arrest warrant was even issued for Spence-Jones, Florida Governor Charlie Crist knew that Spence-Jones was going to be charged and arrested.

145.    On November 10, 2009, two days before Spence-Jones' swearing in, Governor Crist had in his files a document with a picture of Spence-Jones, listing three "felony" charges: "grand theft, organize scheme to defraud, money laundering."

146.    But Spence-Jones had not been charged with any crime as of November 10, 2009.

147.    Rundle's office had alerted Crist that Spence-Jones would be arrested.

148.    Before the arrest, Rundle personally spoke with Governor Crist about removing Spence-Jones from the Commission after her arrest.

149.    Before the arrest, a high-level member of Crist's staff also contacted the Office of the City Attorney, to inquire precisely when an elected Miami City Commissioner would officially take office.

### Regalado Prepares For Spence-Jones' Arrest, and Tries To Destroy a Photograph

150.    Before he was sworn in on November 11, 2009, Regalado was also well aware, via secret communications with Rundle, the SAO, and Crist, that Spence-Jones was going to be charged and arrested.

151.    For example, after November 3, 2009 and, on information and belief, before November 12, 2009, Regalado's new spokesman, Pat Santangelo, was at the Miami television studios of Island TV.  In a conversation there, Santangelo stated that Spence-Jones was going to go to jail on corruption charges.

152.    On November 11, 2009, Regalado was sworn in as Mayor.

153.    Governor Crist decided to attend Regalado's swearing-in ceremony at City Hall.  Shortly before the ceremony, Spence-Jones sought to meet Crist, whom she had never met, and have a photo together.  Spence-Jones was brought to a room in City Hall with, *inter alia*, Regalado and Crist.  Regalado and Crist were quite uncomfortable during the brief meeting.  As between Crist, Regalado, and Spence-Jones, Spence-Jones was the only person unaware that the SAO Defendants were about to arrest her.

154.    An official photographer for the City of Miami took a picture of Spence-Jones, Regalado, and Crist.

22

155.    After the photograph, Spence-Jones left to attend Regalado's swearing-in ceremony.

156.    Regalado later told the City photographer to destroy that photograph.

157.    In the entire career of the City photographer, no public official had ever told him to destroy a photograph.

158.    Regalado's demand was a violation of the Florida Public Records Act. The photograph of these public officials was a public record that could not be destroyed under Florida law.

159.    The photographer, however, disobeyed Regalado's request, and did not destroy the picture.

### Rundle Times Spence-Jones' Arrest for Right After She Is Sworn-In

160.    Between Spence-Jones' election on November 3, and her planned swearing-in on November 12, Rundle was busy perfecting the scheme to arrest and remove Spence-Jones at just the right moment.

161.    During this period, Rundle personally called Julie Bru, seeking to determine the precise date when Spence-Jones' old (2005-2009) term would end, and when her new (2009-2013) term would begin.  Bru informed Rundle that Spence-Jones' new term would not begin until noon on the fifth day after the canvas of the ballots, which would be November 12.

162.    On November 12, 2009, Spence-Jones was sworn into office as City Commissioner for District 5.

163.   *That same day*, just as planned, Rundle and the SAO filed an arrest affidavit and obtained an arrest warrant for Spence-Jones for grand theft, second degree, a felony.

164.   Rundle forwarded Governor Crist the arrest affidavit by email dated November 12, 2009.

165.   On November 13, 2009, Spence-Jones turned herself in.

166.   At the direction of the SAO Defendants, Spence-Jones was arrested, detained, booked, fingerprinted and jailed in a holding cell.

167.   Scruggs asked that corrections officers handcuff Spence-Jones while she was transported to the cell.  Upon information and belief, Scruggs made that request in order to arrange a "perp walk" to further humiliate Spence-Jones.

168.   An employee of the Miami Dade Corrections Department rejected the request to handcuff Spence-Jones and rejected Scruggs' request to transport Spence-Jones outside (*i.e.*, a "perp walk"), saying it was not necessary.

**Rundle Defames Spence-Jones**

169.   On November 13, 2009, Rundle held a press conference.  Earlier that day, the SAO issued a press release—which remains published on the SAO's official website, available to anyone in Florida, the United States, or anywhere in the world with access to the Internet—announcing that press conference.

170.   The press conference served no legitimate prosecutorial purpose.  Rather, the SAO Defendants intended to and did unfairly and improperly defame Spence-Jones, tar her reputation in the community and in the court of public opinion, and attempt to taint the jury pool that would eventually hear the SAO's fraudulent case**.**

24

171.     During the November 13, 2009 press conference, Rundle stated that Spence-Jones is "being charged with theft relating to her acts of re-directing county money for her personal use prior to her becoming a city commissioner, while she was working as a public servant for the City of Miami."

172.     Spence-Jones never committed any "acts" of "re-directing county money for her personal use."  The statement was deliberately and maliciously false and defamatory.

173.     During the press conference, Rundle also stated that Michelle Spence "was not entitled to spend $50,000 that was supposed to go to two other entities for any other purpose."

174.     The statement was deliberately and maliciously false and defamatory.

175.     Spence-Jones never spent money that was "supposed to go to two other entities"; the moneys in question were supposed to go the entity that received those moneys: an entity called Karym.

176.     On November 20, 2009, Rundle—both directly, and through her director of media relations—sent emails to the largest newspaper in Miami, the *Miami Herald*, accusing Spence-Jones of stealing money.

177.     First, Rundle authorized and approved statements sent to *Miami Herald* reporters stating that, in contrast to Spence-Jones, Commissioner Angel Gonzalez "didn't steal any money."

178.     Referring to Spence-Jones, Rundle also wrote: "Why do some public servants steal from the public"?

179.    Later that morning, and apparently not content to defame Spence-Jones to two *Miami Herald* reporters, Rundle personally emailed the same accusations against Spence-Jones to the editor of the *Miami Herald* editorial page.

180.    These were deliberately false and malicious statements.  Spence-Jones did not steal any money or steal from the public.

### Crist Suspends Spence-Jones (Suspension #1)

181.    On November 13, 2009, just one day after Spence-Jones' swearing-in, Governor Crist issued Executive Order 09-248, immediately suspending Spence-Jones from her Commission seat, and depriving District 5 voters of their elected commissioner.  The Executive Order cited, relied upon, and attached a deliberately false November 12, 2009 arrest affidavit of defendant Robert Fielder, an SAO employee and investigator, *see infra*.

182.    Crist's November 13, 2009 Executive Order also prohibited Spence-Jones "from performing any official act, duty, or function of public office; from receiving any pay or allowance; and from being entitled to any of the emoluments or privileges of public office during the period of this suspension; which period shall be from today, until a further Executive Order is issued, or as otherwise provided by law."

183.    By the terms of the Executive Order, Spence-Jones was suspended because of her arrest.

184.    Crist issued the Executive Order suspending Spence-Jones even before an Information or any charging document had been filed against her.

185.    On November 13, 2009, prior to the issuance of the Executive Order, Governor Crist's Deputy General Counsel requested a copy of the non-existent charging

document.  Although there was no Information or Indictment, and no formal criminal charge had been filed against Spence-Jones, Crist suspended Spence-Jones anyway.

186.    The rush to suspend Spence-Jones was irregular at best.  For example, when Cape Coral Commissioner Eric Grill was arrested for three felonies in December 12, 2009, Crist told an Assistant City Attorney that he would not even consider issuing an executive order suspending him until the State Attorney filed formal charges.  Grill was only suspended on February 24, 2010, *after* a formal Information was filed.

### *Rundle and Regalado Attempt to Manipulate the Composition of the Commission*

187.    As set forth below, Spence-Jones' arrest warrant was based on a November 12, 2009 affidavit of defendant Robert Fielder, an SAO employee and investigator, and was approved and filed at the direction of Rundle and Scruggs.

188.    The Fielder affidavit, in turn, was allegedly based on a September 18, 2009 subpoenaed sworn statement by Barbara Carey-Shuler, the product of Fielder and Scruggs' conspiracy to withhold and fabricate evidence.

189.    Rundle and her co-conspirators, however, waited almost two months after the Carey-Shuler statement to arrest Spence-Jones.

### *The Importance of Waiting Until Spence-Jones Was Sworn In Before Arresting and Suspending Her*

190.    The timing of Spence-Jones' arrest – immediately *after* she was sworn in as Commissioner – was no accident.  It was part of defendants' conspiracy to manipulate the Commission for political reasons.

191.    Prosecutors even admitted to the media that the SAO purposefully waited until after Spence-Jones was elected to arrest Spence-Jones.

192.     Defendants' plan was (i) to remove Spence-Jones from the Commission; (ii) to remove Spence-Jones' ally and another Regalado opponent, Commissioner Angel Gonzalez, from the Commission; (iii) the remaining Commissioners aligned with Regalado would appoint Richard Dunn, a Regalado ally, as Commissioner to fill Spence-Jones' seat; and (iv) Regalado-allied Commissioners would appoint Wilfredo Gort as Commissioner to fill Angel Gonzalez' seat.  This would leave Regalado in total control of the Commission, with Sarnoff (the Chair appointed by Regalado), Dunn, and Gort reflecting three controlling votes of the five-member body.

193.     Under Section 12 of the Miami Charter, a "majority of the remaining city commissioners" could fill a vacant Commission seat until the next general or municipal election.

194.     As of Spence-Jones' swearing-in on November 12, 2009, the next general or municipal election was November 2, 2010, almost an entire year away.

195.     Had Spence-Jones been arrested *before* the election or her swearing-in, any temporary appointment filled by the Commission would only have been in effect until the November 2009 election and swearing-in, at which time the voters would have elected Spence-Jones again, by an overwhelming margin.

196.     Defendants therefore had little reason to arrest Spence-Jones before the election, in September or October 2009.  She would have simply re-filled her own seat.

197.     By waiting until *after* the November 2009 election and swearing-in to arrest Spence-Jones, however, defendants could ensure that the temporary appointments by the Regalado-allied Commission would be in effect for an entire year, until November 2010.

198.     Absent Spence-Jones and Gonzalez, the "majority of the remaining city commissioners" would have been controlled by Regalado and his allies.

### *A Snag: No Quorum to Replace Spence-Jones; a Ten-Day Deadline Expires*

199.    Defendants' nefarious scheme almost worked.

200.    As noted, on November 12, the SAO Defendants arrested Spence-Jones after she was sworn in, and on November 13, Crist suspended her.

201.    Also on November 13, Rundle announced the charges against Commissioner Gonzalez.  As part of the express terms of a plea deal with the SAO, Commissioner Gonzalez (i) resigned from office, effective November 16; (ii) agreed not to be a candidate in any special election to fill his own vacant seat; and (iii) agreed not to be a candidate for any county, state, or municipal office "through the close of the year 2010."

202.    Thus, as of November 13, 2009, defendants successfully removed both Spence-Jones and Gonzalez from office, leaving Commissioners Frank Carollo and Marc Sarnoff.

203.    Defendants' plan, however, hit a snag.  At the time of Spence-Jones' removal and Gonzalez' forced resignation, District 4 remained open, because of the pending run-off election between Francis Suarez and candidate Manuel Reyes.

204.    Thus, as of November 13, instead of three sitting commissioners on the Commission, there were only two.

205.    Absent a quorum of three, the Commission could not vote at all, much less appoint Regalado's allies to replace Spence-Jones and Gonzalez.

206.    In addition, under the Miami Charter, the Commission had only 10 days from Spence-Jones' removal, until November 23, 2009, to appoint a replacement for Spence-Jones.  If the 10 days lapsed, the people of District 5 would have another opportunity to vote in a special election for District 5 Commissioner.

207.    Even worse from defendants' perspective, the people of District 5 would have another opportunity to vote *for Spence-Jones*.

208.    This political development—the lack of a quorum on the Commission due to the run-off in District 4—was of great concern to Rundle and her co-conspirators.

209.    Far from being a disinterested prosecutor, Rundle abandoned her function as prosecutor and sought to intervene to fill the empty Commission seats.

### *Rundle Tries to Manipulate Bru and the Commission*

210.    Rundle once again called the City Attorney for the City of Miami, Julie Bru.

211.    Rundle had no legitimate reason to call Ms. Bru.

212.    Rundle asked Bru to contact Gonzalez and persuade him to return temporarily to the Commission on Saturday November 14, 2009, before the effective date of his resignation.

213.    Rundle wanted Gonzalez to return temporarily in order to create a three-Commissioner quorum, so that the Commission could appoint Regalado's hand-picked successor to Spence-Jones.

214.    Bru did call Gonzalez, and Gonzalez refused.

215.    Rundle had no legitimate reason to attempt to influence Ms. Bru on a Commission matter, to create a quorum on the Commission, or to help Regalado pick his ally to fill Spence-Jones' seat.

### *Rundle and Regalado Team Up to Pressure Gonzalez and Manipulate the Commission*

216.    Once again acting far beyond the scope of any prosecutor, Rundle also called her co-conspirator, Regalado, and asked him personally to pressure Gonzalez to return to

the Commission in order to create a quorum.  Again, the purpose was to permit the Commission

to replace Spence-Jones and avoid a special election in which Spence-Jones would inevitably be

returned to her Commission seat.

217.    After the call, Regalado did contact Gonzalez, and met him at a golf

course.  There, he pressured Gonzalez to return to the Commission to create a quorum.

218.    Gonzalez again refused.

### *Regalado Tries to Manipulate Bru and the Commission*

219.    Having failed to manipulate Gonzalez to return to the Commission despite

the plea deal Rundle orchestrated, and having failed to manipulate the composition of the

Commission to favor her co-conspirator Regalado, Rundle and Regalado took yet another tack as

part of their continuing conspiracy to control the City Commission.

220.    Regalado summoned Bru to a secret meeting at City Hall, on the weekend

of November 14-15, 2009.

221.    Such a meeting was unprecedented.

222.    At the meeting were Regalado, Bru, and a City Commissioner.

223.    At the meeting, Regalado pressured Bru to disregard the Miami Charter

and opine that the Commission, even *absent* a quorum, could appoint a commissioner to fill

Spence-Jones' seat.

224.    Bru refused.

225.    On November 16, 2009, Bru opined that the Commission could not

appoint Spence-Jones' replacement, because two commissioners are not a quorum.

226.    On November 17, 2009, Francis Suarez, an ally of Regalado, won the run-

off election for Commissioner for District 4.

31

227.    According to published reports, Regalado then allegedly pressured Miami city clerk Priscilla Thompson to expedite the certification results of the Suarez/Reyes runoff so that the winner could be sworn in immediately, creating a three-member quorum to appoint Spence-Jones' replacement before the ten-day deadline, on November 23.  Thompson refused.

228.    According to published reports, Regalado than pressured Bru again, this time to opine that State Governor Crist could appoint Spence-Jones' replacement on the City Commission.  According to published reports, Bru acquiesced this time, but Crist did not appoint a replacement.

229.    On November 25, 2009, Suarez was sworn in.

230.    As of November 25, the Commission finally had a quorum: Suarez, Sarnoff, and Carollo.

231.    But it was too late.  The ten-day period under the Miami Charter to appoint Spence-Jones' replacement lapsed on November 23, 2009.  The Commission was forced to call a special election to fill Spence-Jones' seat.

232.    On November 25, 2009, the Commission scheduled District 5's special election for January 12, 2010.

233.    On November 25, 2009, the Commission also voted to schedule a special election to fill Gonzalez' District 1 seat.  Apparently Regalado's plan to appoint Gonzalez' replacement also failed, because, *inter alia*, a member of the Commission publicly admitted to discussing the replacement with other Commissioners in private, violating Florida's sunshine law, and tainting any potential attempt by the Commission to appoint Gonzalez' replacement.

234.    On November 25, 2009, Regalado appointed his ally, Commissioner Sarnoff, to be Chair of the Commission.  By tradition, as the ranking member of the

Commission, but for her arrest and suspension, Spence-Jones should have been appointed as Chair.

### The Carey-Shuler Charge: Baseless and Based on Fabricated Evidence

235.    How did defendants engineer Spence-Jones' removal in the first place? To manufacture and time this baseless arrest in order to remove Spence-Jones from office on November 13, 2009, the SAO Defendants, *inter alia*: (i) withheld *the* single two most important documents in the case—which definitively disproved the baseless grand theft charge—from the chief prosecution witness, Barbara Carey-Shuler; (ii) fabricated evidence in an attempt to manufacture probable cause, by lying to, threatening, and manipulating Carey-Shuler to induce her to give an apparently unknowingly false statement that became the basis for Spence-Jones' arrest; (iii) withheld those same crucial documents from Spence-Jones and her counsel; (iv) affirmatively stated that all relevant documents had been produced to Spence-Jones and actively opposed a public records request seeking access to Carey-Shuler's file boxes containing these two critical documents; and (v) filed a knowingly false arrest affidavit that relied on the manufactured, false statement and withheld and concealed exculpatory evidence that disproved the fabricated charge.

236.    After the documents were finally revealed and the defendants' Carey-Shuler-related fraud was exposed, Rundle and Scruggs attempted to cover up their own fraud by claiming, falsely and maliciously, that Spence-Jones and her counsel fabricated, forged, and planted these two exonerative documents in the County file.

237.    Throughout, Rundle took an unusually direct role and personal interest and involvement in the handling of the case, and later, the Codina case.  When it came to Spence-Jones, Rundle was not simply a chief prosecutor merely overseeing the general running

33

of a prosecutor's office.  To the contrary, as part of the conspiracy with her co-defendants,

Rundle personally directed the investigations and prosecutions   Instead of assigning the Spence-

Jones investigations through the regular chain of command at the SAO, Rundle selected Scruggs,

her Assistant who reported directly to her, to run both investigations.  Rundle regularly

scheduled meetings and calls with Scruggs, Fielder, and others, specifically to direct both

Spence-Jones investigations and prosecutions.  Rundle personally approved, directed, and timed

Spence-Jones' false arrest, seizure, and detention, long before there was any criminal

prosecution—an arrest that immediately caused Spence-Jones' suspension from the Commission

just after she was sworn-in to office.  Rundle personally and repeatedly interfered with and

manipulated both the political process and the criminal process to remove Spence-Jones from the

Commission, keep Spence-Jones off the Commission, and remove Spence-Jones as a political

rival to her friend, ally, and co-conspirator, Regalado, *inter alia*, personally calling Regalado to

pressure Gonzalez to create a Commission quorum and avoid Spence-Jones' re-election, calling

Bru herself to achieve the same purpose, timing Spence-Jones' first arrest to remove her from the

Commission for the maximum period of time after highly unusual inquiries she made (and other

prosecutors made on her behalf) to the City Attorney's office to effectuate that timing, and

personally timing later indictments of Spence-Jones in order to circumvent an imminent state

court ruling reinstating Spence-Jones to the Commission.  Rundle also personally and repeatedly

defamed Spence-Jones to the media, the public, and others, both in public, and privately, as part

of the scheme.  Rundle was personally confronted with evidence that the Carey-Shuler

investigation was a fraud, yet pursued the fabricated case for years.  Rundle later ran meetings

with defense counsel in which, knowing both cases were fabricated, she insisted Spence-Jones

desert her political ambitions on the Commission.  In short, from the beginning, Rundle, acting

as investigator, police officer, and above all, political operative, was herself a mastermind of this nefarious scheme.

### *Carey-Shuler Authorizes $50,000 to Karym*

238.   In September 2004, Dr. Barbara Carey-Shuler was Chairperson of the 13-member Miami-Dade County Commission, which reviews development plans, regulates transportation services and systems, enforces building codes and zoning laws, and manages public health facilities, housing programs and cultural affairs for the unincorporated areas of Miami-Dade County.  In effect, she was in charge of a multibillion dollar County budget.  One of the County Commission's responsibilities was also to fund and recommend budget allocations for the Metro-Miami Action Plan Trust (MMAP), an urban development agency with its own board.

239.   Carey-Shuler and her office received numerous, perhaps hundreds, of budget requests.  One proposal came from Karym Ventures, Inc. ("Karym"), a private company founded by Spence-Jones' family, for a neighborhood revitalization project called Café Soul.  (Spence-Jones had not yet run for City Commissioner.)  Café Soul was an urban development program to stimulate the economy in the predominately African-American Liberty City area of Miami.  It involved a redevelopment of a crack house and had several components: a themed restaurant focusing on southern cuisine, an art gallery, a hair salon and an entertainment space.

240.   Carey-Shuler knew Spence-Jones personally and had confidence that Spence-Jones would make Café Soul a success.

241.   On September 23, 2004, Carey-Shuler recommended that MMAP provide funding for Café Soul.  As part of a long County Commission session involving dozens of budget allocations, the Commission, at least according to some MMAP staff, apparently

recommended, mistakenly, that the funds be directed to two entities partnering with Karym on the project: Timbuktu Marketplace ("Timbuktu") and Osun Village ("Osun").

242.    After Spence-Jones informed Carey-Shuler of the mistake, Carey-Shuler took steps to direct the $50,000 to Karym, the entity meant to oversee the development of the Café Soul project.

243.    Carey-Shuler orally informed the senior contract manager at MMAP, William Simmons, of her intent to direct the $50,000 to Karym.

244.    On January 18, 2005, Simmons sent an email to the Miami-Dade County Attorneys' Office that the MMAP funding was to be paid to "Karym Ventures, Representing Timbuktu Market Place and Osan [sic] Village."

245.    This email was a public record and available to anyone who requested records from MMAP concerning the Karym funding.

246.    Thus, long before Carey-Shuler's written approval, MMAP stated in writing, and the Miami-Dade County Attorneys' Office knew, that Karym was to receive the funds.

247.    Simmons also drafted a confirmatory letter for Carey-Shuler's review and approval.

248.    That original draft was dated January 9, 2005.

249.    Carey-Shuler reviewed the draft and made numerous handwritten edits.

250.    Carey-Shuler changed the "re" line from "Negotiated Budget Items— Karym Ventures, Inc." to read "Re: Café Soul d/b/a/ Karym Ventures, Inc."

251.    Carey-Shuler also edited the first paragraph.  As drafted by Simmons it read: "This letter serves as clarification of my intent regarding funding allocations to Timbuktu

Marketplace, Inc. and Osun Village during budgetary negotiations in September 2004." Carey-Shuler edited the paragraph, adding revisions in her own hand: "This letter serves as clarification of my intent regarding the funding allocations of $25,000 to Timbuktu Marketplace, Inc. and $25,000 to Osun's placed in the September 2004 budget."

252.    Carey-Shuler also edited the second paragraph.  As drafted by Simmons it read: "It was intended for Metro-Miami Action Plan Trust to release funding allocated for Timbuktu Marketplace, Inc. and Osun Village to Karym Ventures Inc.  Karym Ventures Inc. is the company overseeing the development of Café Soul—a commercial development project that includes Timbuktu Marketplace, and is part of the overall Osun's Village project." Carey-Shuler edited the paragraph, adding revisions in her own hand:  *The Metro-Miami Action Plan Trust should release the $50,000 to Karym Ventures Inc.*, the company overseeing the development of Café Soul—a commercial development project that includes Timbuktu Marketplace, as a portion of the overall Osun Village Project (See attachments)."  (Emphasis added).

253.    Carey-Shuler's draft was faxed on February 11, 2005, likely as a fax between Carey-Shuler's home office and her County Commission office.

254.    Carey-Shuler's edits were incorporated into a draft on Carey-Shuler's letterhead dated February 15, 2005.

255.    Carey-Shuler then made further handwritten edits to the February 15, 2005 letter.  She fixed a few typos and wrote a note on top: "It is Kary<u>m</u> or Kary<u>n</u>?"

256.    These two drafts, in Carey-Shuler's own handwriting, made clear her intent to direct $50,000 to Karym.

257.    These two drafts, with Carey-Shuler's handwritten edits, were in a thin file in her records labeled "Café Soul."

37

258.    On February 15, 2005, Carey-Shuler directed the final version of the letter to be signed and sent to MMAP, and requested that MMAP provide the $50,000 to Karym.

### MMAP Approves the Funding to Karym

259.    Ultimately, MMAP's independent board itself had to decide whether to allocate $50,000 to Karym.

260.    On February 16, 2005, MMAP's board voted 10-1 to spend $50,000 in MMAP funds to Karym.

261.    MMAP's vote to authorize $50,000 to Karym was public and widely available.  Any minimally competent investigator or prosecutor investigating the payment to Karym would have known about the MMAP vote.

262.    Defendants have never disputed that MMAP approved payment of $50,000 to Karym.

263.    On March 7, 2005, the Miami-Dade County Attorneys' Office wrote a memo to Simmons at MMAP confirming that MMAP had authorized $50,000 in funding to Karym.

264.    Karym used that money to develop Café Soul.

### The SAO Defendants Hide the Evidence from Carey-Shuler

265.    No later than September 18, 2009, by Scruggs' own admission, the SAO had possession of all of Carey-Shuler's files, including the Café Soul file.

266.    One of the files was labeled, simply, "Café Soul 2005."

267.    The clearly-labeled "Café Soul" file was approximately 31 pages.

268.    The Café Soul file was not empty.

38

269. Rather, it contained the drafts of the letter with Carey-Shuler's handwritten edits and the final signed letter, directing $50,000 to be paid to Karym.

270. The SAO Defendants therefore had both Carey-Shuler's final signed letter and her two drafts with extensive handwritten edits prior to taking a sworn statement of Carey-Shuler on September 18, 2009.

271. By September 18, 2009, Scruggs and Fielder knew or should have known that Carey-Shuler had requested that MMAP release $50,000 in funding to Karym.

272. By September 18, 2009, Scruggs and Fielder, on information and belief, knew that MMAP itself voted to give $50,000 to Karym.

273. Not to be deterred by the truth, the SAO Defendants embarked on a nefarious scheme to fabricate false evidence implicating Spence-Jones and bring false charges based on the fabricated evidence.

274. Specifically, the SAO Defendants perpetrated an outlandish and false story in which Carey-Shuler directed funds to Timbuktu Marketplace and Osun Village, Spence-Jones forged Carey-Shuler's signature and secretly redirected funds to Karym, the MMAP Board's vote authorizing funding to Karym simply disappeared, and then Spence-Jones stole the money. This absolutely fraudulent, fictional, and shameful story was concocted by the SAO Defendants to charge, arrest, imprison, and destroy Spence-Jones.

275. How did the SAO Defendants pursue this scheme?  On September 10, 2009, Scruggs and Fielder met with Carey-Shuler and her attorney.

276. First, Scruggs threatened Carey-Shuler.  Scruggs accused Carey-Shuler of receiving cash payments in return for her support for development deals on the County

Commission.  This was no idle threat, as Scruggs and the SAO already had a history of targeting Carey-Shuler for prosecution.

277.     Having accused Carey-Shuler of receiving bribes and being a criminal, Scruggs then outright lied to Carey-Shuler.  Scruggs falsely and maliciously told Carey-Shuler that Spence-Jones had gone to Las Vegas with Rev. Gaston Smith, and stole and misspent funds meant for a separate charity.  Scruggs also falsely and maliciously told Carey-Shuler that Spence-Jones had simply stolen the County/MMAP money meant for the Café Soul project.

278.     In questioning Carey-Shuler, it became clear that Carey-Shuler had forgotten about her decisions about the Café Soul funding, including her decision to request $50,000 for Karym.  Such forgetfulness was understandable, because, *inter alia*, (i) the funding for Café Soul was finalized in February 2005, over four and a half years before the SAO questioned her, and (ii) Carey-Shuler oversaw a multi-billion dollar budget and was involved in literally hundreds of budgetary decisions, many of considerably larger magnitude than the tiny Café Soul project.

279.     Rather than reveal to Carey-Shuler her own handwritten drafts of her letter requesting $50,000 for Karym, the SAO Defendants withheld those drafts from Carey-Shuler.

280.     The SAO Defendants simply hid from Carey-Shuler the evidence that she requested payment of $50,000 to Karym.

281.     The SAO Defendants then deliberately misled Carey-Shuler into believing that she never authorized the funding allocation to Karym at all.

282.     The SAO Defendants knew that if they showed Carey-Shuler the drafts with her own handwriting, their investigation, their story, and their case would be exposed as the fraud that it was.

283.    Scruggs even told Carey-Shuler that Spence-Jones had forged Carey-Shuler's name on the official document directing payment to Karym.

284.    This statement by Scruggs was deliberately and maliciously false.

285.    By threatening, lying to, and misleading the chief prosecution witness, and withholding the key pieces of exculpatory evidence, the SAO Defendants induced Carey-Shuler to make a sworn statement on September 18, 2009, falsely implicating Spence-Jones in a scheme to take County money improperly, without her authorization.

286.    In a further effort to hide and advance this corrupt scheme, Scruggs also instructed Carey-Shuler to keep quiet about their meeting.

### Carey-Shuler's Sworn Statement: More Lies from the SAO

287.    Scruggs and Fielder were present for Carey-Shuler's September 18, 2009 sworn statement.

288.    During that September 18, 2009 sworn statement, it was Scruggs (whose job was to question, not testify) doing much of the testifying.  For many pages, Carey-Shuler—the "witness" under oath—asked the questions, while Scruggs—the "questioner"—answered them.

289.    Scruggs' testimony was misleading at best.

290.    It was Scruggs who "showed [Carey-Shuler] how the money had been redirected" (allegedly by Spence-Jones and her forgery), Scruggs who said that Spence-Jones was programming monies to go to Karym, and Scruggs who suggested there was "something wrong" with Carey-Shuler's letterhead in the February 15, 2005 letter authorizing payment to Karym.

291.    Scruggs also told Carey-Shuler during her sworn statement that Spence-Jones "went to Timbuktu Marketplace and . . . there were dealings there which ended up tricking Mr. Weeks and Osun Village."  This too was false and was said for the purpose of causing Carey-Shuler to make a false inculpatory statement.

292.    At no point did Fielder correct any of Scruggs' false statements, and at no point did Scruggs or Fielder reveal the handwritten drafts to Carey-Shuler, reveal that Spence-Jones did not forge Carey-Shuler's signature, reveal that Carey-Shuler had actually requested payment of $50,000 to Karym, or reveal that MMAP authorized payment of $50,000 to Karym.

293.    Barbara Carey-Shuler's false statement, however unknowing, became the basis for the prosecution.  It was a product of the SAO's deliberate withholding of documents and fraud.

**Acting as Police Officers, Rundle, Scruggs and Fielder File a False Arrest Affidavit**

294.    Prior to November 2009, Scruggs personally reviewed the Café Soul file.

295.    Prior to November 2009, Fielder personally reviewed the Café Soul file.

296.    Prior to November 2009, Scruggs and Fielder, and on information and belief Rundle, knew that Carey-Shuler had requested payment of $50,000 to Karym.

297.    Prior to November 2009, Scruggs, Fielder, and on information and belief Rundle, knew that MMAP had itself voted to give $50,000 to Karym.

298.    On November 12, 2009, Fielder filed a knowingly false arrest affidavit in order to arrest, detain, and imprison Spence-Jones.

299.    Scruggs reviewed and approved Fielder's affidavit.

300.    On information and belief, Rundle reviewed and approved Fielder's affidavit.

301.   It is common for police officers to create and file arrest affidavits, approved by their superior officers in the Miami Police Department.  In this case, however, the SAO simply took over the police function.  Fielder filed the arrest affidavit, approved by Scruggs, and on information and belief, Rundle.

302.   Fielder's affidavit relied largely on Carey-Shuler's sworn statement, itself generated by the SAO's fraud and deliberate withholding of evidence.

303.   Fielder's affidavit affirmed that on February 15, 2005, MMAP received a letter which "purported" to be, but was not, from Carey-Shuler.

304.   Fielder attached to his affidavit the allegedly forged February 15, 2005 letter from Carey-Shuler.

305.   Fielder *failed* to attach the drafts of that letter in Carey-Shuler's own handwriting directing the $50,000 to Karym.

306.   Fielder failed to attach the MMAP ballot or any document reflecting MMAP's own vote to give $50,000 to Karym.

307.   Fielder's affidavit failed to reveal that Carey-Shuler actually did approve $50,000 in funding to Karym.

308.   Fielder's affidavit also failed to reveal that MMAP approved $50,000 in funding to Karym.

309.   Fielder and Scruggs knew, and on information and belief Rundle, knew that the Fielder affidavit was false and relied on fabricated evidence.

310.   As a result of the false affidavit, a warrant was issued for Spence-Jones' arrest, the SAO Defendants seized, detained, arrested, and imprisoned Spence-Jones, and Spence-Jones was suspended from office, her career and reputation in ruins.

43

***The SAO's False Carey-Shuler Information***

311.   On December 2, 2009, weeks after Crist suspended Spence-Jones from office, Rundle and Scruggs filed a sworn Information charging Spence-Jones with one count of grand theft, in violation of section 812.014(2)(b), Florida Statutes.  Scruggs falsely swore to the truth of the Information on December 2.

312.   The Information falsely charged that Spence-Jones "knowingly, unlawfully and feloniously obtain or use or did endeavor to obtain or use FUNDS, valued at twenty thousand dollars ($20,000.00) or more but less than one hundred thousand dollars ($100,000.00), the property of MIAMI-DADE COUNTY," between September 2004 and September 2005.

313.   Scruggs signed the Information charging Spence-Jones with grand theft, and falsely swore that the allegations in the Information were "based on facts which have been sworn to as true by a material witness or witnesses, and which if true, would constitute the offenses therein changes, and that this prosecution is instituted in good faith."  Again, Rundle, Scruggs, and Fielder concealed that Carey-Shuler approved the $50,000 payment to Karym, concealed Carey-Shuler's handwritten drafts, concealed that MMAP itself approved the $50,000 payment to Karym, and instead relied on the false Carey-Shuler "evidence" manufactured and induced by themselves.

***The SAO Defendants Attempt to Hide the Evidence from Spence-Jones***

314.   Compounding their fraud, the SAO Defendants refused to reveal or turn over the exculpatory draft letters to the defense.

315.     To the contrary, Scruggs informed Spence-Jones' defense counsel, Peter

Raben, that the SAO reviewed all 52 boxes of Carey-Shuler's files and determined that *only* 9

boxes of documents were relevant to the Carey-Shuler case.

316.     Scruggs and the SAO bate-stamped and produced for inspection only

those 9 boxes.

317.     The 9 boxes Scruggs produced did not include the Café Soul file.

318.     The 9 boxes Scruggs produced did not contain Carey-Shuler's handwritten

drafts of the February 15th letter, directing $50,000 to Karym.

319.     Scruggs and Fielder knew that the 9 boxes did not include the most

important file in all of Carey-Shuler's files—the very documents disproving SAO Defendants'

fraudulent case.

320.     The SAO Defendants also refused to turn over Carey-Shuler's remaining

boxes or the Café Soul file to members of the public who sought these documents pursuant to

Florida's Public Records Act.  In response to such requests, the SAO only produced 4 boxes of

documents, not including the Café Soul file.

321.     The SAO Defendants did not produce the Café Soul file to the defense.


***A Few, Non-Lawyers in the Community Investigate, and Quickly Realize There is No Legitimate Carey-Shuler Case***

322.     In the months following Spence-Jones' November 2009 arrest, some

members of a community organization began its own investigation into the legitimacy of the

SAO's arrest of Spence-Jones.

323.     Through a simple search of public MMAP records, these community

members, who were not even lawyers, quickly learned that the SAO arrest and investigation was

not legitimate.

324.    For example, they obtained public records that MMAP's contracts manager (Simmons) drafted a January 9, 2005 letter authorizing payment to Karym, that the contracts manager sent an email to the Miami-Dade County Attorneys' Office on January 18, 2005 stating that the MMAP funding was to be paid to Karym, that MMAP actually voted to authorize $50,000 in funding to Karym on February 16, 2005 (making it impossible for Karym to "steal" money from MMAP or the County), and that the Miami-Dade County Attorneys' Office wrote a memo to MMAP on March 7, 2005 that MMAP had authorized $50,000 in funding to Karym.  In short, all of these documents, and MMAP's public authorization of funding to Karym, were known to MMAP, to the Miami-Dade County Attorneys' Office, and to anyone who did even the most cursory investigation of this transaction.

325.    On information and belief between December 2009 and March 3, 2010, representatives of the community organization met personally with Rundle and Scruggs at the SAO's office, and confronted them with evidence that MMAP approved the Karym funds, that Carey-Shuler approved the Karym funds, that Spence-Jones did not forge Carey-Shuler's signature, and that the Carey-Shuler case was entirely baseless.  But Rundle and Scruggs ignored the evidence and pressed on with the manufactured Carey-Shuler case.

### Spence-Jones is Re-Elected; Crist Suspends Her Again (Suspension #2)

326.    As noted above, because the 10-day period to appoint Spence-Jones' replacement lapsed on November 23, 2009, the Commission was forced to call a special election to fill Spence-Jones' seat.

327.    The Commission scheduled a special election for January 12, 2010 to fill both the temporary vacancy created by Spence-Jones' suspension and the permanent vacancy created by Gonzalez' resignation.

46

328.    To defendants' horror, and notwithstanding her arrest, Spence-Jones ran again for office to re-fill her own seat.

329.    On December 19, 2009, Governor Crist threatened that, if Spence-Jones won the special election, he would disregard the will of the voters *again*, suspend Spence-Jones again, and require yet another special election.

330.    In anticipation of the special election, on January 4, 2010, Spence-Jones filed suit against Governor Crist in the Circuit Court of the Eleventh Judicial Circuit in Dade County, Florida ("the ACLU case").

331.    The ACLU case sought, *inter alia*, to enjoin Crist from suspending Spence-Jones for the second time if she were re-elected on January 12.

332.    On January 12, 2010, Spence-Jones indeed won the special election for District 5.

333.    Spence-Jones won by a 53% majority vote in a race with nine candidates.

334.    On January 12, 2010, Regalado's ally, Wilfredo Gort, won the special election for Angel Gonzalez' seat, in District 1.

335.    On January 14, 2010, two days after Spence-Jones won the special election, Crist issued Executive Order 10-05, suspending Spence-Jones upon her assumption of office for the second time.

336.    Crist's Executive Order specifically cited, relied upon, and attached the false Rundle/Scruggs Information.

337.    Crist's January 14, 2010 Executive Order also prohibited Spence-Jones "from performing any official act, duty, or function of public office; from receiving any pay or allowance; and from being entitled to any of the emoluments or privileges of public office during

the period of this suspension; which period shall be from today, until a further Executive Order is issued, or as otherwise provided by law."

338.     The Executive Order was effective upon Spence-Jones' assumption of office.

339.     Spence-Jones was to hold office beginning January 16, 2010, after the City Clerk completed the vote canvas and transmitted the official results.

340.     Thus, Spence-Jones was suspended, for the second time, effective January 16, 2010.

**A Second Race Against Time; District 5 Loses Its Vote Again; "Magic City" For Regalado**

341.     Once again, defendants faced a ten-day deadline under the City Charter—until January 26, 2010—for the Commission to appoint Spence-Jones' replacement, or face another special election in District 5 (which Spence-Jones almost undoubtedly would have won).

342.     This time, however, defendants had a quorum in the Commission, of four votes.

343.     On January 19, 2010, Gort was sworn in as a commissioner.

344.     On January 26, 2010, the Commission held a "Special Meeting" attended, *inter alia*, by Commissioners Sarnoff, Carollo, Gort, and Suarez, and by Mayor Regalado.

345.     This was the tenth day after Spence-Jones' suspension.  To prevent District 5 from voting in another special election, the Commission *had* to appoint Spence-Jones' replacement no later than midnight.

346.     Regalado was extremely eager to get the appointment done by midnight, avoid an election, and prevent Spence-Jones from returning to the Commission.

347.     Regalado began by addressing the Commission: "[T]he *only* thing that I'm asking you guys is to do everything *before midnight*, because as you know, today is the deadline for the appointment of the person."  (Emphasis added.)

348.     Regalado continued: "It's been too long without anyone representing the district, so hopefully, today we will do the right thing for the people of District 5. . . . *We'll be here* listening and participating and hoping that we can have resolution *before midnight*, because if not, *we have to go to the other process that the City charter calls for*."  (Emphasis added.)

349.     The "other process" is an election, by voters of District 5, for their Commissioner.

350.     The "other process," *voting*, had led to Spence-Jones' election twice, in November 2009, and in January 2010.

351.     After a discussion among the Commissioners as to the propriety of appointing a Commissioner instead of permitting voters to choose their own commissioner, the Commission entertained applications from various candidates, then comments from the public concerning who should replace Spence-Jones.

352.     Instead, in an outpouring of support for Spence-Jones, many citizens implored the Commission to respect the will of the voters, and decried the entire appointment process.  For example, Lavern Elie-Scott stated: "On January 12 the people of District 5 voted. Over 2,000 voters made a choice to vote for whoever they chose.  I feel like it was a slap in the face to our community, which I said is already a hopeless one.  This is a democratic society, and as a democratic society, I feel that we should not be ruled as a dictatorship.  So I am asking for a special election."  Muriel Walker said: "we need Michelle . . . we would like to have Michelle Spence-Jones back."  "Evangelist Queen Davis" said: "I want Commissioner Spence-Jones back

in her seat." Delores Smelling said: "I feel like if we had our right to vote – we voted twice. It shouldn't [have] been no twice." Haneef Hamidullah said: "Out of all I heard today, the person – the people [] that got the rawest deal . . . was the constituents." Others made similar comments.

353. The Commission then voted, ultimately appointing Richard Dunn to replace Spence-Jones.

354. Regalado, apparently fulfilling his promise to "be here listening and participating and hoping that we can have resolution before midnight," could not contain his euphoria.

355. Following the appointment, Regalado again addressed the Commission that night. This time, he sat behind the dais of the Commission, as if he were a Commissioner. In fact, Regalado sat *in Spence-Jones' own seat*.

356. Having engineered Spence-Jones' removal and replacement with his own Commissioner, and now literally occupying Spence-Jones' own chair, Regalado told the Commission: "I am so proud of you. . . . You understand the right thing to do. *You understand deadlines*." (Emphasis added.)

357. Regalado then noted that he himself had previously nominated Commissioner Dunn.

358. Regalado then stated, addressing Dunn: "[N]ow with your leadership, we will be able to move forward and you'll be part of the hard decisions, and hopefully, those hard decisions will be 5 to 0. *We have come into the era of 5-0 and not 3-2 or 4-1 in the City of Miami Commission. It's working together for the Magic City.* Thank you, guys. Thank you, Richard. Thank you very much. Thank you, you all, for being here."

359.     The Commission adjourned at 11:18 p.m., 42 minutes before Regalado's "deadline," 42 minutes before the voters of District 5 would have had the right to elect their own Commissioner.

360.     Regalado's victory was complete.  Through the dogged intervention of the SAO Defendants, the fraudulent investigation, arrest, detention, imprisonment, and Information, Regalado had finally swept Spence-Jones off the Commission once and for all.

### *Spence-Jones and Her Constituents Sue to Regain the Commission Seat*

361.     Or so defendants thought.  On January 26, 2010, Spence-Jones filed a five-count amended complaint, alleging, *inter alia*, that Crist's second suspension violated the Florida Constitution.

362.     The American Civil Liberties Union intervened in the Spence-Jones case, seeking a permanent injunction against Spence-Jones' suspension.

363.     The ACLU was joined by five City of Miami District 5 voters who voted for Spence-Jones in the January 12, 2010 special election, as intervenor-plaintiffs.

364.     On February 26, 2010, Miami-Dade Circuit Judge Victoria Platzer held a conference.

365.     At the conference, Judge Platzer delivered shocking news to defendants: they would almost surely lose the ACLU case, and Spence-Jones would have to be reinstated to the Commission.

366.     Judge Platzer stated: "I don't believe the Governor is permitted . . . to have suspended [Spence-Jones,] because I believe that the provision requires an indictment. . . . [A]n indictment is different than an information, and she was not charged.  She was charged by information and she was not indicted, or an indictment was not returned against her."

367.     Judge Platzer stated she would rule "within . . . ten days.  And if I can do it sooner, I will."

### A Third Race Against Time; the SAO Indicts; Crist Suspends Spence-Jones Again (Suspension #3)

368.     Suddenly, defendants were faced, again, with a race against time. Notwithstanding their repeated, fraudulent manipulation of the political process, defendants faced the prospect of Spence-Jones' imminent return to the Commission.

369.     As a result, defendants conspired, yet again, to trump up fraudulent charges against Spence-Jones.

370.     Defendants' first plan was to sidestep Judge Platzer's imminent ruling, by charging Spence-Jones by Indictment instead of Information.

371.     The SAO Defendants did not even hide the true goal and intent of the Indictment: to keep Spence-Jones off the Commission.

372.     For example, SAO prosecutor Joseph Centorino, chief of the SAO's public corruption unit, told an attorney for Spence-Jones that the ACLU lawsuit served no purpose, stating in sum and substance: "It's a waste of time, all we have to do is indict."

373.     Scruggs flatly told a prosecution witness that the SAO would indict Spence-Jones to keep her off the Commission.

374.     Given that there was already an Information, indicting Spence-Jones served no prosecutorial purpose; it did not advance the criminal case.

375.     The sole purpose of the Indictment was to aid Regalado by ensuring that his political opponent remained off the Miami City Commission.

376.     There was nothing legitimate about the SAO's Indictment: it was a naked, overt, and blatant attempt to manipulate the political process in the City of Miami.

377.     Indicting Spence-Jones on a mere grand theft charge was also highly unusual.

378.     Asked about the purpose of indicting Spence-Jones, Rundle stated publicly: "It just seemed logical to go ahead and get an indictment by a grand jury."  The only "logical" reason, however, was to keep Spence-Jones off the Commission.

379.     On March 3, 2010, at the SAO's request, a grand jury returned an Indictment in the Carey-Shuler case, for grand theft, conveniently replacing the November 2, 2009 Information.  The Indictment was based on the same SAO fraud and fabricated evidence as the arrest affidavit and the Information.

380.     This Indictment was a mere five days after Judge Platzer presaged that Spence-Jones would be permitted to return to the Commission *absent* an Indictment, and five days before Judge Platzer's end date for a formal ruling.

381.     The day after the Indictment, Crist issued a *third* executive order concerning Spence-Jones.

382.     Executive Order 10-61, filed March 4, 2010, purported to "amend[]" Executive Order 10-05 to "reflect that the suspension of Michelle Spence-Jones . . . is further supported" by the Indictment.

383.     In subsequent briefing in the ACLU case, Crist's counsel argued that the Indictment rendered the ACLU case "moot."  The Governor argued that "the voters [in the January 2010 special election] could not have reviewed [Spence-Jones'] suspension due to the indictment where [Spence-Jones] had previously been charged by information."

384.     Defendants' scheme succeeded.  On April 5, 2010, in light of the intervening Indictment, Judge Platzer dismissed the ACLU case as moot, and did not reinstate Spence-Jones to the Commission.

385.     Defendants finally appeared to have achieved their goal: removing Spence-Jones from the Commission, permanently.

**The Codina Case: Another Case, Another Fraud**

386.     An indictment in the Carey-Shuler case alone, however, would not definitely keep Spence-Jones off the commission.  In the ACLU case, the ACLU had argued that removing Spence-Jones based on the Carey-Shuler allegations violated the voters' rights because voters re-elected Spence-Jones on January 12, 2010, *after* knowing of the Carey-Shuler allegations.  So defendants concocted yet another fraud to indict Spence-Jones on allegations unknown to the voters on January 12, 2010.  On March 3, 2010, the SAO Defendants brought an entirely separate indictment ("the Codina case").

387.     The Codina Indictment was again conveniently timed just five days after Judge Platzer presaged that Spence-Jones would return to the Commission absent an Indictment, and five days before Judge Platzer's end date for a formal ruling.  Indeed, the SAO Defendants only decided to charge and indict Spence-Jones in the Codina case days before the March 3, 2010 Indictment, precisely when it was clear Spence-Jones would shortly regain her Commission seat.

388.     The very day that Spence-Jones won the special election, January 12, 2010, the SAO Defendants met with Armando Codina, to concoct a separate baseless claim against Spence-Jones.

54

389.     Just as in the Carey-Shuler case, Rundle, Scruggs and Fielder knew that there was no probable cause to charge Spence-Jones in the Codina case.

390.     Like the Carey-Shuler case, the Codina case was, from the beginning, based on a deliberate fraud and series of fabrications and attempts to manufacture non-existent probable cause by the SAO Defendants.

### The Renaming of Southeast Second Ave.

391.     The Codina case allegedly stemmed from events that occurred in the spring of 2006.

392.     Armando Codina is a prominent developer in Miami and a generous philanthropist.

393.     In March 2006, the developers of an office and hotel complex in downtown Miami sought a change to the name of the street address for their proposed complex to aid in marketing.  They sought to change the name from "Southeast Second Ave." to Brickell Ave.  On information and belief, Codina did not own any property on the street whose name might be changed.

394.     On March 23, 2006, the Miami City Commission met about a number of matters, including the name change.

395.     The street was in Commissioner Johnny Winton's District.

396.     Accordingly, Commissioner Winton was seen as the key vote on this proposal.  On a vote that had little City-wide impact, such as this one, the other Commissioners generally deferred to the view of Commissioner whose district was directly affected, and almost always voted unanimously.

397.    On this trivial issue of no relevance to her District and minimal relevance to the City, Spence-Jones intended to defer to Commissioner Winton's view of the Brickell Ave proposal.

398.    At the March 23, 2006 Commission meeting, Spence-Jones told Commissioner Winton on the record that she "concur[red] with" him and "would definitely . . . defer to you [Winton] on this item [the street renaming]."

399.    Because Commissioner Winton was not prepared to vote on the Brickell Ave proposal on March 23rd, it was postponed to a future meeting and the Commissioners did not vote on the matter.

400.    On March 29, 2006, City Attorney Rafael Rivas-Suarez opined that the City Commission did not even have jurisdiction to change the name of a state road.

401.    The Commission never voted on the street naming issue.

### A City of Miami Benefit in the Lyric Theater

402.    Months before March 2006, the City of Miami had planned a benefit in the Lyric Theater in honor of Barbara Carey-Shuler, who had retired from the Miami-Dade County Commission.  The event was scheduled for April 3, 2006.  Two Commissioners—City Commissioner Spence-Jones and County Commissioner Audrey Edmonson—were tasked to host the event in her honor, and to benefit a charity called the Friends of MLK.  Friends of MLK was a charity whose mission was to advance the vision and goals of the Rev. Martin Luther King, Jr., and a co-sponsor of the event.

403.    Spence-Jones' office undertook the fundraising for this official City of Miami benefit.  Her staff invited dozens of people to the benefit, including prominent philanthropists, community leaders and business persons.

56

404.    Codina had previously donated moneys to a charity that Spence-Jones was involved in, and he was known as a businessperson who prided himself in giving back to the community.

405.    Codina had also been dear friends with Carey-Shuler's late-husband, and knew Carey-Shuler for some 15 to 20 years.

406.    Codina was also on the board of Burger King, one of the principal sponsors of the benefit.

407.    An assistant in Spence-Jones' office contacted a number of people, including Codina, to see whether they would consider contributing to the Friends of MLK charity.  At Codina's request, Spence-Jones' office followed-up with an explanatory, March 30, 2006 email describing the charity and the event.  The subject of the email was "Reclaim & Build the Dream Reception Honoring Dr. Barbara Carey-Shule[r]."  The email stated: "Thanks again for your time and support of the MLK Trust Fund," noted the involvement of the Dade Community Foundation, and referred to a "special reception, to our hometown hero Dr. Barbara Carey-Shuler, for her humanitarian efforts in promoting the dreams of Dr. King as well as addressing the needs of the residents of our great city[.]"

408.    During this brief charitable solicitation, the assistant never mentioned the trivial street matter pending before the Commission.  The follow-up email also made no mention of the matter.  The assistant never promised or even implied any "tit for tat" based on Codina's contribution to the charity.  Codina did not speak to Spence-Jones prior to making the donation.

409.    The assistant also explained that Friends of MLK was not yet incorporated, and that the charitable donation would be deposited at the Dade Community Foundation, the leading fiscal sponsor for unincorporated non-profits in the Miami-Dade area.

The Dade Community Foundation supports budding non-profits in registering with the IRS and complying with its regulations.

410.     Spence-Jones' office also informed Codina that Burger King was sponsoring the event.

411.     Codina donated $12,500 to the Friends of MLK Trust Fund.

412.     Codina made the charitable contribution, *inter alia*, because of his dear friendship with Carey-Shuler's late-husband, because Burger King was a sponsor of the event (and Codina was on Burger King's board), because he was a prominent philanthropist, because it was a charitable cause, and because the money would be deposited with and administered by the Dade Community Foundation, one of the most reputable organizations in Miami.

413.     On April 3, 2006, the Friends of MLK organization held the City of Miami charity function in honor of Carey-Shuler at the Lyric Theatre.  It was an enormous success.

414.     Checks for the charity, including Codina's check, were deposited with the Dade Community Foundation.

415.     There was nothing secret about the Codina Group's charitable contribution: the Codina Group, Burger King, and others were publicly recognized as sponsors at the benefit.

416.     The SAO Defendants, however, saw in this publicly-recognized charitable contribution by a prominent philanthropist and friend of the honoree an opportunity to concoct yet another fraudulent investigation and charge against Spence-Jones.

### *The SAO Defendants Intimidate and Falsely Accuse Codina*

417.    This time, the SAO Defendants fabricated evidence in an effort to claim that the $12,500 Codina donated to a charity was actually a bribe to influence Spence-Jones' non-existent vote to change the name of a street in someone else's district.

418.    On or about January 6, 2010, Fielder called Codina on the phone while he was driving with his wife on highway I-95.

419.    This was just 6 days before Spence-Jones' special election to the seat she had lost as a result of the SAO's arrest.

420.    Fielder told Codina: "We have you on tape on a bribery case."

421.    That was a deliberate and malicious falsehood, intended to intimidate and manipulate Codina in order to persuade him to implicate Spence-Jones in a crime.

422.    The SAO did not have any evidence of Codina being involved in a bribe, on tape or otherwise.

423.    In that phone call, Fielder also told Codina that Codina had made donations to a "fund controlled by Michelle Spence-Jones."

424.    That was a deliberate and malicious falsehood: Spence-Jones did not control any fund to which Codina donated.

425.    Codina said that he "better get a lawyer," and Fielder agreed, stating "We've got an issue here."

426.    Knowing there was no bribe, no wrongdoing, and not even a Commission vote, Scruggs and Fielder concocted an alternate reality in order to induce Codina to implicate Spence-Jones in a crime.

427.    Just as they had in the Carey-Shuler case, the SAO Defendants lied to, manipulated, and withheld evidence from the chief prosecution witness, this time Codina, in an effort to manufacture probable cause to arrest and then charge Spence-Jones.

### The SAO Defendants Lie to and Manipulate Codina

428.    On January 12, 2010, the very day of Spence-Jones' special election, Scruggs and Fielder met with Codina and his counsel.

429.    That same day, Spence-Jones won the special election in District 5.

430.    Scruggs and Fielder falsely told Codina that the solicitation of Codina was for a fake, non-legitimate charity run and controlled by Spence-Jones, and that Spence-Jones used the charity money as her personal piggybank.

431.    Scruggs and Fielder also falsely told Codina that the charitable benefit *had simply never occurred.*

432.    In short, Scruggs told Codina and Codina's lawyer "in no uncertain[] terms that no event had taken place at the Lyric Theater, that the charity was a sham, and that Michelle Spence-Jones had used the money as her own piggy bank."

433.    Scruggs and/or Fielder also stated that Spence-Jones was a thief and she could not help herself from stealing.  They said Spence-Jones was a "mouse to cheese."

434.    Each and every one of the statements in the preceding four paragraphs was a deliberate and malicious falsehood.

435.    Before January 12, 2010, Scruggs and Fielder knew that there had been a charitable event.

436.    Before January 12, 2010, Scruggs and Fielder knew that Codina's check had been deposited at the Dade Community Foundation.

60

437.     Before January 12, 2010, Scruggs and Fielder knew that Spence-Jones never stole any of Codina's charitable contribution, much less used the account as her own "piggybank."

438.     On January 12, 2010, the very day of the special election in District 5, Scruggs flatly told Codina that if Spence-Jones were re-elected, the SAO would indict her again.

### Codina Is Duped, by the SAO

439.     Codina believed defendants' lies.  As a result, he was "distraught," and convinced that Spence-Jones victimized him and stole his money.

440.     Codina believed he had been defrauded by Spence-Jones, "based upon the statements that were made to [him] by Mr. Scruggs" when they met.

441.     Because of the SAO Defendants' lies, Codina believed "that there had not been an event, that the charity was a fake, and [Codina's] money had been pocketed by Michelle Spence-Jones."

442.     In short, because of the SAO Defendants' lies, Codina believed he was a victim of theft by Spence-Jones.

443.     Codina left the SAO meeting "ashamed and embarrassed.  I thought Ms. Spence-Jones had duped me.  And I was ashamed and intimidated at the state attorneys office knowing all of that that I gave the check anyway."

444.     The SAO Defendants well knew that their fabricated story could be exposed if Codina did his own, independent investigation into the check, the Friends of MLK, and the event at the Lyric Theater.

445.     As a result, and in a further effort to hide and advance their corrupt scheme, Scruggs instructed Codina "not to talk to anyone else or make any comments" about the Spence-Jones case, including what the SAO Defendants had falsely told Codina.

446.     Because Codina was defrauded and misled by Scruggs and Fielder, he became a witness for the prosecution.

447.     On March 1, 2010, three days after Miami-Dade Circuit Judge Victoria Platzer presaged Spence-Jones' return to the Commission absent an Indictment, the SAO had a sudden, alleged change in policy concerning indictments.

448.     As Scruggs wrote Codina's lawyer in an email on March 1, 2010: "The SAO may be changing policy now to put public corruption cases involving elected officials before grand juries for indictment."

449.     The only reason for the SAO Defendants' sudden, alleged "chang[e]" in "policy" was to circumvent the imminent ruling of a Miami-Dade Circuit Judge, indict Spence-Jones, and keep Spence-Jones off the Commission.

450.     On March 2, 2010, Scruggs and Fielder again attempted to intimidate Codina.  Scruggs threatened Codina with criminal prosecution, warning him that he was "in jeopardy" because he bribed a public official.  Ultimately Codina was not charged because, Fielder claimed, the prosecutor decided Spence-Jones was "the higher target."

451.     The SAO never charged Codina with bribing or attempting to bribe a public official, even though Codina was the alleged briber.

452.     On March 2, 2010, four days after the conference before Judge Platzer, and as a result of Scruggs' and Fielder's outright lies, fabrications, and threats, Codina provided

a sworn statement to aid the prosecution, via an interstate telephone call.  The Indictment was largely based on Codina's testimony.

453.    In his statement, Codina referred to the charity as a "fake charity" that Scruggs said was being "run out of her [Spence-Jones'] office."

454.    Codina also stated that he saw Commissioner Winton, and not Spence-Jones, as the pivotal vote in the Brickell Ave extension; Spence-Jones' assistant never made any mention of the matter pending before the Commission; and Codina decided to donate $12,500 because it was a contribution to a good cause and he did not think there was "anything improper with the request."

455.    Fielder later admitted that not one witness claimed that Spence-Jones solicited a donation with the intent of having her vote influenced.

456.    On March 3, 2010, five days after the conference before Judge Platzer, days after the SAO Defendants decided to seek an Indictment, two days after the SAO's sudden "changing policy," and the day after Codina's statement, the grand jury indicted Spence-Jones. This Indictment was, again, a product of the SAO Defendants' lies, withholding of evidence, and manipulation of Codina.

### Defendants Defame, Arrest, and Attempt to Humiliate Spence-Jones

457.    Also on March 3, 2010, Rundle issued a press release claiming—falsely—that the money Spence-Jones' assistant solicited from Codina was "ultimately deposited . . . into an account accessible to Commissioner Michelle Spence-Jones."

458.    This was false and defamatory.  The Dade Community Foundation account was not accessible to Spence-Jones.  To this day, as authorized by Rundle, the false, defamatory March 3, 2010 press release remains published on the SAO's official website,

available to anyone in Florida, the United States, or anywhere in the world with access to the Internet.

459.    On information and belief, on March 3, 2010, Rundle told the *South Florida Business Journal* that Spence-Jones "solicited" a "bribe" from Codina.

460.    The *South Florida Business Journal* published the statement on March 3, 2010.

461.    This statement was a deliberate and malicious falsehood.

462.    Spence-Jones did not solicit any bribe from Codina.

463.    Shortly after the Indictment, Codina—the supposed briber and the chief prosecution witness—released a public statement: "Armando Codina responded to a request from Michelle Spence-Jones to contribute to an event honoring County Commissioner Barbara Carey-Shuler.  That was the only purpose of the donation.  He was faxed an invitation that showed the event was being sponsored by the friends of MLK (Martin Luther King) and many other respected entities, including Burger King, on whose Board he sat.  He was told the funds were going to be administered by the Dade Community Foundation, an[] organization which he deeply respects.  There was no expectation of a favorable vote from Commissioner Spence-Jones, and he would have made this contribution whether there was something pending or not."

464.    Notwithstanding this public statement from the chief prosecution witness debunking the so-called "bribery" case, Rundle, Scruggs and Fielder continued to press the fabricated case against Spence-Jones.

465.    On March 30, 2010, Spence-Jones was arraigned.

466.    After Spence-Jones' arraignment, Scruggs insisted that Spence-Jones be handcuffed.  He knew that Spence-Jones posed no threat, but had her handcuffed nonetheless to

further humiliate her.  The handcuffing served no prosecutorial purpose, but did allow the media to attempt to take humiliating photographs.

***Scruggs' Personal Vendetta Against Raben; Rundle: "Boys Will Be Boys"***

467.    Scruggs admitted that his baseless pursuit of Spence-Jones was also based, in part, on a personal vendetta against Spence-Jones' criminal counsel, Peter Raben.

468.    Fielder's criminal deposition was scheduled for May 27, 2010.  When Raben sought to confirm the deposition time, Scruggs did not respond.  In a May 27 telephone call, Raben asked Scruggs why he had not responded.  Scruggs said: "I don't have to fucking call you."

469.    Raben queried him on his lack of professionalism.

470.    Scruggs said: "you made a false accusation against me that caused me a lot of grief in the community."  He further stated:  "And until I do that to you, and we are even, then I will continue to have a problem with you."

471.    On the record at the deposition that day, Raben stated that he did not want to begin Fielder's deposition before resolving whether Scruggs would continue to remain on the case, given his statement that he wanted to "get even" with defense counsel.

472.    Scruggs responded to Raben on the record: "What are you upset?  Did I hurt your feelings?  Do you want to call my mother?"

473.    Later that day, Raben wrote to Rundle and relayed Scruggs' unprofessional and irresponsible statements.  Raben wrote: "This prosecutor has expressed a vendetta against me.  It is an embarrassment and disgrace that he should be allowed to remain in this position."  Raben asked that Scruggs be removed from the case.

474.    Rundle refused to remove Scruggs from the case.

475.     Instead, Rundle told Raben in a subsequent phone call: "boys will be boys."

### Raben Deposes Carey-Shuler; Carey-Shuler Learns She Was Deceived; the SAO Defendants Continue to Pursue the Fraudulent Case

476.     Notwithstanding Scruggs' insistence and representation that the nine boxes he produced to Spence-Jones included all Carey-Shuler files relevant to the Carey-Shuler case, Raben demanded access to all Carey-Shuler files in the SAO's possession, including 43 boxes the SAO Defendants previously withheld.

477.     Raben, Spence-Jones and noted members of the community went to the County warehouse to review the remainder of the Carey-Shuler boxes.

478.     As requested by the County, the door to the room in which Raben and others viewed the file was kept open, so the review was visible to County staff.

479.     After reviewing the boxes never produced by Scruggs, in short order Raben and Spence-Jones found a folder clearly labeled "Café Soul."

480.     In the Café Soul file were, among other documents, the two drafts of the February 15, 2005 letter, replete with Carey-Shuler's handwritten edits to the letter authorizing payment of $50,000 to Karym.

481.     On June 21, 2010, Raben deposed Carey-Shuler.

482.     During her deposition, Raben showed Carey-Shuler the drafts of her February 15th letter to MMAP that Scruggs and Fielder had withheld from Carey-Shuler.

483.     Carey-Shuler immediately realized that the handwriting was hers and that she did instruct that MMAP provide funding to Karym.

484.     When Carey-Shuler was shown the drafts of her letter, she realized that Scruggs had defrauded her: "he tricked me," she said.

485.     Carey-Shuler's testimony dissipated whatever manufactured probable cause (if any) had ever existed to prosecute Spence-Jones.  Yet, as set forth below, defendants wrongfully and improperly continued the baseless Carey-Shuler prosecution until August 23, 2011, over a year later.

486.     In late August 2010, Rundle attended and oversaw a meeting with Raben and others to extort Spence-Jones to relinquish her Commission seat.  As part of her proposal, Rundle demanded Spence-Jones resign and promise not to run again for Commissioner for years.  Spence-Jones refused.

### Codina Also Learns He Was Deceived; the Extraordinary Codina Deposition; Scruggs Doubles-Down on His Lies

487.     Even as the Carey-Shuler case was uncovered as a fraud, the SAO Defendants pressed on with the equally fraudulent Codina case.  The SAO's Codina fraud soon began to unravel as well.

488.     On November 16, 2010, Scruggs filed a false, sworn Information charging Spence-Jones with Grand Theft in the Third Degree.  The SAO added this charge to the pending bribery charge.

489.     On information and belief, Rundle reviewed and approved the Information.

490.     The Information alleged that Spence-Jones endeavored to use over $10,000 in funds that were the property of the Codina Group from March 23, 2006 to August 2006.  Scruggs swore under oath to the factual basis of this baseless charge.

491.     The fabricated premise of the new theft charge was that Spence-Jones stole Codina's money, even though Scruggs, Fielder, and on information and belief Rundle, knew that Spence-Jones did not steal Codina's money or commit any theft.  The charge was

based on the same lies and manipulation by the SAO Defendants, including that Spence-Jones had stolen Codina's money, and duped Codina into funding a non-existent charity in connection with a non-existent charity event.

492.    On February 16, 2011, Scruggs deposed Codina.

493.    The Codina deposition was likely one of the most extraordinary in the history of the State of Florida.

494.    Codina testified that, before meeting Scruggs in January 2010, he believed he had "given a charitable contribution for funds to be spent by the Dade Community Foundation at an event . . . in honor of Barbara Carey-Shuler."

495.    When Codina met with Scruggs, however, Scruggs told him "there had not been an event."

496.    As Codina said to Scruggs during Codina's sworn deposition: "*You told me* that there had not been an event.  You told me that the charity was a fake and that she had used the money as her own piggybank, so I was distraught when I was here.  I was convinced that the flier had been a fake, that no event had taken place and that she had pocketed the money."

497.    Codina explained, however, that he had since learned that Scruggs had deceived him:  "Since that time, I know that there was an event.  There was an event that was well attended. . . . It was an event where we were recognized. . . . I found out that my check was deposited at the Dade Community Foundation, so if I had known those facts when I was here, I wouldn't have expressed some of the emotions that I expressed at the time."

498.    Rather than ask questions, as lawyers usually do at depositions, Scruggs essentially testified on the record, in his own defense.  Scruggs admitted that he knew, when he

met Codina in January 2010, that there had been a charitable event.  Scruggs also admitted that

he knew, when he met Codina, that Codina's check had been deposited at the Dade Community

Foundation.

499.    During Codina's deposition, Scruggs claimed that Codina's clear

recollection of their meeting was a simple "misunderstanding."

500.    Codina insisted that there was no misunderstanding: "Mr. Scruggs, you

*unequivocally* told me there had not been an event and that [Spence-Jones] had used the money

as a piggybank."  (Emphasis added.)

501.    Even after Codina learned (independent of the SAO) about the charity

event, Scruggs still claimed that the Codina Group had not been "recognized" at the event.

502.    This, too, was a false statement.

503.    Scruggs later claimed that, unlike his many other lies, this particular

falsehood he perpetrated to, *inter alia*, Codina, was unintentional.

504.    This SAO falsehood, however, was quite intentional.  In a sworn court

filing dated October 6, 2010, which in an October 18, 2010 hearing Scruggs swore to again,

Scruggs and his team stated: "Codina never received credit as a sponsor of the Lyric Theater

event, even as other contributors did," because Spence-Jones supposedly wanted to hide the

alleged Codina "bribe" from the world.  But at the court hearing, Raben presented a photo of *the*

poster at the event crediting and recognizing "The Codina Group" as a sponsor, right under

"Burger King Corporation."  Rather than admit that he outright lied to the Court, Scruggs falsely

insinuated that the photo itself was fabricated in 2010, presumably by Raben, and was itself

"evidence of falsehood."

505.    At Codina's deposition, Scruggs told yet more lies, stating, for example, that Codina's money was under Spence-Jones' "control even at the Dade Community Foundation."

506.    This statement was knowingly and maliciously false.

507.    None of Codina's money was under Spence-Jones' control.

508.    Scruggs also stated, again, that Spence-Jones "had used the money as her own piggybank."

509.    This statement was also knowingly and maliciously false.

510.    Scruggs also stated that "the only person that directed the expenditures of that money [Codina's money] was herself [Spence-Jones]."

511.    This statement was also knowingly and maliciously false.

512.    To the contrary, the Codina deposit was deposited in the account of the Dade Community Foundation, one of the most respected organizations in the State of Florida.

513.    Finally, in an effort to prevent Scruggs from further polluting the record with his own manipulative misstatements, lies, and prevarications, Raben attempted to convert the Codina deposition into an actual deposition: "I want to remind everyone here that the purpose of this deposition is to acquire relevant information of material fact.  This is not a summit meeting where there is some sort of détente going on, and I would like to know if we can proceed to the questioning and answers, rather than the mia [sic] culpas for what the State perceives to be inappropriate dissemination of information."

514.    Notwithstanding this deposition, in which the chief prosecution witness informed the prosecutor he was a liar, Rundle, Scruggs, and Fielder insisted on pursuing the Codina case through to a criminal trial.

### *The Trial: the Codina Case Is Exposed to the World as a Fraud*

515.     The Codina trial lasted from February 28, 2011 to March 16, 2011.

516.     In the middle of the trial, on March 10, 2011, the Commission voted 3-0 to approve the naming of "Katherine Fernandez Rundle Avenue."

517.     The SAO Defendants knew the Codina case was hopeless: as one assistant state attorney wrote in an internal email: "If we win this case it will be a miracle of God."

518.     During the criminal trial, Codina again testified about Scruggs' deceit.

519.     Codina testified that Scruggs told him "in no uncertain[] terms that no event had taken place at the Lyric Theater, that the charity was a sham, and that Michelle Spence-Jones had used the money as her own piggy bank."

520.     Codina explained that he "believed Mr. Scruggs" and was "convinced that there had not been an event, that the charity was a fake, and my money had been pocketed by Michelle Spence-Jones."

521.     As a result of the SAO Defendants' lies, Codina was "ashamed [and] thought Ms. Spence-Jones had duped [him]."  He felt "intimidated" by the SAO, because "knowing all of that that I gave the check anyway."

522.     Codina testified, however, that he ultimately found out that there *was* a well-attended event at which he was recognized and two of his executives attended.  Codina further learned that his check was deposited with the Dade Community Foundation.

523.     Codina later told reporters that Scruggs had "purposely misled" him.

524.     Codina also testified, at this supposed trial about bribery and grand theft, that there was no bribe and no theft.  Codina testified that "it was not a 'tit for tat.'  If I thought for a second it had been, I would not have given the check."

71

525.     During the over two-week trial, not a single witness testified that Codina bribed Spence-Jones or that Spence-Jones improperly solicited anyone,

526.     There was apparently no line the SAO Defendants were unwilling to cross in their zeal to convict Spence-Jones.  For example, even though the SAO Defendants knew full well that the charity event actually occurred, and that Lloyd Boggio, the president of a real estate development company, attended the charity event, they presented testimony by Boggio to the jury indicating that he did not attend the event.  On direct-examination, Scruggs asked: "there's been testimony that there was going to be an event at the Lyric Theater on April 3rd that was commemorating Dr. Barbara Carey-Shuler.  Absent us talking about this, do you remember that event at all?  Does that ring any bells at all in your memory?"  Boggio replied, "No."

527.     On cross-examination, however, Raben confronted Boggio with *photographs* of Boggio attending the charity event.  Boggio was forced to admit that he did attend the charity benefit for Carey-Shuler.

528.     On March 16, 2011, after deliberating for fewer than 90 minutes after an over two-week trial, the jury acquitted Spence-Jones on all counts.

### *Regalado-Rundle's Back-Door Meeting; Machinations to Extend the Carey-Shuler Case*

529.     After the Codina case collapsed, defendants' only remaining way to keep Spence-Jones off the Commission was the fraudulent Carey-Shuler case, now discredited by Carey-Shuler herself.  From its inception, the Carey-Shuler case lacked probable cause.  The SAO Defendants had the documents disproving their case from the beginning.  After Carey-Shuler's deposition on June 21, 2010, it was painfully obvious the case was a sham.

530.     Given that Carey-Shuler testified in June 2010 that she authorized the funds, why did the case continue through August 2011?  The same reason defendants launched the case in the first instance: to keep Spence-Jones off the Commission for as long as possible.

531.     In the summer of 2011, Regalado visited Rundle at the SAO's office.

532.     Regalado and Rundle intended the meeting to be secret.

533.     In order to avoid a written, public record of the secret meeting, Regalado was snuck into the SAO building, and did not go through the normal identification process.

534.     In this secret, back-door meeting, Regalado and Rundle discussed how they could continue the fraudulent prosecution against Spence-Jones, in order to keep her from regaining her seat on the Commission.

535.     Regalado was intent on keeping Spence-Jones off the Commission for multiple reasons.  He knew he did not and could not control her vote.  Most pressingly, Regalado was intent on firing the Miami Police Commissioner, Miguel Exposito, which ultimately would require a majority vote on the Commission.  This was a high-profile political issue in Miami, and Regalado was concerned that Spence-Jones would vote against his decision to fire Exposito.

536.     Regalado sought to fire Exposito in retaliation for Exposito's decision to raid more than a dozen locations containing *maquinitas*, or illegal gambling machines.  On information and belief, Regalado was and is a close ally of companies that build, operate, or market these illegal gambling machines, and received large campaign contributions from these companies and business owners.

537.     Rundle had her own reasons to ensure that Exposito was fired.  In January 2011, he had criticized her for prosecutorial delays in investigating fatal shootings by police officers.

538.     In May 2010, he also accused her of dropping a public corruption case against the grandson of civic leader Georgia Ayers, in order to curry favor with Ms. Ayers.

539.     As Exposito later described Rundle: "The problem I have with her is that she is very aggressive against certain politicians or government workers, yet with others she takes the soft approach.  She gives you all the reasons in the world to not go after them . . . . I think she needs to go."

540.     During the summer 2011 meeting, Regalado and Rundle conspired to keep Spence-Jones off the Commission, by postponing dismissal of the fraudulent case until at least after the Commission voted on Exposito's removal.

541.     In addition, in the Spring/Summer 2011, Regalado stated that he feared Spence-Jones' return to the Commission, because she was "vicious."

542.     In or about May 2011, Regalado privately admitted in multiple meetings with high-level staff that he feared Spence-Jones' return to the dais.  Regalado stated that Spence-Jones would be difficult to work with, a "hell on wheels."  He further stated that the Commission should push through controversial ordinances and resolutions that the Mayor wanted passed, but which Spence-Jones might not support.

543.     Defendants knew, though, that the case against Spence-Jones was baseless and had collapsed.  No later than early summer 2011, months before the ultimate dismissal, Scruggs had drafted a memo explaining why the SAO could not pursue the Indictment.  This memo was called the Closeout Memo.

544.     As part of the conspiracy to continue the baseless and fraudulent criminal prosecution, the SAO Defendants nevertheless (i) refused to drop the charge of grand theft, notwithstanding the lack of probable cause or any basis to support the charge; (ii) attempted to

compel and coerce Spence-Jones into speaking out in support of *themselves*; (iii) attempted to compel and coerce Spence-Jones into falsely incriminating herself; and (iv) through a pattern of deceit and manipulation, extended the prosecution for the maximum possible amount of time, until the threat of an imminent court date finally forced the SAO to drop the sham prosecution.

545.    On July 8, 2011, at Rundle's direction, Scruggs sent an email to Raben demanding that Spence-Jones make certain statements in return for dropping the case.  Rundle and Scruggs knew there was no basis to pursue the Carey-Shuler case, and that they had no right to make any demands in return for dismissing a fraudulent case.

546.    As a condition of the SAO's decision to drop the fraudulent case, Rundle and Scruggs demanded that Spence-Jones "accept responsibility" for "regrettable" actions.

547.    Rundle and Scruggs also demanded Spence-Jones admit there was "probable cause" for a "fair prosecution."

548.    Spence-Jones refused to make these false statements.

549.    Yet even once the SAO's office agreed to a dismissal, they attempted to delay in order to delay Spence-Jones' return to the Commission until, *inter alia*, after the Exposito vote.

550.    As part of her arrangement with Regalado, Rundle repeatedly sought to delay an August 24, 2011 Court date, so that she could postpone dismissing the case.  A high-level source within the SAO told Raben to oppose the politically-motivated and contrived extension request.  Spence-Jones' counsel forced Rundle's hand, and refused.

551.    On August 23, 2011, the day before the August 24 court conference, the SAO Defendants finally filed a *nolle prosequi* to dismiss the Carey-Shuler case.

***Rundle/Scruggs Defame Spence-Jones and Raben in an Outrageous "Closeout Memo,"
then Send the Defamatory Memo to the Miami Press Corps***

552.    On August 23, 2011, Rundle also issued a press release.

553.    That release attached the Closeout Memo written by Scruggs and
approved by Rundle.

554.    The release stated that Rundle "believed at the time of the arrest of
Michelle Spence-Jones that a crime had been committed" and "[w]e still believe so today."   It
explained that the prosecution was dropping the case because "circumstances developed," and
"evidence and testimony . . . change[d] over time."

555.    Rundle and Scruggs issued the press release in order to further damage
Spence-Jones' reputation, and to cover up their own misconduct.

556.    For example, Rundle's spokesman, Ed Griffith, spoke to a member of the
press concerning the dismissal of the Carey-Shuler Indictment: when the journalist indicated that
it appeared that Spence-Jones was innocent, Griffith offered to provide the Closeout Memo to
change his mind.

557.    Scruggs drafted the Closeout Memo

558.    Rundle reviewed and approved the Closeout Memo.

559.    The Closeout Memo served two principal purposes: (i) to defame Spence-
Jones, and (ii) to cover up the SAO Defendants' own fraud, deception, withholding of evidence,
and conspiracy against Spence-Jones.

560.    In the Closeout Memo, Rundle and Scruggs admitted: "Without Dr.
Carey-Shuler's cooperative testimony . . . the state does not believe that it can meet its burden of
proving the case beyond a reasonable doubt."

561.    The SAO Defendants, of course, had this same information on June 21, 2010, the date of Carey-Shuler's deposition, over 14 months before it finally dropped the Indictment.

562.    Even more important, the SAO Defendants had the exonerative documents no later than September 18, 2009, before they charged Spence-Jones at all.

563.    The Closeout Memo claimed, falsely, that Scruggs only obtained Carey-Shuler's files in October 2009, after she gave her September 18, 2009 sworn statement.

564.    The Closeout Memo falsely accused Spence-Jones and her counsel of manufacturing evidence.

565.    Specifically, the Closeout Memo falsely accused Spence-Jones and her counsel of planting the drafts of the February 15, 2005 letter into Carey-Shuler's file.

566.    Rundle and Scruggs claimed that when the prosecutors reviewed the Café Soul file, it was "empty."

567.    That is a lie.

568.    Rundle and Scruggs claimed that the SAO "provid[ed] Ms. Spence Jones and her attorney . . . copies of, all of the documents in its possession."

569.    That is a lie.  The SAO did not provide Spence-Jones or her counsel copies of 43 boxes in its possession, or copies of the Café Soul file.

570.    Rundle and Scruggs then claimed that Spence-Jones' defense attorney, Peter Raben, "discovered" documents containing Carey-Shuler's drafts upon review of the file. The Closeout Memo stated that Raben "demanded" that the county record custodian leave the room during the review, citing attorney-client privilege.

571.     The Closeout Memo further stated: a "short while later, the two drafts of the Dr. Carey-Shuler letter, along with several other documents relating to the Café Soul project, *surfaced* in the *previously empty* Café Soul file."  (Emphasis added).

572.     That is a lie.  The two drafts of the Carey-Shuler letter, and the other documents, had always been in the Café Soul file, including in September-October 2009, when the SAO Defendants reviewed the file, hid the drafts from Carey-Shuler, misled Carey-Shuler, and authorized/filed the false Fielder affidavit that caused Spence-Jones' arrest, detention, and imprisonment.

573.     The Closeout Memo stated: "During questioning by Counsel for Ms. Spence-Jones, two 'newly discovered' documents that had never been given to the State, were produced which appeared to be two earlier drafts of the Dr. Carey-Shuler's letter of February 15, 2005."

574.     This is a series of lies.  The drafts were not "newly discovered"; they had been in the Café Soul file all along.

575.     The claim that the drafts "had never been given to the State" is also false. To the contrary, the SAO Defendants seized Carey-Shuler's file, including the two drafts, no later than September 18, 2009.  It was the SAO Defendants who never produced the drafts to Spence-Jones, Raben, or Carey-Shuler.

576.     The Closeout Memo referred to "the surprise discovery of the two drafts of the Dr. Carey-Shuler letter."  This is a falsehood: the two drafts were not "discovered"; they were already in the SAO's possession.  Nor was there any "surprise": the SAO reviewed the Café Soul file before November 2009, and therefore knew full well about the existence of the drafts.

577.     In short, in the Closeout Memo, Rundle and Scruggs falsely accused Spence-Jones and Raben of planting evidence to obstruct justice.  As the *Miami New Times* reported, "In his close-out memo, Assistant State Attorney Richard Scruggs accuses Spence-Jones and her defense lawyer of evidence tampering."

578.     Rundle and Scruggs then published these outrageous, false accusations to the Miami press corps, to employees of the City of Miami, and to the Florida Governor's office, among others.

579.     Rundle took a keen personal interest in perpetrating the SAO's false story and defaming Spence-Jones and Raben to the world.  On August 24, 2011, after the Carey-Shuler case was formally dismissed, Rundle personally emailed the defamatory Closeout Memo to employees of the City of Miami, to the Florida Governor's office, and to members of the public.

580.     On August 24, 2011, Raben emailed Rundle: "I wanted to provide you with fair warning that I intend to defend my integrity in response to the explicit and implicit assertions in the publicly disseminated close-out memo that I was a criminal conspirator to planting evidence, suborning perjury and obstructing justice.  An immediate and public retraction would be appropriate."

581.     Incredibly, Rundle professed surprise at Raben's email, stating, "I must tell you I didn't see what you see with respect to your integrity in reading Mr. Scruggs' close-out memo. . . . We thought it was just an objective 'factual' rendition by Mr. Scruggs."

582.     The rendition, however, was neither "objective" nor "factual."  It was a litany of falsehoods.

583.     Nor was the rendition only by "Mr. Scruggs"; it was by Scruggs and Rundle, together.

584.     Neither Rundle nor Scruggs issued a retraction or apology to the media for any aspect of the false, defamatory Closeout Memo.

585.     To this day, as authorized by Rundle, the false, defamatory August 23, 2011 press release and Closeout Memo remain published on the SAO's official website, available to anyone in Florida, the United States, or anywhere in the world with access to the Internet.

**A Political Conspiracy**

586.     In the summer of 2011, a high-level source within the SAO stated that the case against Spence-Jones was political, not legal, and was being directed at the highest levels of the SAO.

587.     After the fraud was exposed and the fabricated cases collapsed, a high-level source within the SAO admitted to Spence-Jones that Regalado was behind the SAO scheme that resulted in the investigations, arrests, detention, and prosecutions of Spence-Jones.

**Carey-Shuler and Codina Identify the True Source of the Fraud: the SAO**

588.     After the Carey-Shuler case was dropped, Carey-Shuler's counsel said that had the case gone to trial, she "would have done what Armando Codina did, and said Scruggs lied to her.  That's what she would have said on the stand."

589.     Carey-Shuler's counsel further stated to the press that the Closeout Memo was false because *Scruggs* falsely told Carey-Shuler that the official letter was a forgery, not vice versa.  Scruggs falsely denied Carey-Shuler's statement, insisting to the reporter that he never told Carey-Shuler the letter authorizing $50,000 to Karym was a forgery.

590.    When questioned by the press about the Closeout Memo, Codina described Scruggs as a "serial liar."

591.    Rundle claimed to know about a prosecutor's limits in speaking to the press.  After Carey-Shuler testified that she had approved the funding for Karym, Rundle refused comment, stating through her spokesperson: it is "improper for us to be discussing such factual case matters that relate directly to the upcoming case."

592.    Yet, where expedient for her political goals, or for covering up her own scheme, Rundle did not hesitate to circulate the false and defamatory Closeout Memo to the Miami press corps and to the world.

### Two Years in the Wilderness: A Public Servant in Ruins

593.    As a direct result of defendants' conspiracy, Spence-Jones has been gravely injured.  Michelle Spence-Jones was kept out of office for nearly two years, unable to serve her District or the people of Miami.  She lost her liberty.  She lost her income.  She lost her job.  She incurred legal fees to defend herself against the baseless prosecutions.  Her business and personal reputation was severely damaged.  She suffered immense emotional, psychological, and physical distress as a result of this entire ordeal.  The incident almost destroyed her life and her family.  As a result of what the defendants did, Michelle Spence-Jones lost two years of her life.

594.    During those years, and still today, Rundle remains the State Attorney for Miami-Dade County.

595.    During those years, and still today, Regalado remains the Mayor of Miami.

81

596.    The evidence (direct and circumstantial) of the conspiracy between Regalado, Rundle, and her office is overwhelming.  Rundle and Regalado repeatedly worked together towards their common goal of removing Spence-Jones, of which the fabrication of evidence, trumped-up investigation and charges were a critical part.  After months of planning, Rundle timed the false arrest of Spence-Jones to remove Spence-Jones and allow Regalado to appoint her successor.  In rapid succession, Rundle and Regalado both pressured Bru and her office to violate the City Charter in order to secure Spence-Jones' long-term removal.  After prosecuting Commissioner Gonzalez, Rundle (again, acting far beyond the duties of any prosecutor) personally called Regalado to pressure Gonzalez to give the Commission the quorum needed to prevent Spence-Jones from being reelected to the Commission.  When Spence-Jones was elected again, Rundle timed the fabricated Codina case solely in order to prevent Spence-Jones' return to the Commission, paving the way for Regalado's triumph (no less, occupying Spence-Jones's own seat on the Commission dais) and effective takeover of the Commission.  Knowing full well that she had no probable cause or basis for prosecuting Spence-Jones, Rundle schemed with Regalado as late as the summer of 2011 to keep Spence-Jones off the Commission.  In short, the fraud at the heart of these fabricated prosecutions was not the mere product of a line-level, rogue prosecutor.  This scheme was largely masterminded at the highest levels: by Rundle and Regalado.

597.    Finally, after *both* of the prosecution's lead witnesses – Barbara Carey-Shuler and Armando Codina – described Scruggs as a liar who deceived them, and after both cases against Spence-Jones were revealed as a complete and utter sham, Scruggs was removed from the public corruption unit of the SAO and transferred into a different unit.  However,

Scruggs today remains at the SAO, employed by Rundle, with power to investigate, arrest, imprison, and prosecute.

598.     After the criminal cases collapsed, the new Governor of Florida was forced by law to reinstate Spence-Jones as the Commissioner for District 5.  Spence-Jones today is a Commissioner again, vulnerable once again to the ongoing conspiracy by Rundle and her co-conspirators to remove Spence-Jones, apparently at any cost.

**AS AND FOR A FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983, Fabrication/Concealment of Evidence in Carey-Shuler Case**
**(Against SAO Defendants)**

599.     Plaintiff repeats and realleges the foregoing as if the same were fully set forth at length herein.

600.     Under color of law, Rundle, Scruggs and Fielder, acting individually and in concert, knowingly and intentionally concealed evidence demonstrating that Carey-Shuler had authorized the transfer of $50,000 to Karym, and that MMAP had authorized the transfer of $50,000 to Karym.

601.     In knowingly and intentionally concealing such evidence, Rundle and Scruggs (and of course, Fielder) were not acting as advocates, but were instead acting as police officers investigating a case.

602.     Rundle, Scruggs and Fielder knowingly and intentionally concealed drafts of the February 15th letter from Carey-Shuler herself, causing her to create fabricated and false testimony that the final letter was forged.

603.     To conceal their fabrication and concealment of evidence, Rundle, Scruggs and Fielder then knowingly and intentionally concealed the drafts of the February 15th letter from Spence-Jones and her counsel, to cover up the fact that they knew that Carey-Shuler

83

had authorized the transfer of $50,000 to Karym.  And, as a further cover up, when the evidence of the drafts of the February 15th letter emerged, Rundle, Scruggs and Fielder falsely claimed that Spence-Jones and her counsel had manufactured these drafts and planted them in the Café Soul file.

606. The SAO Defendants also engaged in the other conduct described *supra*, including, *inter alia*, lying to Carey-Shuler, threatening Carey-Shuler, falsely claiming that Spence-Jones had forged Carey-Shuler's signature, and filing an arrest affidavit and Information that withheld exculpatory evidence and relied on false evidence.

605. The SAO Defendants acted with a knowing, willful, wanton, grossly reckless, unlawful, unreasonable, unconscionable, and flagrant disregard of Plaintiff's rights, privileges, welfare, and well-being and are guilty of egregious and gross misconduct towards Plaintiff.

606. The intentional and/or reckless creation of false and misleading evidence and withholding of exculpatory evidence was necessary to the probable cause finding which was the basis for the arrest warrant to be issued, for the Information, and ultimately, the grand jury's decision to indict.

607. In violation of the First Amendment, the SAO Defendants targeted Spence-Jones because of her political position, because she opposed the Mayor, and in order to deprive her of her right to hold public elected office.

608. As a result, Plaintiff was arrested, imprisoned, handcuffed, seized, charged, deprived of her employment and elected position, and deprived of her right not to be deprived of liberty and property, in violation of the First, Fourth and Fourteenth Amendments to the United States Constitution.

609.    As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

**AS AND FOR A SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983, Fabrication/Concealment of Evidence in Codina Case**
**(Against SAO Defendants)**

610.    Plaintiff repeats and realleges the foregoing as if the same were fully set forth at length herein.

611.    Under color of law, Rundle, Scruggs and Fielder, acting individually and in concert, engaged in the misconduct set forth *supra*, and knowingly fabricated "evidence," *inter alia*, that Spence-Jones stole Codina's money, used his funds as a personal piggybank, was a thief, and induced him to give money to a fake charity for a fake charity event, and intentionally concealed evidence from Armando Codina demonstrating that his money was deposited with a real charity in connection with a real charity event, in order to induce him to implicate Spence-Jones in a crime, arrest and imprison Spence-Jones, and support a baseless investigation and prosecution against Spence-Jones.

612.    In knowingly and intentionally concealing and fabricating evidence, Rundle and Scruggs (and of course, Fielder) were not acting as advocates, but were instead acting as police officers investigating a case.

613.    In violation of the First Amendment, the SAO Defendants targeted Spence-Jones because of her political position, because she opposed the Mayor, and in order to deprive her of her right to hold public elected office.

614.    As a result, Plaintiff was arrested, imprisoned, handcuffed, seized, charged, deprived of her employment and elected position, and deprived of her right not to be deprived of liberty and property, in violation of the First, Fourth and Fourteenth Amendments to

85

the United States Constitution.

615.    The SAO Defendants acted with a knowing, willful, wanton, grossly reckless, unlawful, unreasonable, unconscionable, and flagrant disregard of Plaintiff's rights, privileges, welfare, and well-being and are guilty of egregious and gross misconduct towards Plaintiff.

616.    As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

**AS AND FOR A THIRD CLAIM FOR RELIEF**
**42 U.S.C. § 1983, False Arrest for Carey-Shuler Case**
**(Against SAO Defendants)**

617.    Plaintiff repeats and realleges the foregoing as if the same were fully set forth at length herein.

618.    Rundle, Scruggs and Fielder arrested, seized, detained, and imprisoned Spence-Jones without probable cause, and/or failed to intervene to prevent this conduct.

619.    There was no probable cause to arrest Spence-Jones for the Carey-Shuler case (or any case).

620.    The wrongful, unjustifiable, and unlawful apprehension, arrest, seizure, detention, and imprisonment of Spence-Jones was carried out without Spence-Jones' consent, without basis, and without probable cause or reasonable suspicion.

621.    All this occurred without any fault or provocation on the part of Spence-Jones.

622.    In so doing, the SAO Defendants deprived Plaintiff of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, in violation of 42

U.S.C. § 1983, including, but not limited to, rights guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution.

623.    Said acts were acted under pretense and color of state law, beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers, and the SAO Defendants acted willfully, knowingly, and with the specific intent to deprive Plaintiff of her constitutional rights secured by 42 U.S.C. § 1983, and by the Fourth and Fourteenth Amendments to the United States Constitution.

624.    The SAO Defendants acted with a knowing, willful, wanton, grossly reckless, unlawful, unreasonable, unconscionable, and flagrant disregard of Plaintiff's rights, privileges, welfare, and well-being and are guilty of egregious and gross misconduct towards Plaintiff.

625.    As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

### AS AND FOR A FOURTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983, Malicious Prosecution and Seizure for Carey-Shuler Case
### (Against SAO Defendants)

626.    Plaintiff repeats and realleges the foregoing as if the same were fully set forth at length herein.

627.    Under color of state law, without any probable cause, and with malice, the SAO Defendants, in their investigatory capacity, fabricated and withheld evidence, illegally causing the bringing of criminal charges against Spence-Jones for Grand Theft in the Second Degree.

628.    Spence-Jones was criminally prosecuted for almost two years until such charges were dismissed and resolved in her favor.

629.     The SAO Defendants fabricated evidence implicating Plaintiff though they had documents proving that Carey-Shuler had authorized the payment of $50,000 in county moneys to Karym, that MMAP authorized the payment of $50,000 to Karym, and that Spence-Jones had committed no crime.

630.     The prosecution continued even after Carey-Shuler testified that she had authorized the payment of $50,000 in county moneys to Karym.

631.     As a result of the wrongful prosecution, Plaintiff was seized and deprived of her rights under the Fourth and Fourteenth Amendments to the United States Constitution.

632.     The SAO Defendants acted with knowing, willful, wanton, grossly reckless, unlawful, unreasonable, unconscionable, and flagrant disregard of Plaintiff's rights, privileges, welfare, and well-being and are guilty of egregious and gross misconduct towards Plaintiff.

633.     As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

### AS AND FOR A FIFTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983, Malicious Prosecution and Seizure for Codina Case
### (Against SAO Defendants)

634.     Plaintiff repeats and realleges the foregoing as if the same were fully set forth at length herein.

635.     Under color of state law, without probable cause and with malice, the SAO Defendants, in their investigatory capacity, fabricated and withheld evidence, illegally causing the bringing of criminal charges against Plaintiff for Bribery and Grand Theft in the Third Degree.

636.    Plaintiff was criminally prosecuted until such charges were dismissed and resolved in her favor.

637.    The jury acquitted Plaintiff on all counts, and the charges were dismissed in her favor.

638.    As a result of the wrongful prosecution, Plaintiff was seized and deprived of her rights under the Fourth and Fourteenth Amendments to the United States Constitution.

639.    The SAO Defendants acted with knowing, willful, wanton, grossly reckless, unlawful, unreasonable, unconscionable, and flagrant disregard of Plaintiff's rights, privileges, welfare, and well-being and are guilty of egregious and gross misconduct towards Plaintiff.

640.    As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

### AS AND FOR A SIXTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983, First Amendment Retaliation
### (Against SAO Defendants)

641.    Plaintiff repeats and realleges the foregoing as if the same were fully set forth at length herein.

642.    By the conduct set forth *supra*, and by knowingly and intentionally concealing and fabricating evidence in the Codina and Carey-Shuler cases, falsely arresting and wrongfully seizing Spence-Jones, and manipulating the Commission and the political and criminal process to orchestrate her removal and exile from public office, Rundle, Scruggs and Fielder wrongfully retaliated against Spence-Jones for her political position, because she opposed the Mayor, and in order to deprive her of her right to hold public elected office, in violation of Plaintiff's First Amendment rights.

89

643.     As a direct and foreseeable consequence of the SAO Defendants' actions, Plaintiff was deprived of her rights under the First and Fourteenth Amendments to the United States Constitution.

644.     The SAO Defendants acted under color of state law, with knowing, willful, wanton, grossly reckless, unlawful, unreasonable, unconscionable, and flagrant disregard of Plaintiff's rights, privileges, welfare, and well-being and are guilty of egregious and gross misconduct towards Plaintiff.

645.     As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged

## AS AND FOR A SEVENTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983, Civil Rights Conspiracy
### (Against all Defendants)

646.     Plaintiff repeats and realleges the foregoing as if the same were fully set forth at length herein.

647.     Under color of state law, Regalado, Rundle, Scruggs, and Fielder conspired and entered into express and implied agreements, understandings or meetings of the minds among themselves to deprive Plaintiff of her constitutional rights by the conduct described *supra*, including arresting, seizing, detaining, imprisoning, charging and prosecuting her for baseless charges in the Carey-Shuler and Codina cases, which these Defendants knew were fraudulent, baseless, and not supported by probable cause, and repeatedly manipulating the Commission and the political and criminal process, in order to remove her from elected office, and continuing the prosecutions so that she could not return to her elected position.

648.     Regalado, Rundle, Scruggs, and Fielder, acting jointly and in concert, willfully participated in this illegal objective by various means, by the above, and by, *inter alia*:

a.      fabricating Carey-Shuler's inculpatory testimony, threatening

Carey-Shuler, and withholding evidence from Carey-Shuler;

b.      filing a false arrest affidavit based on fabricated testimony and

withheld exculpatory evidence, causing Spence-Jones' arrest, detention,

imprisonment, suspension, and loss of employment and public office,

without basis or probable cause;

c.      timing the arrest to coincide with Spence-Jones' swearing in to

office;

d.      causing and expediting the suspension of Spence-Jones;

e.      filing a false Information based on fabricated testimony and

withheld exculpatory evidence

f.      repeatedly manipulating the political and criminal process to

orchestrate Spence-Jones' removal and control the appointment of Spence-

Jones' replacement;

g.      indicting Spence-Jones based on fabricated evidence, solely to

circumvent an imminent court ruling returning Spence-Jones to office;

h.      lying to and withholding evidence from Codina to cause him to be

the chief prosecution witness, in an attempt to manufacture probable cause

in the Codina case;

i.      arresting and imprisoning Spence-Jones on baseless bribery and,

later, grand theft charges in the Codina case;

j.      withholding exculpatory drafts of Carey-Shuler's letter from

Carey-Shuler, Spence-Jones, her counsel, and the public;

91

k.      attempting to cover up and perpetuate the scheme by ordering prosecution witnesses such as Carey-Shuler and Codina not to reveal the scheme;

l.      continuing the Carey-Shuler prosecution even after she testified that she authorized county moneys for Karym;

m.      postponing dismissing the Indictment to delay Spence-Jones' return to office;

n.      refusing to dismiss the Indictment until Spence-Jones made statements validating the prosecution;

o.      covering up the fraud as to Carey-Shuler by falsely accusing Spence-Jones and her lawyer of manufacturing, forging, and planting evidence; and

p.      repeatedly defaming Spence-Jones to potential jurors and grand jurors, the City, the Governor, the media, and the public.

649.    As a direct and foreseeable consequence of this conspiracy, Plaintiff was deprived of her rights under the Fourth and Fourteenth Amendments to the United States Constitution.

650.    Defendants acted with knowing, willful, wanton, grossly reckless, unlawful, unreasonable, unconscionable, and flagrant disregard of Plaintiff's rights, privileges, welfare, and well-being in conspiring against her and are guilty of egregious and gross misconduct towards Plaintiff.

651.    As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

### AS AND FOR AN EIGHTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983, Supervisory Liability
### (Against Rundle)

652.     Plaintiff repeats and realleges the foregoing as if the same were fully set forth at length herein.

653.     In addition to Rundle's liability for directing the conspiracy to deprive Plaintiff of her constitutional rights, Rundle is additionally liable as a supervisor.

654.     As the head of the SAO, Rundle supervised Scruggs and Fielder.  Indeed, upon information and belief, Scruggs reported directly to Rundle.

655.     In her supervisory capacity, Rundle caused Scruggs and Fielder to violate Plaintiff's constitutional rights, specifically Plaintiff's rights under the First, Fourth and Fourteenth Amendments to the United States Constitution, as detailed above.

656.     Rundle directed Scruggs and Fielder to violate Plaintiff's constitutional rights.

657.     Rundle knew that Scruggs and Fielder would violate Plaintiff's constitutional rights and failed to stop them from doing so.

658.     Rundle knew that Scruggs had a history of documented unlawful, unprofessional, and unethical conduct, including withholding of exculpatory evidence from the defense, withholding of exculpatory evidence from the public/violation of the public records laws, and other misconduct set forth *supra*, yet assigned Scruggs to investigate, arrest, imprison, and prosecute Spence-Jones notwithstanding (and on information and belief, because of) such misconduct.

659.     Rundle acted under color of law, and with a knowing, willful, wanton, grossly reckless, unlawful, unreasonable, unconscionable, and flagrant disregard of Plaintiff's

93

rights, privileges, welfare, and well-being and is guilty of egregious and gross misconduct

towards Plaintiff.

660.     As a direct and proximate result of the misconduct and abuse of authority

detailed above, Plaintiff sustained the damages hereinbefore alleged

**AS AND FOR A NINTH CLAIM FOR RELIEF**
**Civil RICO, 18 U.S.C. § 1962(c)**
**(Against all Defendants)**

661.     Plaintiff repeats and realleges the foregoing as if the same were fully set

forth at length herein.

662.     Plaintiff and defendants are natural "persons," and as such are "persons"

within the meaning of 18 U.S.C. § 1961(3).

***The Enterprise***

663.     Regalado and the SAO Defendants comprise two distinct groups of

persons that together form an enterprise within the meaning of 18 U.S.C. § 1961(4).  Each and

every defendant is associated with the enterprise.  The SAO Defendants also associated together

to form a separate and distinct enterprise within the meaning of 18 U.S.C. § 1961(4).

664.     Taken together, Regalado and the SAO Defendants are an association-in-

fact within the meaning of 18 U.S.C. § 1961(4).  The SAO Defendants are also themselves an

association-in-fact within the meaning of 18 U.S.C. § 1961(4).

665.     Regalado directly participated in the operation and management of an

enterprise comprised of Regalado and the SAO Defendants.  However, even if Regalado were

removed from the enterprise, the SAO Defendants associated together to form a separate and

distinct enterprise and association-in-fact within the meaning of 18 U.S.C. § 1961(4).

94

666.     The purpose of the enterprise and/or enterprises (collectively "Enterprise") was to remove Spence-Jones, Regalado's political opponent, from elected office through fraudulent means, and keep her off the Commission as long as possible.  This was accomplished, *inter alia*, by fabricating false charges to remove Spence-Jones from office and continuing to pursue those charges even where there was no evidence supporting them.

**The Enterprise's Conduct and Participation in Racketeering Activity**

667.     As part of this fraudulent conspiracy, Rundle, Scruggs and Fielder participated in the operation and management of the Enterprise by engaging in, *inter alia*, the acts listed below.   Rundle, Scruggs, and Fielder either personally made the decision that the Enterprise should engage in, *inter alia*, the following acts, or knowingly implemented the decision to engage in, *inter alia*, the following acts:

> a.     fabricating Carey-Shuler's inculpatory testimony, threatening Carey-Shuler, and withholding evidence from Carey-Shuler;
>
> b.     filing a false arrest affidavit based on fabricated testimony and withheld exculpatory evidence, causing Spence-Jones' arrest, detention, imprisonment, suspension, and loss of employment and public office, without basis or probable cause;
>
> c.     timing the arrest to coincide with Spence-Jones' swearing in to office;
>
> d.     causing and expediting the suspension of Spence-Jones;
>
> e.     filing a false Information based on fabricated testimony and withheld exculpatory evidence

f.      repeatedly manipulating the political and criminal process to orchestrate Spence-Jones' removal and control the appointment of Spence-Jones' replacement;

g.      indicting Spence-Jones based on fabricated evidence, solely to circumvent an imminent court ruling returning Spence-Jones to office;

h.      lying to and withholding evidence from Codina to cause him to be the chief prosecution witness, in an attempt to manufacture probable cause in the Codina case;

i.      arresting and imprisoning Spence-Jones on baseless bribery and, later, grand theft charges in the Codina case;

j.      withholding exculpatory drafts of Carey-Shuler's letter from Carey-Shuler, Spence-Jones, her counsel, and the public;

k.      attempting to cover up and perpetuate the scheme by ordering prosecution witnesses such as Carey-Shuler and Codina not to reveal the scheme;

l.      continuing the Carey-Shuler prosecution even after she testified that she authorized county moneys for Karym;

m.      postponing dismissing the Indictment to delay Spence-Jones' return to office;

n.      refusing to dismiss the Indictment until Spence-Jones made statements validating the prosecution;

96

o.      covering up the fraud as to Carey-Shuler by falsely accusing Spence-Jones and her lawyer of manufacturing, forging, and planting evidence; and

p.      repeatedly defaming Spence-Jones to potential jurors and grand jurors, the City, the Governor, the media, and the public.

668.    As part of this fraudulent conspiracy, and as set forth *supra*, Regalado participated in the operation and management of the Enterprise by directing the SAO Defendants to remove Spence-Jones from office and keep her off the commission by fraudulent means.

**Pattern of Racketeering Activity – Mail and Wire Fraud**

669.    Defendants, individually and collectively, as an Enterprise, have engaged, directly or indirectly, in a pattern of racketeering activity, as described below, in violation of 18 U.S.C. § 1962(c)..

670.    Defendants, acting individually and as part of the Enterprise, have used the mails and interstate wires and have caused the mails and interstate wires to be used, or reasonably knew the mails and interstate wires would be used, in furtherance of their fraudulent schemes.  For example:

a.      By taking the sworn statement of Armando Codina on March 2, 2010 via interstate telephone, as detailed above, while Scruggs and Fielder were in Florida and Codina was out of state.

b.      By using the wires, *i.e.*, the SAO's website, on November 13, 2009 to issue a press release announcing that Spence-Jones was being criminally charged.

c.      By using the wires, *i.e.*, the SAO's website, on March 3, 2010 to issue a press release making false statements about Spence-Jones.

d.  By using the wires, *i.e.*, the SAO's website, on August 23, 2011 to issue a press release and Closeout Memo which made false statements about Spence-Jones.

e.  Scruggs and Fielder visited New York in June 2010 to interview witnesses for the Codina case and investigate Spence-Jones in yet other cases.  On information and belief, during that trip, Scruggs and Fielder repeatedly used the wires, including telephone and email, to communicate with others at the SAO.

f.   On information and belief, by repeatedly using the wires, including telephone and email, between Regalado, Rundle, Scruggs, Fielder, and others at the SAO, in connection with the fraudulent investigations, arrests, imprisonment, detention, seizure, and prosecutions against Spence-Jones.

671.   On information and belief, each and every defendant had specific knowledge that the mails and wires were being utilized in furtherance of the overall purpose of executing the scheme to defraud, and/or it was reasonably foreseeable that the mails and wires would be used given the nature of the investigation and prosecutions and the repeated use of the press, *inter alia*, to destroy Spence-Jones' reputation, pollute the jury pool, and engineer Spence-Jones' removal.

672.   In connection with defendants' schemes, the acts of racketeering activity have occurred after the effective date of the RICO statute, 18 U.S.C. § 1961 *et seq.*, and on numerous occasions over a substantial time period within ten years of each other.  Defendants' conduct has involved and continues to pose a threat of long term criminality since it is believed to have commenced no later than 2009 and lasted until at least 2011.  Because the defendants'

actions were part of their regular way of doing business, and because Spence-Jones is again an active Commissioner for District 5, and all defendants remain in their positions of power as elected officials, prosecutors, or investigators, there is also an ongoing threat that they will continue their fraudulent scheme.

***Relationship of Pattern of Racketeering Activity to Enterprise***

673.    As described above, the goal of the enterprise was to remove Spence-Jones, Regalado's political opponent, from elected office through fraudulent means, and keep her off the Commission as long as possible.  This was accomplished, *inter alia*, by the conduct set forth *supra*, and by defrauding Carey-Shuler, defrauding Codina, fabricating false charges to remove Spence-Jones from office and continuing to pursue those charges even where there was no evidence supporting them.

674.    Each defendant has conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through the pattern of racketeering activity described above. Accordingly, each defendant has violated 18 U.S.C. § 1962(c).

675.    As a direct and proximate result of the RICO violations described in this Complaint, Plaintiff was injured by being deprived of her elected office, losing wages, incurring legal fees and costs, and harm to her business/professional reputation, thus constituting an injury to Plaintiff's business or property within the meaning of 18 U.S.C. § 1964, by the actions of Defendants in violation of 18 U.S.C. § 1962(c)..

676.    For the violations of 18 U.S.C. § 1962(c) described in this Complaint, Plaintiff is entitled to recover compensatory and treble damages in an amount to be determined at trial.

### AS AND FOR A TENTH CLAIM FOR RELIEF
### Civil RICO Conspiracy, 18 U.S.C. § 1962(d)
### (Against all Defendants)

677.    Plaintiff repeats and realleges the foregoing as if the same were fully set forth at length herein.

678.    Each defendant has knowingly agreed and conspired to violate the provisions of 18 U.S.C. § 1962(c), by either agreeing to the commission of the numerous predicate acts of mail and wire fraud described above, and/or agreeing to the Enterprise's overall objective of removing Spence-Jones from office through fraudulent means and keeping her off the commission as long as possible, violating 18 U.S.C. § 1962(d).

679.    As a direct and proximate result of the RICO violations described in this Complaint and the actions of defendants in violation of 18 U.S.C. § 1962(d), plaintiff was injured by being deprived of her elected office, losing wages, incurring legal fees and costs, and harm to her business/professional reputation, thus constituting an injury to plaintiff's business or property within the meaning of 18 U.S.C. § 1964.

680.    For the violations of 18 U.S.C. § 1962(d) described in this Complaint, plaintiff is entitled to recover compensatory and treble damages in an amount to be determined at trial.

### AS AND FOR AN ELEVENTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983, Retaliatory Inducement to Prosecute
### (Against Regalado)

681.    Plaintiff repeats and realleges the foregoing as if the same were fully set forth at length herein.

682.     Regalado was motivated by retaliatory animus against Spence-Jones because they were political opponents and he knew he could not control her vote on numerous issues of significant concern to the people of the City of Miami.

683.     Regalado induced his friend and co-conspirator, Rundle, to prosecute Spence-Jones for the Carey-Shuler case and the Codina case.

684.     Regalado induced Rundle to prosecute Spence-Jones to remove Spence-Jones from elected office.

685.     There was no probable cause to pursue the Carey-Shuler case or the Codina case.

686.     Regalado's inducement caused Rundle to prosecute these cases, which they knew were baseless and lacking in probable cause.

687.     Even after Codina stated that he was defrauded by the SAO, Regalado continued to induce Rundle to prosecute Spence-Jones.

688.     Even after Carey-Shuler testified that she had authorized the provision of county moneys to Karym, Regalado continued to induce Rundle to prosecute Spence-Jones.

689.     Even after Spence-Jones was acquitted on all counts in fewer than 90 minutes for the Codina case, Regalado continued to induce Rundle to prosecute Spence-Jones.

690.     Regalado continued to induce Rundle to prosecute Spence-Jones to ensure that Spence-Jones could not return to her elected office.

691.     Regalado acted under color of law, with knowing, willful, wanton, grossly reckless, unlawful, unreasonable, unconscionable, and flagrant disregard of Plaintiff's rights, privileges, welfare, and well-being and is guilty of egregious and gross misconduct towards Plaintiff.

692.     As a direct and foreseeable consequence of this conspiracy, Plaintiff was deprived of her rights under the First and Fourteenth Amendments to the United States Constitution.

693.     As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

### AS AND FOR A TWELFTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983, Due Process/Stigma Plus
### (Against SAO Defendants)

694.     Plaintiff repeats and realleges the foregoing as if the same were fully set forth at length herein.

695.     Under color of law, Rundle, Scruggs, and Fielder intentionally and maliciously made false public statements of fact of and concerning Spence-Jones, to the media, the public, the Governor, the City, potential jury and grand jury pools, and/or to key witnesses, as set forth *supra*, and by falsely stating, *inter alia*:

a.   that Spence-Jones committed "acts" of "re-directing county money for her personal use," as detailed in paragraph 165;

b.   that Spence-Jones spent $50,000 that was "supposed to go to two other entities," as detailed in paragraph 167;

c.   that Spence-Jones stole money from the public, as detailed in paragraphs 170-173 and 259;

d.   that Spence-Jones had gone to Las Vegas with Reverend Gaston Smith, and stole and spent moneys meant for a separate charity, as detailed in paragraph 259;

102

e.  that Spence-Jones had forged Carey-Shuler's name on the official document
    directing payment to Karym, as detailed in paragraph 265;

f.  that Spence-Jones "went to Timbuktu Marketplace and . . . there were
    dealings there which ended up tricking Mr. Weeks and Osun Village," as
    detailed in paragraph 273;

g.  that Codina had made donations to a "fund controlled by Michelle Spence-
    Jones" and the SAO had him "on tape on a bribery case," as detailed in
    paragraphs 397 and 400;

h.  that the solicitation of Codina was for a fake, non-legitimate charity, run and
    controlled by Spence-Jones, and that Spence-Jones used the charity money as
    her personal piggybank, as detailed in paragraph 407;

i.  that the charitable benefit had simply never occurred, as detailed in paragraph
    408;

j.  that "no event had taken place at the Lyric Theater, that the charity was a
    sham, and that Michelle Spence-Jones had used the money as her own piggy
    bank," as detailed in paragraph 409;

k.  that Spence-Jones was a thief, could not help herself from stealing, and was a
    "mouse to cheese," as detailed in paragraph 410;

l.  that the money Spence-Jones' assistant solicited from Codina was "ultimately
    deposited  . . . into an account accessible to Commissioner Michelle Spence-
    Jones," as detailed in paragraph 434; and

m.  that Spence-Jones "solicited" a "bribe" from Codina, as detailed in paragraph
    436.

696.    These statements stigmatized Plaintiff by imputing that she acted with fraud, dishonesty, misconduct and unfitness in her profession as an elected official.  These statements stigmatized Plaintiff by imputing that she had committed the serious crimes of theft, forgery, and soliciting a bribe.

697.    These false statements were made in connection with and were reasonably related to and/or caused the constitutional violations Spence-Jones suffered, including the multiple suspensions of Spence-Jones from her public employment as an elected official on November 13, 2009, January 14, 2010, and March 4, 2010, her loss of livelihood and business goodwill, her loss of liberty, and the other harms alleged *supra*..

698.    The SAO Defendants' actions evidenced a reckless and callous disregard for, and deliberate indifference to, Plaintiff's constitutional rights.

699.    As a direct and proximate result of these false public statements, Plaintiff sustained the damages hereinbefore alleged.

### AS AND FOR A THIRTEENTH CLAIM FOR RELIEF
### Florida RICO, Title 45, § 772.103(3)
### (Against all Defendants)

700.    Plaintiff repeats and realleges the foregoing as if the same were fully set forth at length herein.

701.    Plaintiff and Defendants are natural "persons," and as such are "persons" within the meaning of Title 45, § 772.103.

*The Enterprise*

702.    Regalado and the SAO Defendants comprise two distinct groups of persons that together form an enterprise within the meaning of Title 45, § 772.103(3).  Each and

every defendant is associated with the enterprise. The SAO Defendants also qualify as separate and distinct enterprises within the meaning of Title 45, § 772.103(3).

703.    Taken together, Regalado and the SAO Defendants are an association-in-fact within the meaning of Title 45, § 772.103(3).  The SAO Defendants are also themselves an association-in-fact within the meaning of Title 45, § 772.103(3).

704.    Regalado directly participated in the operation and management of an enterprise comprised of Regalado and the SAO Defendants.  However, even if Regalado were removed from the enterprise, the SAO Defendants associated together to form a separate and distinct enterprise and association in fact within the meaning of Title 45, § 772.103(3). The purpose of the enterprise and/or enterprises (collectively "Enterprise") was to remove Spence-Jones, Regalado's political opponent, from elected office through fraudulent means, and keep her off the Commission as long as possible.  This was accomplished, *inter alia*, by fabricating false charges to remove Spence-Jones from office and continuing to pursue those charges even where there was no evidence supporting them.

### *The Enterprises's Conduct and Participation in Racketeering Activity*

705.    As part of this fraudulent conspiracy, Rundle, Scruggs and Fielder participated in the operation and management of the Enterprise by engaging in, *inter alia*, the acts listed below.  Rundle, Scruggs and Fielder either personally made the decision that the Enterprise should engage in, *inter alia*, the following acts, or knowingly implemented the decision to engage in, *inter alia*, the following acts:

a.    fabricating Carey-Shuler's inculpatory testimony, threatening Carey-Shuler, and withholding evidence from Carey-Shuler;

b.      filing a false arrest affidavit based on fabricated testimony and withheld exculpatory evidence, causing Spence-Jones' arrest, detention, imprisonment, suspension, and loss of employment and public office, without basis or probable cause;

c.      timing the arrest to coincide with Spence-Jones' swearing in to office;

d.      causing and expediting the suspension of Spence-Jones;

e.      filing a false Information based on fabricated testimony and withheld exculpatory evidence;

f.      repeatedly manipulating the political and criminal process to orchestrate Spence-Jones' removal and control the appointment of Spence-Jones' replacement;

g.      indicting Spence-Jones based on fabricated evidence, solely to circumvent an imminent court ruling returning Spence-Jones to office;

h.      lying to and withholding evidence from Codina to cause him to be the chief prosecution witness, in an attempt to manufacture probable cause in the Codina case;

i.      arresting and imprisoning Spence-Jones on baseless bribery, and later, grand theft charges in the Codina case;

j.      withholding exculpatory drafts of Carey-Shuler's letter from Carey-Shuler, Spence-Jones, her counsel, and the public;

106

k.     attempting to cover up and perpetuate the scheme by ordering prosecution witnesses such as Carey-Shuler and Codina not to reveal the scheme;

l.     continuing the Carey-Shuler prosecution even after she testified that she authorized county moneys for Karym;

m.     postponing dismissing the Indictment to delay Spence-Jones' return to office;

n.     refusing to dismiss the Indictment until Spence-Jones made statements validating the prosecution;

o.     covering up the fraud as to Carey-Shuler by falsely accusing Spence-Jones and her lawyer of manufacturing, forging, and planting evidence; and

p.     repeatedly defaming Spence-Jones to potential jurors and grand jurors, the City, the Governor, the media, and the public.

706.     As part of this fraudulent conspiracy, and as set forth *supra*, Regalado participated in the operation and management of the Enterprise by directing the SAO Defendants to remove Spence-Jones from office and keep her off the commission by fraudulent means.

**Pattern of Racketeering Activity – Tampering with a Witness**

707.     Defendants engaged in "misleading conduct" toward Carey-Shuler with intent to cause her to testify untruthfully in the SAO's "official investigation" and at the trial of Spence-Jones, an "official proceeding," in violation of Section 914.22(1)(f) of the Florida code. Such conduct is a predicate act for a Florida RICO Claim pursuant to Section 772.102(33).

708.    Defendants engaged in "misleading conduct" toward Carey-Shuler with intent to cause her to withhold truthful testimony in the SAO's "official investigation" and at the trial of Spence-Jones, an "official proceeding," in violation of Section 914.22(1)(f) of the Florida code.  Such conduct is a predicate act for a Florida RICO Claim pursuant to Section 772.102(33).

709.    Defendants engaged in "misleading conduct" toward Codina with intent to cause him to testify untruthfully in the SAO's "official investigation" and at the trial of Spence-Jones, an "official proceeding," in violation of Section 914.22(1)(f) of the Florida code.  Such conduct is a predicate act for a Florida RICO Claim pursuant to Section 772.102(33).

710.    Defendants engaged in "misleading conduct" toward Codina with intent to cause him to withhold truthful testimony in the SAO's "official investigation" and at the trial of Spence-Jones, an "official proceeding," in violation of Section 914.22(1)(f) of the Florida code.  Such conduct is a predicate act for a Florida RICO Claim pursuant to Section 772.102(33).

***Pattern of Racketeering Activity – Tampering with or fabricating physical evidence***

711.    Defendants concealed the drafts of the Carey-Shuler February 15th letter with the "purpose to impair its verity or availability" in the official investigation against Spence-Jones and at the trial of Spence-Jones, an "official proceeding," in violation of Section 918.13 of the Florida code.  Such conduct is a predicate act for a Florida RICO Claim pursuant to Section 772.102(34).

***Relationship of Pattern of Racketeering Activity to Enterprise***

712.    As described, the goal of defendants' Enterprise was to remove Spence-Jones, Regalado's political opponent, from elected office through fraudulent means.  This was accomplished by defrauding Carey-Shuler, defrauding Codina, fabricating false charges to

remove Spence-Jones from office and continuing to pursue those charges even where there was no evidence supporting them.

713.    The pattern of racketeering activity described above is integral to defendants' scheme.  Without engaging in witness tampering and concealment of evidence, defendants would have been unable to manufacture the baseless charges that supported and caused the Governor's removals of Spence-Jones from office.

714.    Each defendant has conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through the pattern of racketeering activity described above.

715.    In connection with defendants' scheme, the acts of racketeering activity have occurred on numerous occasions over a substantial time period within ten years of each other.  Defendants' conduct has involved and continues to pose a threat of long term criminality since it is believed to have commenced no later than 2009 and lasted until at least 2011. Because the defendants' actions were part of their regular way of doing business, and because all defendants remain in their positions of power as elected officials, prosecutors, or investigators, there is also an ongoing threat that they will continue their fraudulent scheme.

716.    As a direct and proximate result of the RICO violations described in this Complaint, Plaintiff suffered actual damages, as detailed herein. For the violations of 772.103(3)described in this Complaint, Plaintiff is entitled to recover compensatory and treble damages in an amount to be determined at trial.

**AS AND FOR A FOURTEENTH CLAIM FOR RELIEF**
**Florida RICO, Title 45, § 772.103(4)**
**(Against all Defendants)**

717.    Plaintiff repeats and realleges the foregoing as if the same were fully set forth at length herein.

109

718.     Each defendant has knowingly agreed and conspired to violate the provisions of 772.103(3), by either agreeing to the commission of the numerous predicate acts of mail and wire fraud described above, and/or agreeing to the Enterprise's overall objective of removing Spence-Jones from office through fraudulent means and keeping her off the commission as long as possible, violating 772.103(4).

719.     As a direct and proximate result of the RICO violations described in this Complaint, Plaintiff suffered actual damages, as detailed herein. For the violations of 772.103(4) described in this Complaint, Plaintiff is entitled to recover compensatory and treble damages in an amount to be determined at trial.

### AS AND FOR A FIFTEENTH CLAIM FOR RELIEF
**Florida Common Law/False Arrest for Carey-Shuler Case**
**(Against SAO Defendants)**

720.     Plaintiff repeats and realleges the foregoing as if the same were fully set forth at length herein.

721.     At all relevant times, the SAO Defendants acted forcibly in apprehending and arresting Plaintiff.

722.     Rundle, Scruggs and Fielder arrested Spence-Jones without probable cause, and/or failed to intervene to prevent this conduct.

723.     There was no probable cause to arrest Plaintiff for the Carey-Shuler case.

724.     The wrongful, unjustifiable, and unlawful apprehension, arrest, and detention, of Plaintiff was without Plaintiff's consent, without basis, and without probable cause or reasonable suspicion.

725.     This is a cause of action for damages in excess of fifteen thousand dollars exclusive of costs and attorneys' fees.

110

726.    As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

## AS AND FOR A SIXTEENTH  CLAIM FOR RELIEF
### Florida Common Law/Malicious Prosecution for Carey-Shuler Case
### (Against SAO Defendants)

727.    Plaintiff repeats and realleges the foregoing as if the same were fully set forth at length herein.

728.    The SAO Defendants, in their investigatory capacity, fabricated and withheld evidence, illegally causing the bringing of criminal charges against Spence-Jones for Grand Theft in the Second Degree.

729.    Plaintiff was criminally prosecuted until such charges were dismissed and resolved in her favor.

730.    There was no probable cause for the prosecution from its inception.

731.    The SAO Defendants fabricated evidence implicating Plaintiff though they had documents proving that Carey-Shuler had authorized the payment of $50,000 in county moneys to Karym, and that Spence-Jones had committed no crime.

732.    The prosecution continued even after Carey-Shuler admitted that she had authorized the payment of $50,000 in county moneys to Karym.

733.    The SAO Defendants acted with malice, and with knowing, willful, wanton, grossly reckless, unlawful, unreasonable, unconscionable, and flagrant disregard of Plaintiff's rights, privileges, welfare, and well-being and are guilty of egregious and gross misconduct towards Plaintiff.

734.     This is a cause of action for damages in excess of fifteen thousand dollars exclusive of costs and attorneys' fees.

735.    As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

### AS AND FOR A SEVENTEENTH CLAIM FOR RELIEF
### Florida Common Law/Malicious Prosecution for Codina Case
### (Against SAO Defendants)

736.    Plaintiff repeats and realleges the foregoing as if the same were fully set forth at length herein.

737.    Under color of state law, the SAO Defendants, in their investigatory capacity, fabricated and withheld evidence, illegally causing the bringing of criminal charges against Plaintiff for Bribery and Grand Theft in the Third Degree.

738.    There was no probable cause for the prosecution from its inception.

739.    Plaintiff was criminally prosecuted until the jury acquitted her on all counts.

740.    The SAO Defendants acted with malice, and with knowing, willful, wanton, grossly reckless, unlawful, unreasonable, unconscionable, and flagrant disregard of Plaintiff's rights, privileges, welfare, and well-being and are guilty of egregious and gross misconduct towards Plaintiff.

741.    This is a cause of action for damages in excess of fifteen thousand dollars exclusive of costs and attorneys' fees.

742.    As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

### AS AND FOR AN EIGHTEENTH CLAIM FOR RELIEF
### Florida Common Law/Intentional Infliction of Emotional Distress
### (Against All Defendants)

743.     Plaintiff repeats and realleges the foregoing as if the same were fully set forth at length herein.

744.     As set forth *supra*, defendants' conduct was extreme and outrageous.

745.     These actions were done with intent to cause Plaintiff mental suffering and/or were done in reckless disregard of the mental suffering that would result.

746.     As a result of the Defendants' actions, Plaintiff suffered extreme and severe emotional and physical distress.

747.     This is a cause of action for damages in excess of fifteen thousand dollars exclusive of costs and attorney's fees.

748.     As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

### AS AND FOR A NINETEENTH CLAIM FOR RELIEF
### Florida Common Law/Negligent Hiring, Discipline, Training, Retention and Supervision
### (Against Rundle)

749.     Plaintiff repeats and realleges the foregoing as if the same were fully set forth at length herein.

750.     Scruggs was Rundle's agent and employee.

751.     Rundle hired Scruggs though she knew that he was unfit to serve as a prosecutor.  It was unreasonable for her to have hired Scruggs, given his unfitness.

752.     Rundle continued to retain Scruggs as her employee though she knew that he was unfit to serve as a prosecutor.  On information and belief, she did not investigate his

misconduct. She did not discharge or reassign him. It was unreasonable for Rundle to have failed to take corrective action against Scruggs, including terminating him.

753.     To the contrary, Rundle affirmatively hired Scruggs for the prestigious position of Special Assistant to the State Attorney for Public Corruption. Scruggs reported directly to Rundle. Rundle affirmatively tasked Scruggs with investigating, arresting, and prosecuting Spence-Jones. As set forth *supra*, Rundle continued to allow Scruggs to hold that position and to continue to investigate and prosecute Spence-Jones when it was clear that he was unfit to do so.

754.     Rundle tasked Scruggs with investigating, arresting and prosecuting Spence-Jones in bad faith and with the malicious purpose of harming Spence-Jones as part of Rundle's scheme to have Spence-Jones removed from the Commission.

755.     Rather than provide appropriate training, discipline, and supervision of Scruggs, either before or during the Spence-Jones-related conspiracy, Rundle's approach was: "Boys will be boys." As a result, Scruggs participated in the fraud and misconduct set forth *supra*.

756.     This is a cause of action for damages in excess of fifteen thousand dollars exclusive of costs and attorneys' fees.

757.     As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

114

WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

(A)     an order granting compensatory damages in an amount to be determined at trial;

(B)     an order awarding treble damages pursuant to RICO, 18 U.S.C. § 1964(c), and Florida RICO, Title 45, § 772.104(1);

(C)     an order awarding punitive damages in an amount to be determined at trial;

(D)     an order awarding Plaintiff reasonable attorneys' fees and costs under 42 U.S.C. § 1988, RICO, 18 U.S.C. § 1964(c), and Florida RICO, Title 45, § 772.104(1); and

(E)     an order awarding such other further relief as the Court may deem just and proper.

Dated:  Miami, Florida
        March 7, 2013

EMERY CELLI BRINCKERHOFF &         LAW OFFICES OF RAY TASEFF, P.A.
    ABADY LLP

                                   /s/_____
Ilann Maazel*                      Ray Taseff
Debra L. Greenberger*              Florida Bar No. 352500
Jennifer Keighley*                 225 Alcazar Avenue, 2nd Floor
75 Rockefeller Plaza, 20th Floor   Coral Gables, Florida 33134
New York, New York 10019           Phone: (786) 363-9020
Phone: (212) 763-5000              Fax: (786) 363-9040
Fax: (212) 763-5001                RayTaseffPA@gmail.com
imaazel@ecbalaw.com
dgreenberger@ecbalaw.com           *Attorneys for Plaintiff*
jkeighley@ecbalaw.com

Charles J. Ogletree*
Harvard Law School
Hauser 516
1563 Massachusetts Avenue
Cambridge, MA 02138
Phone: (617) 495-5097
Fax: (617) 496-3936
ogletree@law.harvard.edu

* Admitted *pro hac vice*

115

# EXHIBIT A TO COMPLAINT: TIMELINE

| Date | Event | Related ¶¶s |
|---|---|---|
| 1993 | Rundle becomes State Attorney | 41 |
| 2005 | Spence-Jones elected Commissioner for District 5 | 24 |
| Apr. 3, 2006 | Benefit at the Lyric Theatre; Codina Group publicly recognized | 413, 415 |
| Aug. 2009 | Regalado states Spence-Jones going to jail | 129 |
| Fall 2009 | SAO repeatedly and secretly contacts Office of the City Attorney about filling Commission vacancies | 112 – 122 |
| No later than Sep. 18, 2009 | SAO has the Café Soul file, including the drafts | 265 |
| Sep. 18, 2009 | Carey-Shuler gives sworn statement after being deceived by Fielder and Scruggs | 285 |
| Nov. 3, 2009 | Regalado elected Mayor. Spence-Jones reelected Commissioner. | 130, 136 |
| Nov. 10, 2009 | Governor Crist has document in file listing three felony charges for Spence-Jones | 145 |
| Nov. 11, 2009 | Regalado sworn in as Mayor. Spence-Jones photograph Regalado tries to destroy. | 152 – 159 |
| Nov. 12, 2009 | Spence-Jones sworn in as Commissioner  Fielder files arrest affidavit | 162 – 163 |
| Nov. 13, 2009 | Spence-Jones arrested, detained, booked and jailed for Carey-Shuler case  Crist issues Executive Order 09-248 suspending Spence-Jones  Rundle forces Commissioner Gonzalez out of office  Rundle defames Spence-Jones at press conference | 166, 181 – 183, 201, 169 – 173 |
| Approximately Nov. 13, 2009 | Rundle asks Bru to convince Gonzalez to create quorum to replace Spence-Jones  Regalado pressures Bru to opine that the Commission could replace Spence-Jones absent a quorum | 212, 220 – 224 |
| Nov. 20, 2009 | Rundle defames Spence-Jones to the *Miami Herald* | 176 – 179 |
| Nov. 23, 2009 | Deadline for Commission to appoint Spence-Jones replacement | 206 |
| Nov. 25, 2009 | Suarez sworn in; Commission has quorum. Too late!  Commission schedules special election for Jan. 12, 2010 | 229 – 232 |

| Date | Event | Related ¶¶s |
|---|---|---|
| Dec. 2, 2009 | SAO files Information in the Carey-Shuler case | 311 |
| Dec. 4, 2009 | Judge Butchko reprimands Scruggs for "very unprofessional" withholding of evidence | 100 |
| Dec. 19, 2009 | Crist threatens to suspend Spence-Jones again if she wins special election | 329 |
| Jan. 4, 2010 | Spence-Jones sues Crist (the ACLU case) | 330 |
| Jan. 6, 2010 | Fielder threatens Codina in I-95 phone call | 418 – 425 |
| Jan. 12, 2010 | Scruggs to Codina: if Spence-Jones wins special election, we'll charge her again<br><br>Scruggs and Fielder tell Codina there was no charity event and Spence-Jones stole his money<br><br>Spence-Jones wins Special Election | 428 – 433, 438 |
| Jan. 14, 2010 | Crist issues Executive Order 10-05 suspending Spence-Jones again, effective January 16, 2010 | 335 |
| Jan. 26, 2010 | 10-day deadline for Commission to appoint Spence-Jones replacement<br><br>Shortly before 11:18 p.m.: Commission appoints Dunn; "Magic City" for Regalado | 341, 353, 358 |
| Feb. 26, 2010 | Judge Platzer: no Indictment, no suspension. Promises final ruling within 10 days or sooner. | 366 – 367 |
| Days before Mar. 3, 2010 | SAO suddenly seeks Indictment in Codina case | 370 – 378 |
| Mar. 1, 2010 | SAO's new "policy": indict in public corruption cases | 447 – 449 |
| Mar. 2, 2010 | Scruggs lies to Codina again; Codina's sworn statement | 450 – 452 |
| Mar. 3, 2010 | SAO gets Indictment in Carey-Shuler case<br><br>SAO gets Indictment in Codina case | 379, 386 |
| Mar. 4, 2010 | Crist issues Executive Order 10-61 suspending Spence-Jones for a third time | 381 – 382 |
| Apr. 5, 2010 | Because of Indictment, Judge Platzer dismisses ACLU case | 384 |
| May 27, 2010 | Scruggs threatens to get "even" with Raben | 468 – 472 |
| Jun. 21, 2010 | Raben shows drafts to Carey-Shuler at her deposition; Carey-Shuler tricked by the SAO | 481 – 484 |
| Jan. 18, 2011 | Regalado sends secret email to rename street "Katherine Fernandez-Rundle Avenue" | 62 – 63 |
| Feb. 16, 2011 | Codina deposition: Codina accuses Scruggs of deception | 496 – 500 |

| Date | Event | Related ¶¶s |
|------|-------|-------------|
| Feb. 28 – Mar. 16, 2011 | Codina trial; Spence-Jones acquitted in less than 90 minutes | 515 – 528 |
| Mar. 10, 2011 | Commission names street "Katherine Fernandez-Rundle Avenue" | 516 |
| Approx. May 2011 | Regalado: pass resolutions before "hell on wheels" returns to Commission | 542 |
| Summer 2011 | Back-door meeting between Regalado and Rundle | 531 – 534 |
| Jul. 2011 | SAO demands Spence-Jones admit that there is "probable cause" for a "fair prosecution" | 545 – 547 |
| Aug. 23, 2011 | Raben calls SAO's bluff; refuses to postpone August 24th court date<br><br>SAO dismisses Carey-Shuler case<br><br>SAO issues defamatory press release and close-out memo | 550 – 579 |
| Aug. 24, 2011 | Codina: Scruggs is a "serial liar"<br><br>Lawyer for Carey-Shuler: "Scruggs lied to her" | 588 – 590 |

## CERTIFICATE OF SERVICE

I hereby certify that on March 7, 2013, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

Dated:  Miami, Florida
       March 7, 2013

EMERY CELLI BRINCKERHOFF &
   ABADY LLP

Ilann Maazel*
Debra L. Greenberger*
Jennifer Keighley*
75 Rockefeller Plaza, 20th Floor
New York, New York 10019
Phone: (212) 763-5000
Fax: (212) 763-5001
imaazel@ecbalaw.com
dgreenberger@ecbalaw.com
jkeighley@ecbalaw.com


Charles J. Ogletree*
Harvard Law School
Hauser 516
1563 Massachusetts Avenue
Cambridge, MA 02138
Phone: (617) 495-5097
Fax: (617) 496-3936
ogletree@law.harvard.edu


* Admitted *pro hac vice*

LAW OFFICES OF RAY TASEFF, P.A.

/s/_____
Ray Taseff
Florida Bar No. 352500
225 Alcazar Avenue, 2nd Floor
Coral Gables, Florida 33134
Phone: (786) 363-9020
Fax: (786) 363-9040
RayTaseffPA@gmail.com

*Attorneys for Plaintiff*

## SERVICE LIST

John M. Hogan
john.hogan@hklaw.com
Sanford L. Bohrer
sbohrer@hklaw.com
Scott D. Ponce
sponce@hklaw.com
Brian W. Toth
Florida Bar No. 57708
Holland & Knight LLP
701 Brickell Avenue, Suite 3000
Miami, Florida 33131
Telephone: (305) 374-8500
Fax: (305) 789-7799
*Attorneys for Katherine Fernandez Rundle*


Thomas E. Scott, Esq.
Thomas.scott@csklegal.com
Scott A. Cole, Esq.
Scott.cole@csklegal.com
Steven R. Safra, Esq.
Steven.safra@csklegal.com
Cole, Scott & Kissane, P.A.
Dadeland Centre II
9150 S. Dadeland Blvd.
Suite 1400
Miami, FL 33156
Tel: (305) 350-5300
*Attorneys for Defendant Scruggs*

Christopher J. Whitelock, Esq.
cjw@whitelocklegal.com
Whitelock & Associates, P.A.
The Whitelock Law Building
300 Southeast Thirteenth Street, Suite D
Fort Lauderdale, Florida, 33316
Telephone: (954) 463-2001
Facsimile: (954) 463-0410
*Attorneys for Defendant Fielder*


Jose M. Quinon
Kristina G. Maranges
Jose M. Quinon, P.A.
2333 Brickell Avenue, Suite A-1
Miami, Florida 33129
Telephone (305) 858-5700
Facsimile (305) 358-7848
Email: jquinon@quinonlaw.com
Email: kmaranges@quinonlaw.com
*Attorneys for Defendant Regalado*