**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 12-24253-CIV-MIDDLEBROOKS/BRANNON**

MICHELLE SPENCE-JONES,

     Plaintiff,

vs.

STATE ATTORNEY KATHERINE
FERNANDEZ RUNDLE, MAYOR TOMÀS
TOMÀS REGALADO, ASSISTANT STATE
ATTORNEY WILLIAM RICHARD SCRUGGS,
and INVESTIGATOR ROBERT FIELDER,

     Defendants.

_____/

## ORDER DISMISSING AMENDED COMPLAINT

THIS CAUSE comes before the Court upon the following:

1. Motion to Dismiss by Katherine Fernandez Rundle (DE 60);

2. Motion to Dismiss by Tomás Regalado(DE 61);

3. Motion to Dismiss by Robert Fielder (DE 62);

4. Motion to Dismiss by William Richard Scruggs (DE 73); and

5. Motion to Strike Amended Complaint by William Richard Scruggs (DE 74).

I have had the benefit of memoranda filed by the Parties as well as oral argument.

## I.  Introduction

The Plaintiff, Michelle Spence-Jones ("Spence-Jones"), a former Miami City Commissioner has sued Dade County State Attorney Katherine Fernandez Rundle

1

("Rundle"), Assistant State Attorney Richard Scruggs ("Scruggs"), an investigator in the State Attorney's office, Robert Fielder ("Fielder"), and the Mayor of Miami, Tomás Regalado ("Regalado"). Essentially the Complaint alleges that the Defendants conspired to remove Ms. Spence-Jones from office by manufacturing false evidence, hiding exculpatory evidence, and manipulating the criminal process by charging her in two criminal cases. One of the cases was dismissed. In the other she was acquitted by a jury of her peers.

The Complaint[1] reads more like a political manifesto than the short, plain statement of jurisdiction and the claims contemplated by Rule 8 of the Federal Rules of Civil Procedure. Nineteen claims are asserted: ten claims pursuant to 42 U.S.C. § 1983 alleging fabrication and concealment of evidence, false arrest, malicious prosecution, First Amendment retaliation, civil rights conspiracy, supervisory liability, retaliatory inducement to prosecute, and Due Process Stigma-Plus; Civil RICO; common law false arrest; malicious prosecution; intentional infliction of emotional distress; and negligent hiring, discipline, training, retention and supervision. Mindful of the damage that could be inflicted on the functioning of the government and law enforcement officials of Miami Dade County, I stayed discovery pending resolution of the instant motions to dismiss. See *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353 (11th Cir. 1997).

## II.   **Amended Complaint**

The Complaint is 114 pages long and has 757 numbered allegations. It is full of self-serving hyperbole, personal attacks, and formulaic, implausible conclusions. For example, Spence-Jones describes herself as "a powerful voice for the community . . .

---

[1]   The Plaintiff amended her Complaint on March 7, 2013. All references to the "Complaint" are directed at the operative, Amended Complaint at Docket Entry 48.

[who] quickly developed a reputation for independence and loyalty to her constituents, often fighting powerful, moneyed, and entrenched interests for the sake of what she believed to be the good of her District and the City." (Compl. ¶ 30). Her opposition, however, "came from a somewhat different school of politics than Spence-Jones, a school based on friendship, patronage, and political favors." (*Id.* ¶ 35).

Full of political intrigue, the Complaint moves from an attempted extradition or kidnapping in Costa Rica (*id.* ¶¶ 83-88), the 1993 confrontation between the FBI and Branch Davidians at Waco, Texas (*id.* ¶¶ 89-93), a plan to fire the Miami Police Commissioner because he had ordered raids on illegal gambling (*id.* ¶¶ 535-540), the Mayor's alleged misuse of a city-issued gas credit card (*id.* ¶¶ 51-55), and the failure to arrest and prosecute the Mayor (at the time, a city commissioner) over an incident during street protests over Elian Gonzalez which occurred over a decade ago. (*Id.* ¶ 56).

For purposes of this Order, however, the pertinent allegations are relatively discreet, involving two criminal prosecutions.

A. Karym Ventures\Café Soul Prosecution

Allegations of the Complaint pertaining to the prosecution of Ms. Spence-Jones arising out of the Karym Ventures\Café Soul matter may be found in paragraphs 238-325 and 543-592. I have construed the Complaint in the light most favorable to the Plaintiff, accepting as true all facts that she alleges. *See Hishon v. King of Spaulding*, 467 U.S. 69, 73 (1984); *see also Wright v. Newsome*, 795 F.2d 964, 967 (11th Cir. 1986).

I have also reviewed a document entitled "Close-Out Memo, Michelle Spence-Jones Case No. F09-37102," attached as Exhibit B to the Defendant Scruggs' Motion to Dismiss (the "Closeout Memo"). References to the Closeout Memo are contained in paragraphs 8, 553-577, 584-585, and 589-592 of the Complaint. The Eleventh Circuit has held that a court may consider a document attached to a motion to dismiss without converting the motion into one for summary judgment if the attached document is: (1) central to the plaintiff's claim, and (2) undisputed. In this context "undisputed" means that the authenticity of the document is not challenged. A document need not be physically attached to a pleading to be incorporated by reference into it; if the document's contents are alleged in a complaint and no party questions those contents, such a document can be considered, provided it meets the centrality requirement. *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005). *See also Horsley v. Feldt*, 304 F.3d 1125 (11th Cir. 2002). Unlike the factual allegations of the Complaint, I have not presumed the truth of the statements contained in the Closeout Memo. But it is helpful in understanding the nature of the dispute and the chronology of events during the criminal prosecutions.

Karym Ventures, Inc. ("Karym") was a private corporation founded by Ms. Spence-Jones and several of her family members while Ms. Spence-Jones was a city employee, but before she was elected to the City Commission. (Compl. ¶¶ 31, 239; Closeout Memo, p. 2). According to the Complaint, Dr. Barbara Carey-Shuler, Chairperson of the Dade County Commission, authorized $50,000 in public funds to Karym for a neighborhood revitalization project called Café Soul that involved redevelopment of a crack house. The project had several components: a restaurant

4

focusing on southern cuisine, an art gallery, a hair salon, and an entertainment space. (*Id.* ¶ 239).  On September 23, 2004, Dr. Carey-Shuler recommended that the Metro-Miami Action Plan Trust ("MMAP") provide funding for Café Soul, but "the Commission, at least according to some MMAP staff, apparently recommended mistakenly" that the funds be directed to two other entities: Timbuktu Marketplace and Osun Village.  (*Id.* ¶ 241).

> The Closeout Memo describes the "mistake" as follows:

> The facts relevant to the criminal case against Ms. Spence-Jones began on September 23, 2004.   On that date the Miami-Dade County Commission held a budget meeting to determine how county funds should be allocated in fiscal year 2005.   Shortly before the public meeting, Chairperson Dr. Barbara Carey-Shuler had a meeting in her county office with MMAP officials and told them she was going to recommend that MMAP award grants to three separate entities: (1) Friends of MLK, Inc. ("FMLK"); Timbuktu Marketplace ("Timbuktu"), and Osun Village ("Osun"). Commissioner Dr. Carey-Shuler's "recommendation" became part of the county's budget at that nights' Commission meeting; however, no dollar amounts were included in the line item.  According to MMAP officials, nothing like this had ever happened before.  Under normal circumstances individuals submit grant applications on their own behalf or on behalf of their organization to MMAP, the applications are reviewed by members of MMAP's staff and the proposed grantees to the MMAP Board, and finally the MMAP Board votes on whether to fund the grant.  Commissioner Dr. Carey-Shuler's "recommendation" voided this entire process. Furthermore, MMAP officials have stated that the recommendation from the Chairperson of the Miami Dade County Commission was considered to be a directive and that neither the staff nor the Board ever believed that they had any choice about the three grants.

(Closeout Memo, pp. 2-3).

> According to the Complaint, after Ms. Spence-Jones informed Dr. Carey-Shuler

of the "mistake," she took steps to direct the $50,000 to Karym.  However, the Closeout Memo states as follows:

> Processing of the three grants was assigned to William Simmons, MMAP's senior manager.   Since the three grants as voted on by the

County Commission had no dollar amount, Mr. Simmons called Commissioner Dr. Carey-Shuler's office to determine the amount for each grant. He was told by a senior staff person in the Chairperson's office that each of these grants should be for $25,000. The MMAP Board affirmed the three grants on November 8, 2008 without even knowing which individuals would actually receive the funds. After the Board's vote, Mr. Simmons tried to determine who would sign the grant documents for each of the three entities since he had never heard of them and no application had been submitted to MMAP. During November and December, 2004 Mr. Simmons was unable to ascertain any of the individuals associated with FMLK, Timbuktu, or Osun. Meanwhile, on December 15, 2004 (after MMAP had affirmed the three grants) Karym Ventures, Inc. was incorporated by attorney Marlon Hill. Mr. Hill has testified in a sworn statement that he was called to the home of Michelle Spence-Jones and requested to file the incorporation papers for Karym since, according to Ms. Spence-Jones, Karym was about to receive a county grant from MMAP.

Around January 3, 2005, Ms. Spence-Jones called William Simmons. His notes of the conversation are included in the Closeout Memo. She told him that the Café Soul project was to be completed with Karym, that the overall project name was Osun, and that Café Soul would include the Timbuktu Market Place. She also told Mr. Simmons that she would put him in touch with the Friends of MLK ("FMLK"), most likely through Pastor Gaston Smith.

The Complaint alleges that "Carey-Shuler knew Spence-Jones personally and had confidence that Spence-Jones would make Café Soul a success." The Closeout Memo puts it a little differently. According to Mr. Simmons' sworn statement, he was well aware of the close relationship between Commission Chairperson Carey-Shuler and Ms. Spence-Jones and believed that it was in the best interest of his continued employment to "make this happen." (Closeout Memo, p. 4). Simmons requested letters from the principals of Timbuktu and Osun authorizing receipt by Karym of the two

6

$25,000 grants and also drafted a proposed letter to be signed by Dr. Carey-Shuler approving the redirecting of funds and sent the draft to Ms. Spence-Jones. (*Id.* at 4).

These three letters and the circumstances surrounding them constitute the heart of the Karym-related prosecution of Ms. Spence-Jones. (Compl. ¶ 4). One of them, the Carey-Shuler letter, is at the crux of her case against the State Attorney's Office ("SAO") defendants. (*Id.* ¶¶ 247-58, 269-70, 279-83, 292, 314, 318, 480-84).

Marvin Weeks, who originated the idea of Timbuktu Marketplace, had discussions with Ms. Spence-Jones about joining with her in Café Soul, but was unaware that on September 23, 2004, Dr. Carey-Shuler directed MMAP to award a grant to Timbuktu or that the MMAP Board had approved a $25,000 grant. (*Id.* ¶ 4). On January 3, 2005, Ms. Spence-Jones offered her "public relations and marketing services" to Mr. Weeks for $3,000; two days later she requested a letter from Mr. Weeks supporting the Café Soul project. According to the Closeout Memo, Mr. Weeks provided the letter without knowing it would be used to obtain Timbuktu's $25,000 grant from MMAP. Months later, Mr. Weeks learned that Karym had received the $25,000 and confronted Ms. Spence-Jones. He provided sworn testimony that she replied: "Marvin, that is not your money. This is my money, the Commissioner intended me to have that money." (Closeout Memo, p. 5).

The second $25,000 grant was directed by Commissioner Carey-Shuler to Osun Village, a redevelopment project of the N.W. 7th Avenue corridor between 54th and 58th Streets in Miami that did not include Café Soul. According to the Closeout Memo, the originators of the Osun Village, architects Harland Woodward and Nathaniel Styles, were likewise unaware that they had been awarded a $25,000 grant by MMAP. The

7

second letter, a letter with the letterhead of their corporation, Community Builders Holistic Development Corporation, was submitted to MMAP by Ms. Spence-Jones supporting the redirection of the $25,000 Osun grant to Karym. According to Stiles' and Woodward's sworn statements, they were unaware of the letter until it was shown to them by prosecutors and investigators and they did not prepare or authorize the unsigned letter on their corporate stationary. (*Id.* at 6).

The third letter forms much of the basis of Ms. Spence-Jones' lawsuit. (*See* Compl. ¶¶ 247-58, 269-71, 279-85, 292, 303-05, 313-14, 318, 480, 482-84, 565, 570-76, 589, 602-04, 648). The Complaint alleges that the Karym's prosecution was based upon "fabricated" evidence. Surprisingly however, the so-called "fabricated evidence" is not physical evidence, but, instead, a sworn statement by Commission Chairperson Dr. Barbara Carey-Shuler.

The key allegation underlying all of the exaggerated and conclusory rhetoric is that the SAO Defendants "fabricated evidence in an attempt to manufacture probable cause, by lying to, threatening, and manipulating Carey-Shuler to induce her to give an apparently unknown false statement that became the basis for Spence-Jones' arrest." (*Id.* ¶ 235(ii)). The Complaint alleges that Dr. Carey-Shuler had "forgotten about her decisions about Café Soul funding including her decision to request a $50,000 grant for Karym . . . , that her 'forgetfulness was understandable,' and the SAO Defendants 'deliberately misled' her into believing she had never authorized the Karym funding." (*Id.* ¶¶ 278, 281). By threatening, lying to, and misleading the chief prosecution witness, and withholding the key pieces of exculpatory evidence, "the SAO Defendants induced Carey-Shuler to make a sworn statement on September 18, 2009, falsely implicating

Spence-Jones in a scheme to take County money improperly without her authorization."
*Id.* ¶¶ 285, 602.

And how did the SAO Defendants trick the County Commission Chairperson into providing "fabricated and false testimony"? (*Id.* ¶ 602). By allegedly concealing from her drafts of her own February 15, 2005 letter. While it might seem implausible that an educated, experienced, elected public official, described by Ms. Spence-Jones as a "hometown hero" would be so easily misled, the Complaint alleges that the prosecutors acted with "a knowing, willful, wanton, grossly reckless, unlawful, unreasonable, unconscionable, and flagrant disregard of Plaintiff's rights, privileges, welfare, and well-being and are guilty of egregious and gross misconduct towards Plaintiff." (*Id.* ¶ 605).

The Closeout Memo describes the interaction with Dr. Carey-Shuler from the perspective of the prosecutors. On September 10, 2009, pursuant to subpoena and accompanied by counsel, Dr. Carey-Shuler reviewed the MMAP file including her February 15, 2005 letter which had been faxed to Mr. Simmons and directed MMAP to "release the $50,000 to Karym Ventures, Inc." The letter was stamped, but not personally signed.

Dr. Carey-Shuler allegedly told the prosecutors that she: had intended the two grants to go to Timbuktu and Osun Village; that she had not signed or authorized the stamped signature on the February 15, 2005 letter; and had never intended Spence-Jones or Karym to receive the $50,000. (Closeout Memo, p. 7). No sworn statement was taken that day, but she was requested to return a week later.

On September 18, 2009, again accompanied by counsel, she returned to the

State Attorney's office and provided a sworn statement.  The Closeout Memo

summarizes her sworn testimony as follows:

- She intended for Timbuktu Marketplace and Osun Village to get the MMAP grants;

- She was not aware that Michelle Spence-Jones had contacted the MMAP in order to redirect these two grants to Karym Ventures;

- She not only denied writing the February 15th letter to MMAP, but also stated that it was not her recognized style of writing;

- It was never her intent for Karym Ventures to obtain the grant funds; and

- She could not redirect the programming of funds on her own.  They would have to be reprogrammed by the full county commission.

(*Id.*).

On November 13, 2009, "largely upon reliance on Dr. Carey-Shuler's sworn

statement, Michelle Spence-Jones was criminally charged and arrested for the theft of

$50,000 in MMAP and Miami Dade County funds." (*Id.* at 8).  What happened next is a

matter of bitter dispute.

According to the prosecutors, after receiving Dr. Carey-Shuler's sworn statement,

but before the criminal charges were filed, investigators reviewed approximately sixty

(60) boxes of commission documents.  A county employee remained in the room with

them during their review of the files.  Investigators located Dr. Carey-Shuler's February

15, 2005 letter with her stamped signature.  They also claim to have discovered an

empty file marked "Café Soul."  According to the Closeout Memo, prosecutors and

investigators "all specifically remember the 'Café Soul' file was empty." (*Id.* at 7).

Prosecutors obtained copies of approximately nine boxes of documents that were then bates numbered and provided to defense counsel.

Six months later, on June 21, 2010, Dr. Carey-Shuler was deposed by defense counsel. She was confronted with two documents that had never been provided to the prosecutors and that appeared to be earlier drafts of her February 15, 2005 letter with handwritten notations. Carey-Shuler identified her handwriting, but said that she had no recollection of preparing the letter. During her deposition, Dr. Carey-Shuler testified that she did not recall writing the letter, did not recall speaking to anyone about its contents, could not confirm it had been in her files, but "it look[ed] like [her] handwriting, so [she] must have approved it." (*Id.* at 9).

Investigators then contacted the Miami Dade County Commission's custodian of records to learn more about the circumstances of how Ms. Spence-Jones and her counsel discovered the documents. According to the Closeout Memo, sign-in logs and witnesses confirmed that Ms. Spence-Jones, her counsel, and several "third parties with an expressed interest in her case" visited the County Building on March 8, 2010 to review Carey-Shuler's files. The boxes were placed in the same room where they had been reviewed by the State, and the same county employee – who had stayed in the conference room with the state investigators during their review of the documents – was initially present. However, citing attorney-client privilege, Ms. Spence-Jones' counsel demanded that the county employee leave, and after a call to the county attorney, the county employee did so. The Closeout Memo states: "[a] short while later, the two drafts of the Dr. Carey-Shuler letter, along with several other documents relating to the Café Soul project surfaced in the previously empty Café Soul file." (*Id.* at 10).

11

The case against Ms. Spence-Jones was premised on the submission of three fraudulent letters to MMAP redirecting the $50,000 to Karym.  With the discovery of the February 15th draft letters and the inability or unwillingness of Dr. Carey-Shuler to remember or explain why she appeared to draft the letter, the prosecutors determined that their case "ha[d] disintegrated to the point that, at [that] juncture, [they were] unable to proceed in good faith."  According to the Closeout Memo, the prosecutors:

> believed at the time of arrest of Michelle Spence-Jones that the crime of Second Degree Theft of funds belonging to Miami Dade County had been committed when the $50,000 in grants from MMAP were diverted from the intended recipients to Karym Ventures, Inc.  We still believe so today.  The law requires the State to prove beyond a reasonable doubt in court that the defendant, Michelle Spence-Jones committed the crime of grand theft in the second degree.  However, based upon circumstances which have occurred since the time of arrest, and which were beyond our control, we are presently unable to meet the burden of proving the case beyond a reasonable doubt.

On August 23, 2011, charges against Ms. Spence-Jones in the Carey-Shuler case were dismissed. (Compl. ¶ 551).

## B. Reclaim and Build the Dream Reception Honoring Dr. Barbara Carey-Shuler

Described in the Complaint as "Another Case, Another Fraud," a second prosecution of Ms. Spence-Jones ended in an acquittal.  The events giving rise to this aspect of the case transpired after Ms. Spence-Jones was elected to the Miami City Commission in 2005.  According to the Complaint the City of Miami planned a benefit, scheduled for April 3, 2006, in honor of Commissioner Carey-Shuler, who by then had retired from the Miami-Dade County Commission.  Ms. Spence-Jones, along with another Commissioner, was "tasked to host the event in [Carey-Shuler's] honor, and to benefit a charity called the Friends of MLK ("FMLK")." (Compl. ¶ 402).  FMLK was a charity whose mission was to advance the vision and goals of the Reverend Martin

Luther King, Jr., and a co-sponsor of the event. (*Id.* ¶ 402). According to the

Complaint, "Spence-Jones' office undertook the fundraising for the official City of Miami

benefit." (*Id.* ¶ 403).

Armando Codina is a prominent developer in Miami, and, together with Ricardo

Glas, was involved with a downtown high-rise project. (*Id.* ¶¶ 392-93; State's Traverse

and Response to the Defendant's Sworn Motion to Dismiss, 17-18 ("Traverse")).[2] In

connection with the project, the developers sought an extension of Brickell Avenue from

the Miami City Commission. (Compl. ¶ 393; Traverse, 18). While the matter was

pending before the City Commission, an assistant in Ms. Spence-Jones' office

contacted Mr. Codina soliciting a contribution to the FMLK charity. (Compl. ¶ 407).

According to the complaint, "[d]uring this brief charitable solicitation, the assistant

never mentioned the trivial street matter pending before the Commission." (*Id.* ¶ 408).

"The assistant never promised or even implied any 'tit for tat' based on Codina's

contribution to the charity." (*Id.*).

Unsurprisingly, the State's Traverse in the criminal case describes the

circumstances somewhat differently. Shortly after Mr. Codina appeared before the

Commission in support of the requested Brickell Avenue extension, Ms. Spence-Jones

is alleged to have directed a member of her staff to obtain a contact number for him.

Two days later, and a week before the scheduled vote on the matter, Ms. Spence-Jones

directed that a call be placed to Mr. Codina. During the call, Ms. Spence-Jones (or a

---

[2] A district court may take judicial notice of certain facts without converting a motion to
dismiss into a motion for summary judgment. Public records are among the permissible
facts that a district court may consider. *Universal Express, Inc. v. S.E.C.*, 177 F. App'x
52, 53 (11th Cir. 2006) (considering complaint in enforcement proceedings attached to
motion to dismiss).

staff member at her direction) solicited $25,000 from Mr. Codina to be paid to the FMLK

Trust, which did not exist at the time. (Traverse, p. 19).  According to Mr. Codina, he

> Became very concerned when he received the telephone call because of
> the matter pending before the Defendant and the City Commission.  He is
> not sure who he spoke with that day; however, it was clear that he was
> "asked to donate" $25,000 to the FMLK Trust in order to help sponsor the
> event honoring Barbara Carey-Shuler. . . . According to Mr. Codina,
> despite his concerns about the propriety of the solicitation, he decided to
> pay since he didn't want 'to poke the Commissioner in the eye' with the
> important vote on the Brickell issue just one week away.  Mr. Codina
> decided to write a check for $12,500, and decided to call Mr. Glas, who
> was the owner and developer of the MET1 project to get him to write a
> check for the remaining $12,500.

(*Id.*, pp. 19-20).

According to the Complaint, "[j]ust as they had in the Carey-Shuler case, the

SAO Defendants lied to, manipulated and withheld evidence from the chief prosecution

witness, this time Codina, in an effort to manufacture probable cause to arrest and then

charge Spence-Jones." (Compl. ¶ 427).  "[A]s a result of Scruggs' and Fielder's outright

lies, fabrications, and threats, Codina provided a sworn statement to aid the

prosecution, via an interstate telephone call." (*Id.* ¶ 452).  "The Indictment was largely

based on Codina's testimony."  (*Id.* ¶ 62).

The Complaint alleges that Defendant Scruggs falsely told Mr. Codina that the

FMLK was a fake, non-legitimate charity run and controlled by Spence-Jones, and that

she "used the charity money as her personal piggybank."  (*Id.* ¶¶ 430, 432, 441, 453).

Because of this manipulation, Codina referred to the FMLK as a "fake charity" being run

out of her [Spence-Jones'] office."  (*Id.* ¶ 453).  The Complaint does not describe why

Ms. Spence-Jones would use her city staff to solicit funds for a private charity or send

Mr. Codina an e-mail stating "[t]hanks again for your time and support of the MLK Trust

Fund." (*Id.* ¶ 407). However, the State's Traverse and the Closeout Memo explain why these events attracted the interest of prosecutors.

According to the Traverse, in March of 2004 Ms. Spence-Jones approached Reverend Gaston Smith and suggested he create a non-profit corporation called Friends of MLK, Inc. No activity took place until January 2005, when Ms. Spence-Jones told Reverend Smith that Dade County Chairperson Barbara Carey-Shuler had awarded FMLK a $25,000 grant and that he only had to complete some paperwork to receive the funds. Reverend Smith was surprised because FMLK had never applied for any funds. As noted above, Ms. Spence-Jones told Mr. Simmons, the contract manager for MMAP, that she would put him in touch with the FMLK, most likely through Reverend Smith. Ms. Spence-Jones told Reverend Smith that she would be a "consultant" for FMLK for a fee of $8,000, and that her duties would include fundraising. (Traverse, 14-15).

A check for $25,000 was issued by Miami-Dade County in June 2005. The Traverse alleges that Ms. Spence-Jones received $8,000 as a fundraising consultant and Reverend Smith took $17,000. Reverend Smith was convicted in December 2009 for the theft of most of the $17,000. When Ms. Spence-Jones was elected to the Miami City Commission in November 2005, FMLK had been dissolved as a non-profit corporation for failure to file an annual report. However, in January 2006, Ms. Spence-Jones solicited a $20,000 contribution to assist in the renovation of the Lyric Theatre in Overtown. The contribution was solicited for the FMLK Trust, an entity which was non-existent, but the money was placed in the account of FMLK, Inc. (*Id.* at 16).

The Traverse alleges that by January 2006, FMLK, Inc. existed only as a bank account and the FMLK Trust did not exist at all. However, according to the Traverse,

city staff in Spence-Jones' Commission office told prosecutors that, "FMLK (whether Inc. or Trust) was totally controlled by [Spence-Jones] using city employees on city time." (*Id.*). The Traverse alleges that as of April 2006, FMLK had raised $45,000 – the $25,000 from Dade County, arranged by Dr. Carey-Shuler, and the $20,000 contribution for renovation of the Lyric Theatre. The prosecutors contended that Ms. Spence-Jones directed $20,000 to be spent on the benefit honoring Dr. Carey-Shuler, that she took $8,000 for her fundraising efforts, and that Reverend Smith stole the remaining $17,000. (*Id.* at 17).

On March 18, 2010, Ms. Spence-Jones filed a Motion to Dismiss or, in the Alternative for Statement of Particulars and Incorporated Memorandum of Law. Attached to the Motion as Attachment 2 was a statement from Mr. Codina that he had responded to a request from Ms. Spence-Jones to contribute to an event honoring County Commissioner Barbara Carey-Shuler, that there was no expectation of a favorable vote from Commissioner Spence-Jones, and he would have made the contribution whether there was something pending or not. The Motion was denied on October 18, 2010.

The Spence-Jones trial lasted from February 28, 2011 to March 16, 2011. (Compl. ¶ 515). Mr. Codina testified that his contribution "was not 'tit for tat.' If I thought for a second it had been, I would not have given the check." (*Id.* ¶ 524). After deliberating for fewer than ninety (90) minutes, the jury acquitted Ms. Spence-Jones on all counts. (*Id.* ¶ 525). On August 24, 2011, the Governor restored Commissioner Spence-Jones to office following her acquittal. She received full back pay and the

emoluments and allowances for the period of her supervision.  *Spence-Jones v. Dunn*,

118 So. 2d 261, 262 (Fla. 3d DCA 2013).

## III.   **Analysis**

This case presents a text book example of the reasons underlying a prosecutor's

immunity.  It requires me to analyze: (1) immunity from suit; (2) qualified immunity from

damages; and (3) Florida law delineating a prosecutor's responsibilities.  Because of the

conclusory nature of the allegations of the Complaint and its transparent attempt to

plead around these immunities, I must also apply judicial experience and common

sense to the context-specific task of determining whether there is a plausible claim of

relief.  *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S.

544 (2007).

A.  Immunity from Suit

Almost forty years ago, in *Imbler v. Pachtman*, 424 U.S. 409 (1976), Justice

Powell wrote, "The question presented in this case is whether a state prosecuting

attorney who acted within the scope of his duties in initiating and pursuing a criminal

prosecution is amenable to suit under 42 U.S.C. § 1983, for alleged deprivations of the

defendant's constitutional rights."  The plaintiff in that case, Paul Imbler, was imprisoned

for ten years after conviction for felony murder.  He was released after a federal judge

concluded that the principal identification witness, who subsequently recanted his

testimony, lied about his background and presented misleading testimony at trial.  The

district judge also ruled that either the prosecutor or a police officer present in the

courtroom knew that the testimony was misleading and that the prosecutor had "cause

to suspect" its falsity.  After his release, Imbler sued the prosecutor alleging that he had

allowed the witness to testify, that he knew Imbler had passed a lie detector test, and that he had used a police artist's sketch during the trial that had been altered to resemble Imbler.

The Supreme Court held that the prosecutor was absolutely immune from a § 1983 suit for damages while acting within the scope of his prosecutorial duties.  The Court pointed out that without absolute immunity, such actions "could be expected with some frequency, for a defendant often will transform his resentment at being prosecuted into the attribution of improper and malicious actions to the State's advocate." *Id.* at 425. "[I]f the prosecutor could be made to answer in court each time such a person charged him with wrongdoing, his energy and attention would be directed from the pressing duty of enforcing the criminal law." *Id.*  Acknowledging that most executive branch officials were entitled only to qualified immunity the Court concluded that "qualifying a prosecutor's immunity would disserve the broader public interest . . . because it would prevent the vigorous and fearless performance of the prosecutor's duty that is essential to the proper functioning of the criminal justice system." *Id.* at 427-28.

> Attaining the [criminal justice] system's goal of accurately determining guilt or innocence requires both the prosecution and the defense have wide discretion in the conduct of trial and the presentation of evidence.  The veracity of witnesses in a criminal case frequently is subject to doubt before and after they testify, as is illustrated by the history of this case.  If prosecutors are hampered in exercising their judgment as to the use of such witnesses by concern about resulting personal liability, the triers of fact in criminal cases often would be denied relevant evidence.

*Id.* at 426.

These concerns are particularly acute in cases involving public officials and alleged public corruption.  "A prosecutor often must decide, especially in cases of wide public interest, whether to proceed to trial where there is a sharp conflict in the

evidence. The appropriate course of action in such a case may well be to permit a jury to resolve the conflict. Yet a prosecutor understandably would be reluctant to go forward with a close case where an acquittal likely would trigger a suit against him for damages." *Id.* at 427.

The Court concluded that the burden that would be placed upon prosecutors defending civil damage claims would severely harm the justice system. "[S]uits that survived the pleadings would pose substantial danger of liability even to the honest prosecutor." *Id.* at 425. The presentation of issues surrounding a prosecutor's conduct in a § 1983 action "would require a virtual retrial of the criminal offense." *Id.* "Frequently acting under serious constraints of time and even information, a prosecutor inevitably makes many decisions that could engender colorable claims of constitutional deprivations." *Id.* "Defending these decisions . . . could impose unique and intolerable burdens upon a prosecutor responsible annually for hundreds of indictments and trials." *Id.*

In *Imbler*, the Court also recognized that a prosecutor's immunity extended to "actions preliminary to the initiation of a prosecution and actions apart from the courtroom." *Id.* at 431.

> A prosecuting attorney is required constantly, in the course of his duty as such, to make decisions on a wide variety of sensitive issues. These include questions of whether to present a case to a grand jury, whether to file an information, whether and when to prosecute, whether to dismiss an indictment against particular defendants, which witnesses to call, and what other evidence to present. Preparation both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluating of evidence.

*Id.* at 431.

19

The Supreme Court emphasized that it is the interest in protecting the functioning of the prosecutor's office, not its occupant, that is of primary importance. In *Imbler*, the Court did not define the outer limits of the prosecutor's absolute immunity, but it did recognize that some official activities would not be encompassed, such as "those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than an advocate." *Id.* at 430-31.

In subsequent cases, the Court has further refined its analysis. *Burns v. Reed*, 500 U.S. 478 (1991), held that a prosecutor's appearance in court in support of an application for a search warrant and the presentation of evidence at that hearing were protected by absolute immunity. The Court further decided, however, that since providing legal advice to the police was not a function closely associated with the judicial process, a prosecutor's advice on the propriety of hypnotizing a subject and on whether probable cause existed to arrest the subject was only entitled to qualified, not absolute, immunity. *Id.* at 494-95. Similarly, in *Buckley v. Fitzsimmons*, 509 U.S. 259 (1993), the Court held that holding a press conference "does not involve the initiation of a prosecution, the presentation of the State's case in court, or actions preparatory for these functions." *Id.* at 278. While statements to the press may be an integral part of a prosecutor's job and may serve a vital public function, in this respect a prosecutor is no different than other executive officials who deal with the press and qualified immunity is therefore the norm. *Id.*

In *Kalina v. Fletcher*, 522 U.S. 118 (1997), the Court held that a prosecutor's actions in preparing charging documents, such as an information and a motion for an arrest warrant, were protected by absolute immunity, but that her action in personally

attesting to facts in a certification for probable cause was subject to qualified immunity because she was acting as a complaining witness rather than as a lawyer. *Id*. at 129-31.

In a case relevant to certain allegations here, the Court has also considered whether absolute immunity extended to a failure to disclose impeachment material due to: (1) a failure to properly train prosecutors; (2) a failure to properly supervise prosecutors; or (3) a failure to establish an information system containing potential impeachment. *Van de Kamp v. Goldstein*, 555 U.S. 335 (2009). As in *Imbler*, plaintiff Goldstein's § 1983 action arose after a successful habeas petition. He claimed: that he was wrongfully convicted of murder based on the testimony of a jailhouse informant, Edward Floyd Fink; that Fink's testimony was unreliable, indeed false; that Fink had received reduced sentences for favorable testimony in other cases; that some prosecutors in the Los Angeles District Attorney's Office knew about the favorable treatment; and that the district attorney's failure to provide his attorney with this impeachment information had led to the conviction. *Id*. at 339. After an evidentiary hearing the district court agreed that Fink had been untruthful and further that if the prosecution had disclosed the information it might have made a difference. The court ordered the State to either grant Goldstein a new trial or to release him. Rather than retry Goldstein, who had already served twenty-four (24) years of his sentence, the state decided to release him.

Goldstein sued the former Los Angeles District Attorney and Chief Deputy District Attorney alleging that the prosecution's failure to disclose the facts about Fink's earlier testimony-related rewards violated the prosecution's constitutional duties under *Giglio v*.

*United States*, 405 U.S. 150 (1972), and resulted from the failure of the office's chief supervisory attorneys to train and supervise the prosecutors who worked for them as well as their failure to establish an information system about informants.

The Supreme Court unanimously held that prosecutors involved in such supervision or training or information system management were entitled to absolute immunity:

> These claims focus upon a certain type of administrative obligation . . . a kind that itself is directly connected with the content of a trial. Here, unlike with other claims related to administrative decisions, an individual prosecutor's error in the plaintiff's specific criminal trial constitutes an essential element of the plaintiff's claim.

*Id.* at 344.

The Court noted that decisions about indictment or trial prosecution will often involve more than one prosecutor within an office. *Id.* at 345. Moreover, the faulty training claim rested in necessary part upon a consequent error by an individual prosecutor in the midst of a specific plaintiff's trial. The Court found that its concern in *Imbler*, that the threat of damages liability for an error could lead a trial prosecutor to take account of that risk when making trial-related decisions, applied equally to more widespread liability throughout the office tied to that same trial error. *Id.* at 346-47. "Most important," said the Court, "the ease with which a plaintiff could restyle a complaint charging a trial failure so that it becomes a complaint charging a failure of training or supervision would eviscerate *Imbler*." *Id.* at 347.

Just last year the Supreme Court decided a case which reflects application of its functional approach to absolute immunity in a factual posture with particular relevance to the allegations in this case. *Rehberg v. Paulk*, 132 S.Ct. 1497 (2012). Since the

case arose in the Eleventh Circuit, and because the allegations in *Rehberg* bear

similarity to allegations in this case, it is useful to analyze both the opinions of the Court

of Appeals and the Supreme Court.

Alleging four federal § 1983 claims, Rehberg sued a Georgia District Attorney, a

specially appointed prosecutor, and the district attorney's chief investigator after being

indicted three times and after all charges were dismissed by the state court. The Court

of Appeals described the alleged pre-indictment conduct as follows:

> Hodges (the District Attorney) and Paulk (the Chief Investigator), acting as
> investigators, got together as a favor to the hospital, with   malice and
> without probable cause, and made up a story about Rehberg, and then
> Paulk (at Hodge's direction) told that fake story under oath to the grand
> jury, leading to Rehberg's indictment and arrest.

*Rehberg v. Paulk*, 611 F.3d 828, 840 (11th Cir. 2010). The Court described the

question before it as "whether absolute immunity applies to the alleged conspiracy

decision in the investigative stage to make up and present Paulk's false testimony  to

the grand jury." *Id*. at 840-41. Relying on prior precedent, including *Mastroianni v.*

*Bowers*, 173 F.3d 1363 (11th Cir. 1999), *Jones v. Cannon*, 174 F.3d 1271 (11th Cir.

1999), and *Rowe v. City of Ft. Lauderdale*, 279 F.3d 1271 (11th Cir. 2002), the Court

held that since Paulk had absolute immunity for his false testimony before the grand

jury, both he and the district attorney were similarly immune for their alleged conspiracy

to fabricate and present false testimony. To hold otherwise, the Court concluded, would

eviscerate absolute immunity as well as the purpose it serves. ("To allow a        § 1983

claim based on subordination of perjured testimony where the alleged perjured

testimony itself is cloaked in absolute immunity would be to permit through the back

door what is prohibited through the front."). *Rowe*, 279 F.3d at 1282.[3]

In affirming the Eleventh Circuit, the Supreme Court applied its "functional

approach," and agreed that grand jury witnesses should be accorded the same absolute

immunity as witnesses at trial. *Rehberg*, 132 S.Ct. at 1499.  Moreover, the Court

stated:

> [T]his rule may not be circumvented by claiming that a grand jury witness
> conspired to present false testimony or using evidence of the witness
> testimony to support any other § 1983 claim concerning the initiation or
> maintenance of a prosecution.  Were it otherwise, "a criminal defendant
> turned civil plaintiff could simply reframe a claim to attack the preparation
> instead of the absolutely immune actions themselves." . . . In the vast
> majority of cases involving a claim against a grand jury witness, the
> witness and the prosecutor conducting the investigation engage in
> preparatory activity, such as a preliminary discussion in which the witness
> relates the substance of his intended testimony.  We decline to endorse a
> rule of absolute immunity that is so easily frustrated.

*Id.* at 1507 (internal citations omitted).

B. Qualified Immunity

Qualified Immunity shields federal and state officials from money damages

unless a plaintiff pleads facts showing: (1) that the official violated a statutory or

constitutional right, and (2) that the right was "clearly established" at the time of the

challenged conduct. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Qualified

immunity gives government officials breathing room to make reasonable, but mistaken

judgments about open legal questions.  When properly applied, it protects "all but the

---

[3]   A second aspect of *Rehberg* has a bearing on this case as well.  There the
prosecutor was also sued for statements made to the media.  However, since Rehberg
was unable to point to any constitutional injury, other than his indictment and related
events, the prosecutor received qualified immunity for his press statements.

plainly incompetent or those who violate the law." *Malley v. Briggs*, 475 U.S. 335 (1986).

If an official was acting within the scope of discretionary authority, the burden shifts to the Plaintiff to show that qualified immunity is inappropriate. *McCullough v. Antolini*, 559 F.3d 1201, 1205 (11th Cir. 2009). The government official is entitled to qualified immunity unless the Plaintiff can show: first, that the facts viewed in the light most favorable to the Plaintiff establish a constitutional violation by the official, and second, that the unlawfulness of the Defendant's actions was clearly established at the time of the incident. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). The inquiry concerning whether a right is clearly established must be undertaken in light of the specific context of the case, not as a broad general proposition. *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).

C. Florida Law

Pursuant to the Florida Constitution, in each judicial circuit within the State – and there are twenty – a state attorney shall be elected for a four-year term and "shall be the prosecuting officer of all trial courts in that circuit . . . ." FLA. CONST. art. I, § 15. Except for capital crime, most prosecutions in Florida are initiated by information. Section 27.04 of the Florida Statutes provides in pertinent part as follows:

> The state attorney shall have summoned all witnesses required on behalf of the state, and he is allowed the process of his court to summon witnesses from throughout the state . . . to testify before him as to any violation of the criminal law upon which they may be interrogated, and he is empowered to administer oaths to all witnesses summoned to testify by the process of his court or who may voluntarily appear before him to testify as to any violation or violations of the criminal law.

*Id.* Florida Rule of Criminal Procedure 3.10(g) provides:

25

> An information charging the commission of a felony shall be signed by the state attorney, or a designated state attorney, under oath stating his good faith in initiating the prosecution and certifying that he has received testimony under oath from the material witness or witnesses for the offense.

*Id.*

The Florida Supreme Court has said that the primary purpose of allowing criminal charges to be brought by information is "[t]he undoubted benefits from the continued presence and functioning in each judicial circuit of some trained and responsible officer representing the state vested with the very grave but necessary authority of initiating prosecutions. . . ." *Hall v. State*, 187 So. 392, 399 (Fla. 1939). One of these benefits, according to the court, is the reduction of expense and delay involved in frequent summoning of grand juries. *Id.*

A pre-filing conference held for the purpose of taking sworn testimony from witnesses is a necessary predicate to the filing of an information. "[I]nfluencing as it may the discretionary decision to file criminal charges against another," it has been characterized as both "quasi-judicial" and an "official proceeding." *State v. Witte*, 451 So. 2d 950, 954 n.8 (Fla. 3d DCA 1984) (citing *Hall*, 187 So. 392). Pre-filing conferences have been held to be the equivalent of grand jury testimony in terms of application of the felony perjury statute. "[A] proceeding is not made official by the formality with which it is conducted; instead, its officiality depends on its purpose and the authority from which it derives." *Id.* at 953. Florida courts have described the state attorney in non-capital cases as acting as a one-person grand jury. *See Doe v. State*, 634 So. 2d 613, 615 (Fla. 1994); *Imperato v. Spicola*, 238 So. 2d 503, 506 (Fla. 2d DCA 1970).

26

"Under Florida's Constitution, the decision to charge and prosecute is an executive responsibility and the state attorney has complete discretion in deciding whether and how to prosecute." *State v. Bloom*, 497 So. 2d 2, 3 (Fla. 1986).  Further, under the Florida Constitution, the Governor is the chief law enforcement officer of the state and responsible for taking "care that the laws be faithfully executed."  FLA. CONST. art. IV, § 1(a).  He also possesses the power to suspend from office state officers not subject to impeachment, and "any elected municipal officer indicted for crime may be suspended from office until acquitted." *Id*. § 7.  Moreover, Section 112.51(2) of the Florida Statutes provides:

> Whenever any elected or appointed municipal official is arrested for a felony or for a misdemeanor related to the duties of office or in indicted or informed against for the commission of a federal felony or misdemeanor or state felony or misdemeanor, the Governor has the power to suspend such municipal official from office.

*Id.*

## IV.    Claims for Relief

Having reviewed the law of absolute and qualified immunity, as well as Florida law with respect to a state attorney and the governor's authority to suspend municipal officials, I turn to the allegations of the Complaint.

It's not an easy task.  The amended complaint is a "shot gun" pleading of the sort the Eleventh Circuit "has been roundly, repeatedly, and consistently condemning for years." *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 979 n.54 (11th Cir. 2008).  And as was the case in *Davis*, the pleading strategy employed by Plaintiff's counsel seems not to have been taken out of ignorance, but, instead, is deliberate and calculated as part of the effort to plead around immunity.  The Complaint contains

several counts, each incorporating by reference the allegations of its predecessors, leading to a situation where most of the counts contain irrelevant factual allegations and legal conclusions. *Strategic Income Fund v. Spear, Leeds & Kellog*, 305 F.3d 1293, 1295 (11th Cir. 2002). It buries material allegations "beneath innumerable pages of rambling irrelevancies" making no distinction between the defendants engaged in the various alleged acts, i.e. "the SAO defendants." *See Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001).

While I was tempted to order another amended complaint, I was also cognizant that a purpose of absolute and qualified immunity is to spare a prosecutor's office the burden and expense of litigation. "[E]ntitlement to absolute immunity must be determined as early as possible." *Marx v. Gumbinner*, 855 F.2d 783, 788 (11th Cir. 1988). Moreover, a plaintiff must not be permitted through shotgun pleadings containing allegations of generalized abstract rights to strip government officials of the protection provided by immunity doctrine. *Id.* at 792. So I stayed discovery, attempted to wade through the allegations, and held oral argument to help sift through the detritus.

A. First and Second Claims for Relief: "Fabrication and Concealment of Evidence"

*Iqbal* directs that I first identify allegations of the complaint that because of their conclusory nature are not entitled to the assumption of truth. Among those are: paragraph 605, "The SAO Defendants acted with a knowing, willful, wanton, grossly reckless, unlawful, unreasonable, unconscionable, and flagrant disregard of Plaintiff's rights, privileges, welfare, and well-being and are guilty of egregious and gross misconduct toward Plaintiff"; paragraph 607, "In violation of the First Amendment, the SAO Defendants targeted Spence-Jones because of her political position, because she

opposed the Mayor, and in order to deprive her of her right to hold public elected office";

paragraph 600, "Rundle, Scruggs, and Fielder, acting individually and in concert,

knowingly and intentionally concealed evidence"; and paragraph 601, "In knowingly and

intentionally concealing such evidence, Rundle and Scruggs (and of course, Fielder)

were not acting as advocates, but were instead acting as police officers investigating a

case." The Complaint lumps the Defendants together, makes conclusory and abstract

allegations about fabrication/concealment of evidence, and hides rather than illuminates

the facts giving rise to the claim. This is an effort to disguise how implausible and

fanciful the claims actually are. The Supreme Court has specifically warned against

allowing generalized pleading of abstract rights to transform a guarantee of immunity

into a rule of pleading. *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). Setting aside

the conclusions and hyperbole, the facts pertinent to the "fabrication and concealment"

claims are as follows:

On September 10, 2009, pursuant to a subpoena, Mr. Scruggs and Mr. Fielder

met with Dr. Carey-Shuler and her attorney.[4] (Compl. ¶ 275; Closeout Memo, p. 7).

Scruggs allegedly threatened Dr. Carey-Shuler, accused her of receiving cash

payments with respect to county business, said that Ms. Spence-Jones and Rev.

Gaston-Smith had misspent funds earmarked for the Friends of Martin Luther King, and

that Ms. Spence-Jones had taken money designated for Café Soul. (Compl. ¶¶ 276-77).

According to the Closeout Memo, Dr. Carey-Shuler expressed shock and outrage that

Ms. Spence-Jones had used her name to obtain the $50,000 that she had intended go

to Timbuktu and Osun Village. Dr. Carey-Shuler and her attorney were asked to return

---

[4]  The attorney, according to the Closeout Memo, was Milton Hirsch, who is now a state Circuit Judge, and by reputation, able and no shrinking violet.

for a sworn statement on September 18, 2009.  They were told that if Dr. Carey-Shuler's

statements were false she would be prosecuted for perjury; however, if they were true

Ms. Spence-Jones would be arrested. (Closeout Memo, p. 7).

On September 18, 2009, Dr. Carey-Shuler, again represented by counsel,

provided a sworn statement that was the basis for prosecution.  (Compl. ¶¶ 285-93).

Mr. Scruggs questioned Dr. Carey-Shuler, and Mr. Fielder was present.  (*Id.* ¶¶ 287-88).

According to the Closeout Memo the following testimony was given:[5]

> Q:    [D]id you, in any way intend for Karym Ventures to get the money from
> Timbuktu Marketplace and Osun Village?
>
> A:    Absolutely not.  I intended it to go to groups that I allocated it to at that
> budget meeting.
>
> Q:    Are you surprised by the fact that this money got reallocated apparently by
> her to herself using your name and position?
>
> A:    Yes, I am surprised.
>
> Q:    Does it?
> (Interjection by Mr. Hirsch):  Last week you used, discussing with me you said
> you were shocked.
>
> A:    Yes, because I thought, yes I did say that because when I read that I was
> like in shock.  This money was supposed to go to these organizations.
>
> Q:    Is there any way as you sit here now that you would have allowed her to
> have this money?
>
> A:    Not unless she made a request and came back before the board and
> somehow we would have reviewed her project.  But additional money, we would
> not have taken it from these groups.

(Closeout Memo,. 7-8).  According to the Complaint, by September 18, 2009, Mr.

Scruggs and Mr. Fielder "knew or should have known" that Dr. Carey-Shuler had

requested that MMAP release $50,000 in funding to Karym and "on information and

---

[5]  Questioning is by Mr. Scruggs – Answers are by Dr. Carey-Shuler.

belief" knew that MMAP had voted to do so.  (Compl. ¶¶ 271-72).  Thus for Count One, the "fabrication" claimed in the Complaint is Dr. Carey-Shuler's sworn testimony which Plaintiff alleges was "induced" by Mr. Scruggs.  The "concealment" is the belief that when Mr. Scruggs took the sworn statement he knew or should have known, because of the annotated draft letter that allegedly was in Dr. Carey-Shuler's file, that she had authorized Karym to get the funds, and that he failed to tell this to Dr. Carey-Shuler.

The theory underlying Count Two is similar. The Complaint alleges that Mr. Scruggs and Mr. Fielder met with Armando Codina and his counsel on January 12, 2010. (*Id.* ¶ 428).  Mr. Scruggs allegedly told Mr. Codina that the FMLK was a fake charity, controlled by Ms. Spence-Jones, and that she used its funds as her personal piggy-bank.   (*Id.* ¶¶ 430, 432).  On March 2, 2010, "as a result of Mr. Scruggs' and Mr. Fielder's outright lies, fabrications, and threats," Mr. Codina provided a sworn statement. (*Id.* ¶ 452).  The indictment was largely based on Mr. Codina's testimony. Again the "fabrication" is alleged to be Mr. Codina's sworn statement; the "concealment" was not telling Codina that the money went to "a real charity" in connection with a "real charity event."

I am tempted to find these claims implausible on their face.  I question whether the Plaintiff has nudged her claim across the line from conceivable to plausible.  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The idea that Mr. Scruggs could bamboozle two sophisticated witnesses, each represented by counsel, into concocting false testimony about the Plaintiff seems highly unlikely.  However, in *Iqbal*, the Supreme Court said that allegations should not be dismissed because of their extravagantly fanciful nature or on the ground they are unrealistic or nonsensical, but

instead their conclusory nature.  Even assuming the truth, however, of these unlikely allegations, Mr. Scruggs is absolutely immune.

In taking sworn testimony from Dr. Carey-Shuler and Mr. Codina, pursuant to Section 27.04 of the Florida Statutes and Florida Rule of Criminal Procedure 3.140(g), Mr. Scruggs was participating as an advocate for the State in an official proceeding.  In Florida, such sworn testimony is a prerequisite for the filing of an information, and is the functional equivalent of grand jury testimony.  The sworn testimony and the meeting Mr. Scruggs had with Dr. Carey-Shuler and her counsel and Mr. Codina and his counsel, prior to that testimony were part of, and preliminary to, the initiation of a criminal prosecution to which a prosecutor's immunity extends. *Imbler*, 424 U.S. at 431.  *See also Rehberg*, 132 S.Ct. 1497; *Mullinax v. McElhenney*, 817 F.2d 711, 715 (11th Cir. 1987) ("[A] prosecutor is entitled to absolute immunity for the factual investigation necessary to prepare a case, including interviewing witnesses before presenting them to the grand jury.").

The Complaint is transparent in its attempt to identify some act by Mr. Scruggs outside of the prosecutions themselves or preliminary to their initiation.  Plaintiff tries to characterize Mr. Scruggs' questioning of witnesses as fabrication and concealment and claims that in doing so he was acting as a police officer rather than a prosecutor.  By clever pleading the Complaint seeks to evade immunity by invoking case law involving fabrication of physical evidence during the investigative stage of a criminal action.  *See Buckley*, 509 U.S. at 262-64 (no immunity for prosecutor who fabricated expert testimony linking defendant's boot with boot print at murder scene); *Rowe*, 279 F.3d at 1281 (no immunity for fabrication of jump rope); *Jones*, 174 F.3d at 1289-90 (no

immunity for fabrication of boot print); *Riley v. City of Montgomery, Ala.*, 104 F.3d 1247, 1253 (11th Cir. 1997) (no immunity for police officer's planting of cocaine).

Of course, the facts of those cases are very different.  But, even more significantly, the effort to circumvent absolute immunity creates yet another bar to the Plaintiff's claims.  Simply put, in trying to evade immunity the Plaintiff has pled herself out of court.

Fabrication or concealment of evidence during an investigation does not itself violate the Constitution.  This is apparent both from the Supreme Court's decision in *Buckley* and also Judge Easterbrook's opinion for the Seventh Circuit on remand. *Buckley*, 20 F.3d 789 (7th Cir. 1994).

In *Buckley,* the prosecutor allegedly participated with police officers during the investigative stage of the case well before the grand jury was impaneled and before probable cause existed.  The investigation led to unreliable expert testimony concerning a boot print found at the murder scene.  The Supreme Court held that the prosecutor's participation in the investigation was not protected by absolute immunity.  However, the majority in *Buckley* warned against "conflat[ing] the question whether a [Section] 1983 plaintiff has stated a cause of action with the question whether the defendant is entitled to absolute immunity for his actions."  *Buckley*, 509 U.S. at 275 n.5.  In concurring, Justice Scalia was even more specific.  Responding to the dissent's concern that absolute immunity might become "little more than a pleading rule" he wrote that such reframed claims "are unlikely to be cognizable under § 1983, since petitioner cites, and I am aware of, no authority for the proposition that the mere preparation of false

evidence, as opposed to its use in a fashion that deprives someone of a fair trial or otherwise harms him, violates the Constitution." *Id.* at 281 (Scalia, J., concurring).

On remand, the Seventh Circuit considered Buckley's argument that prosecutors violated his rights under the Due Process Clause by coercing two witnesses and paying them money to falsely implicate him.  Buckley alleged that the prosecutors repeatedly interrogated two individuals, paid them for statements inculpating him, that during the interrogations, the prosecutors "coerced" them to finger him, and that the accusations leveled against him were false. *Buckley*, 20 F.3d at 794.  The Seventh Circuit found that the allegations did not state a claim under the Constitution, much less suggest a violation of a clearly established right. *Id.*  "The exchange of money for information may be a regrettable way of securing evidence, but it is common." *Id.* "So too are promises to go easy." *Id.*  While the payments would have had to have been disclosed at trial, the Court noted that Buckley had not alleged concealment at trial, which would have in any event been within the scope of absolute immunity. *Id.*  And while coercion of witnesses could have been a genuine constitutional wrong, the aggrieved persons would be the witnesses, not Buckley.  "Buckley cannot complain that the witnesses may have twisted Cruz's arm any more than he can collect damages because they failed to read Cruz *Miranda* warnings." *Id.*

> Let us suppose the prosecutors put Cruz on the rack, tortured him until he named Buckley as his confederate, and then put the transcript in a drawer, or framed it and hung it on the wall but took no other steps, or began a prosecution, but did not introduce the statement.  Could Buckley collect damages under the Constitution?  Surely not; Cruz himself would be the only victim.

*Buckley*, 20 F.3d at 795. *See also Michaels v. New Jersey*, 222 F.3d 118, 123 (3d Cir. 2000), *cert. denied*, 531 U.S. 118 (2001); *Zahrey v. Coffey*, 221 F.3d 342, 348 (2d Cir.

2000) ("The manufacture of false evidence, in and of itself . . . does not impair anyone's

constitutional right.") (internal citation omitted); *Landrigan v. City of Warwick*, 628 F.2d

736, 744 (1st Cir. 1980) ("[W]e do not see how the existence of a false police report,

sitting in a drawer in a police station, by itself deprives a person of a right secured by

the Constitution and laws.").

With respect to the expert witness providing false evidence linking the boot print

to the defendant, the Seventh Circuit likewise found no basis to proceed:

> So far as we can tell, no court has ever held a prosecutor liable for
> seeking out and hiring a witness, even one "well known for her willingness
> to fabricate unreliable expert testimony." Qualified immunity does not
> permit us to recognize such a right in this litigation, even if we were
> persuaded (which we are not) that such an entitlement should be created.
> And what we have said about Robbins is equally true with respect to
> Buckley's contention that the prosecutors "suppressed" a favorable
> evaluation of the boot print by a sergeant of the DuPage County Sheriff's
> Office (i.e., that they violate their duties under *Brady v. Maryland*, 373 U.S.
> 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)) and that they induced two
> experts to give testimony more damaging to Buckley then these experts'
> initial notes and reports suggested. These wrongs, if they are wrongs at
> all, occurred at trial, and do not support an award of damages.

*Buckley*, 20 F.3d at 797.

So it is here. As I have said before, Mr. Scruggs' questioning of Dr. Carey-Shuler

and Mr. Codina occurred during and in preparation for initiation of criminal charges and

is therefore absolutely privileged. However, even if we assume the allegedly improper

interrogation occurred before Mr. Scruggs put on his prosecutor's hat, there is no basis

for recovery. The statements themselves were never used at trial. Indeed, to the

contrary, Mr. Codina, according to the Complaint, turned on the prosecutors and

complained that he had been misled by them. Moreover, there is no authority for the

proposition that Mr. Scruggs was required to tell either Dr. Carey-Shuler or Mr. Codina

everything that he might have known about the case.  He certainly had no obligation to tell them Ms. Spence-Jones' version of the facts.

It is not unconstitutional to lie to witnesses.  Coercive or overbearing tactics may violate some right of the witness, but not Ms. Spence-Jones.  And, even assuming he knew of the Carey-Shuler drafts, Mr. Scruggs' obligation to disclose them arose after indictment, not before.  Counts One and Two do not state a claim under the Constitution, let alone a violation of clearly established rights.

B. <u>Third Claim for Relief: False Arrest for the Carey-Shuler Case</u>

The Complaint alleges in conclusory fashion that "Rundle, Scruggs, and Fielder arrested, seized, detained, and imprisoned Spence-Jones without probable cause, and or failed to intervene to prevent this conduct." (Compl. ¶ 617).  Also, in the section of the Complaint entitled "Acting as Police Officers, Rundle, Scruggs and Fielder File a False Arrest Affidavit," the Plaintiff alleges that: (1) on November 12, 2009, Mr. Fielder filed a knowingly false affidavit; (2) Mr. Scruggs reviewed and approved the affidavit; (3) on "information and belief," Ms. Rundle reviewed and approved the affidavit; and (4) a warrant was issued for Ms. Spence-Jones' arrest. (*Id.* ¶¶ 298-300, 310).  The allegedly false affidavit is not attached to the Complaint, nor did the Defendants include it in their Motions to Dismiss.  Nonetheless, it is a public record, indeed it is attached to the State of Florida's Executive Order 09—248 which suspended Ms. Spence-Jones from office.[6]

Where the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner, or put

---

[6]   State of Florida Office of the Governor, Executive Order 09-248, *available* at www.law.fsu.edu/library/collection/Exectutiveorders.

differently, in "objective good faith," *Messerschmidt v. Millender*, __ U.S. ___, 132 S.Ct. 1235, 1245, 182 L.Ed.2d 47 (2012), *United States v. Leon*, 468 U.S. 897, 922-23 (1984). However, the fact that a magistrate has issued a warrant does not end the inquiry. The Supreme Court has recognized an exception allowing suit when "it is obvious that no reasonably competent officer would have concluded that the warrant should issue." *Messerschmidt*, 132 S.Ct. at 1245 (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "The shield of immunity" otherwise conferred by the warrant will be lost, for example, where the warrant was "based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Messerschmidt*, 132 S.Ct. at 1245 (citing *Leon*, 468 U.S. at 923) (internal citation and quotation marks omitted). "[T]he threshold for establishing the exception is a high one, and it should be." *Id.* While not dispositive, the fact that an affidavit has been reviewed by others, such as an officer's superior, or a part of a prosecution team, "is certainly pertinent in assessing whether they could have held a reasonable belief that the warrant was supported by probable cause. *Id.* at 1250.

It is not necessary to decide whether the facts contained within the affidavit actually establish probable cause. Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments. *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2081 (2011). An officer's judgment that a warrant is supported by probable cause may be mistaken, but unless "plainly incompetent," it remains protected. *Messerschmidt*, 132 S.Ct. at 1249.

The Affidavit in Support of Arrest Warrant was signed by Robert Fielder and was sworn and subscribed before Circuit Court Judge Beatrice A. Butchko on November 12,

2009. After describing his experience, Fielder stated that he had personally interviewed numerous witnesses, reviewed and analyzed hundreds of documents, including the records of the Metro-Miami Action Plan Trust, correspondence, emails, and banking records. The affidavit is seven pages long and contains eighteen (18) numbered paragraphs and three attachments.

Paragraphs 1-8 of the affidavit describe Timbuktu Marketplace, Osun Village, and the FMLK, and recount that on September 23, 2004, at a budget meeting of the Miami-Dade County Commission, the Metro-Miami Action Plan Trust was directed to distribute county funds as grants to the three organizations with the exact dollar amounts to be determined later. On November 8, 2004, the MMAP Board of Directors allocated $25,000 each to the three organizations. Paragraphs 8-18 are as follows:

8.     The officials at MMAP, including Contracts Officer Williams Simmons, were unsure how to distribute the funds to Timbuktu Marketplace, Osun Village, and Friends of MLK, Inc. The usual process was for a potential grant recipient to apply to and make a presentation to MMAP's staff and Board of Director's stating why they needed public funds and what was to be accomplished with these funds. However, with the grants to the three entities at issue, MMAP officials did not know who to contact and who would sign the necessary documents before the grant funds could be distributed.

9.     Sometime in November and December 2004, MICHELLE SPENCE-JONES contacted MMAP Contracts Officer William Simmons and told him that she would be the contact person for the three grants at issue. Although this process was highly unusual and unprecedented, Mr. Simmons decided to go along with SPENCE-JONES' directions because he was aware of her close relationship with Chairperson Carey-Shuler and he was afraid of adverse employments actions if he failed to cooperate.

10.    On December 15, 2004, Karym Ventures, Inc. was incorporated as a for-profit corporation with its directors and officers consisting of MICHELLE SPENCE-JONES and members of her immediate family.

11.   On or about January 4th, 2005, MICHELLE SPENCE-JONES spoke once again to Williams Simmons and told him that the grant funds for Timbuktu Marketplace and Osun Village should be redirected to Karym Ventures, Inc. for its Café Soul project which would be located at 4905 N.W. 7th Avenue.   She also told Simmons that the Reverend Gaston Smith would likely be the principal of Friends of MLK, Inc. and the person who would sign for and receive the grant funds.

12.   William Simmons wanted some proof that the intended grant recipients, Timbuktu Marketplace and Osun Village agreed to the re-designation of Karym Ventures, Inc. as the new grant recipient. To satisfy Mr. Simmons' request, MICHELLE SPENCE-JONES obtained two letters which were submitted to MMAP.   SPENCE-JONES asked her "business partner," Marvin Weeks, to write her a letter in support of her Café Soul project.  He wrote this letter never stating and never intending that SPENCE-JONES and Karym Ventures, Inc. would receive grant funds intended for him.  He was aware that he was to receive grant funds from MMAP; however, he didn't realize that SPENCE-JONES had actually taken his grant until the summer of 2005. (See Attachment 1)

13.   The second letter that MICHELLE SPENCE-JONES provided to MMAP was an unsigned letter from Community Builders Holistic Development Corporation Association, the corporation of Nathaniel Styles and Harlan Woodard.   This letter purported to support the SPENCE-JONES' Café Soul project.  However, even though it was on their corporation's letterhead, Mr. Styles and Mr. Woodard never saw the letter, did not sign it, and never authorized anyone to write a letter on their behalf.  In fact, Mr. Woodard, when shown the letter for the first time by you Affiant, exclaimed that "We are the victims of identity theft!" (See Attachment 2)

14.   Even with the two letters discussed above, MMAP official Simmons still wanted verification from Chairperson Carey-Shuler that she approved of this unprecedented redirection of grant funds from the intended recipients to a third party. On or about February 15, 2005, MMAP received a letter purportedly from Chairperson Barbara Carey-Shuler on her official office stationery. This letter, which was faxed to MMAP from an unknown telephone number, stated that the original intent of the Chairperson was for MICHELLE SPENCE-JONES and her family corporation Karym Ventures, Inc. to receive the grant money instead of Timbuktu Marketplace and Osun Village. Ms. Carey-Shuler has stated under oath that she did not sign this letter, that a stamp of her signature was used instead of her actual signature, that she would never sign a letter like this, that

she had never seen or authorized this letter, and that she never directed MMAP to redirect the funds to SPENCE-JONES. Furthermore, Ms. Carey-Shuler stated that she had no authority to reallocate the funds because it would be unlawful for a single commissioner to reallocate funds without a vote of the full County Commission.    In fact, Ms. Carey-Shuler stated that she was "shocked" that MICHELLE SPENCE-JONES had gotten the funds instead of the intended recipients. (See Attachment 3)

15.    As for the $25,000 grant to Friends of MLK, Inc., MICHELLE SPENCE-JONES arranged for Reverend Gaston Smith to be the contracting principal and recipient of the funds.  On July 17, 2005, MMAP and Miami-Dade County wrote a check to Friends of MLK, Inc. for $25,000.  Reverend Gaston Smith stole a portion of these funds and is presently awaiting trial as a defendant in a separate case.  MICHELLE SPENCE-JONES received $8,000 of these funds as an alleged "consultant" to Friends of MLK, Inc.

16.    On or about April 8, 2005, Miami-Dade County issued a check to Karym Ventures, Inc. for $50,000 which was the total amount of the two grants intended for Timbuktu Marketplace and Osun Village.

17.    The contract between MMAP, on behalf of Miami-Dade County, and Karym Ventures, which was signed by Kenneth Spence, the brother of MICHELLE SPENCE-JONES, specifically required that the County's $50,000 grant be placed into a separate bank account and not comingled with funds from any other source.  This is a standard provision in county grants and loans so that auditors can later verify that the county funds were used for the intended purpose.    MICHELLE SPENCE-JONES and her brother immediately violated the prohibition against co-mingling fund [sic] by depositing the $50,000 check into a bank account with fund [sic] from other sources.  Between April 2005 and September 2005, Karym Venture's bank account included in addition to the aforementioned $50,000, additional grant funds from Miami-Dade County for the Café Soul project in the amount of $25,000, "consulting" fees from Friends of MLK, Inc. in the amount of $8,000, a "finder's fee" from a client of MICHELLE SPENCE-JONES in the amount of $3,000, and a few small cash deposits totaling less than $1,000, and an additional running balance of approximately $2,000. Therefore, during the relevant time period of April to September 2005, MICHELLE SPENCE-JONES and her family, through their corporation Karym Ventures, Inc., had co-mingled funds in the amount of approximately $89,000.   It is important to note that $83,000 from the total amount of funds came from county services (i.e., the $50,000 grant from MMAP, the $25,000 additional grant

for Café Soul from Miami-Dade County, and $8,000 from the MMAP grant to Friends of MLK, Inc.).  By September 23, 2005, Karym Ventures bank account had a balance of $728.82

18.    The $89,000 (with $83,000 derived from Miami-Dade County funds) was spent as follows:

| | | |
|---|---|---|
| -- | MICHELLE SPENCE-JONES: | $12,408.00 |
| -- | Kenneth Spence: | $  9,569.00 |
| -- | Yvonne Lowe (mother of MICHELLE SPENCE-JONES) | $  3,175.00 |
| -- | American Express: | $ 10,279.71 |

(credit card charges by MICHELLE SPENCE-JONES and Kenneth Spence included air travel, hotels, restaurants, Pet care, footwear, gasoline, groceries, satellite television, Clothing and automobile repair).

--     Expenses related to the Café Soul project:      ≈$ 54,000

The affidavit was initialed on each page by Judge Butchko, who then issued an arrest warrant and certified that "[b]ased upon the sworn statement of facts, I find probable cause that Spence-Jones, Michelle did commit the crime" of second degree grand theft.

In the Complaint, the Plaintiff concedes that the Dade County's Commission recommended that the funds be directed not to Karym (which apparently did not yet exist), but to Timbuktu and Osun Village. (Compl. ¶ 241).  She also admits that Dr. Carey-Shuler gave a sworn statement on September 18, 2009 implicating her in a scheme to take County money.  (Id. ¶ 285).  The Plaintiff has not identified any

41

statement within the affidavit as being untrue.[7]  Instead, she argues that Mr. Fielder and

Mr. Scruggs had seen the drafts of the February 15, 2005 letter purportedly sent by Dr.

Carey-Shuler, recognized the writing on the draft as her handwriting, and thus realized

that her sworn statement "that she would never sign a letter like this, that she had never

seen or authorized this letter, and that she never directed MMAP to redirect the funds to

Spence-Jones" could not be true and that "Carey-Shuler had forgotten about her

decisions about Café Soul funding."  (Id. ¶ 278).

Of course that allegation hinges entirely on the assumptions: (1) that Mr. Fielder

and Mr. Scruggs actually saw the draft letters, (2) that they recognized the significance

of the drafts and the handwritten notes contained upon the drafts; and (3) that they

doubted Dr. Carey-Shuler's testimony.  Assuming that all of that is true, the question

becomes whether "it is obvious that no reasonably competent officer would have

concluded the warrant should issue."

To me it is not at all obvious.  A reasonable officer could have believed Dr.

Carey-Shuler when she said she had no authority to reallocate funds because it would

be unlawful to do so without a vote of the entire County Commission.  Moreover, a

reasonable officer could have believed that Harlan Woodward and Nathaniel Styles, the

creators of Osun Village, had never authorized the diversion of funds allocated to Osun

---

[7]  In Franks v. Delaware, 438 U.S. 154 (1978), the Supreme Court addressed the
similar issue of when a criminal defendant who attacks the existence of probable cause
for a search warrant based on false statements in the warrant affidavit is entitled to an
evidentiary hearing.  The Court stated that to overcome the presumption of validity, a
challenge must be "more than conclusory" and "point out specifically the portion of the
warrant affidavit that is . . . false . . .  accompanied by a statement of supporting
reasons." Id.  "[I]f these requirements are met, and if, when material that is the subject
of the alleged falsity or reckless disregard is set to one side, there remains sufficient
content in the warrant affidavit to support a finding of probable cause, no hearing is
required." Id. at 171.

Village, and had never authorized anyone to write the letter attached to the affidavit as Exhibit 2.  A reasonable officer could have believed it was improper for Ms. Spence-Jones to arrange for Reverend Gaston Smith to be the contracting principal and recipient of the $25,000 allocated to FMLK, take $8,000 of the funds as a consultant, and allow Reverend Smith to steal the remainder.  Finally, a reasonable officer could have believed it was unlawful to comingle the County's funds and use those funds for her own and her family's own personal expenses.

The existence of the drafts with handwritten edits, even if Mr. Fielder did know about them, does not preclude probable cause.  While they tend to discredit Dr. Carey-Shuler's testimony, "arresting officers, in deciding whether probable cause exists, are not required to sift through conflicting evidence or resolve issues of credibility so long as the totality of the circumstances present a sufficient basis for believing an offense has been committed."  *Dahl v. Holley*, 312 F.3d 1228, 1234 (11th Cir. 2002).  *See also Smith v. Sheriff, Clay Cnty., Fla.*, 506 F. App'x 894 (11th Cir. 2013).

The Supreme Court has cautioned that the circumstances are rare where "it will be appropriate to impose personal liability on a lay officer in the face of judicial approval of his actions."  *Messerschmidt*, 132 S.Ct. at 1250.  They are not present here.

C. Fourth and Fifth Claims for Relief: Malicious Prosecution and Seizure

Counts Four and Five allege that "the SAO defendants in their investigatory capacity fabricated and withheld evidence, illegally causing bringing of criminal charges . . . [and that] [a]s a result of the wrongful prosecution, Plaintiff was seized and deprived of her rights under the Fourth and Fourteenth Amendments to the United States Constitution."  (Compl. ¶¶ 627, 635).

However, "[a] prosecutor is immune for malicious prosecution." *Hart v. Hodges*,

587 F.3d 1288, 1295 (11th Cir. 2009) (citing *Malley v. Briggs*, 475 U.S. 335, 342-43,

106 S.Ct. 1092, 1097, 89 L.Ed.2d 271 (1986). *See also Rehberg*, 611 F.3d at 837 ("At

common law, the general rule was, and is, that a prosecutor is absolutely immune from

suit for malicious prosecution.") (quotation marks and alterations omitted).  Pursuant to

absolute immunity, Counts Four and Five must be dismissed.

### D.  Sixth Claim for Relief: First Amendment Retaliation

Re-alleging everything from the previous 88 pages and 640 paragraphs of

allegations, Plaintiff leaps to this unlikely conclusion:

> By the conduct set forth, *supra*, and by knowingly and intentionally concealing
> and fabricating evidence in the Codina and Carey-Shuler cases, falsely arresting
> and wrongfully seizing Spence-Jones, and manipulating the Commission and the
> political and criminal process to orchestrate her removal and exile from public
> office, Rundle, Scruggs, and Fielder wrongfully retaliated against Spence-Jones
> for her political position, because she opposed the Mayor, and in order to deprive
> her of her right to hold public office in violation of Plaintiff's First Amendment
> rights.

These allegations state no plausible claim for relief.

First, as the Supreme Court has explained, a retaliatory prosecution case cannot

be brought against the prosecutor, but only against the non-prosecuting official who

successfully induced the prosecutor to bring charges that would not otherwise have

been brought. *Hartman v. Moore*, 547 U.S. 250, 262 (2006); *see also Rehberg*, 611

F.3d at 848.  The SAO Defendants are absolutely immune with respect to the

prosecution of Ms. Spence-Jones.

Once indicted, it should have come as no surprise to Ms. Spence-Jones that she

was suspended by the Governor.  Suspension was and is authorized by both the Florida

Constitution and Florida Statutes, and it routinely follows when a public official is

charged with a crime.  On January 27, 2010, at the Associated Press' annual legislative meeting, Governor Crist told reporters that he had suspended no less than 37 public officials during the previous 36 months.  *Florida Gov. Crist Says he has Suspended 37 Public Officials*, POLITIFACT, (Jan. 27, 2010),

http://www.politifact.com/florida/statements/2010/jan/29/charlie-crist/florida-gov-crist-says-he-has-suspended-37-public-/.

As between the obvious alternative explanation for her "removal and exile from public office" – that is the normal functioning of Florida government, as opposed to the alleged purposeful retaliation due to political belief in the Complaint, retaliation is not a plausible conclusion.  *Iqbal*, 556 U.S. 662.

E.  Seventh Claim for Relief: Civil Rights Conspiracy Against All Defendants

Civil Rights conspiracy is one of two claims asserted against Mayor Regalado. However, to comply with Federal Rule of Civil Procedure 8(a)(2), a complaint must plead enough facts to state a claim for relief that is plausible on its face.  *Id.  See also Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010).  Rule 8's pleading standard "demands more than an unadorned, the defendant-unlawfully-harmed-me accusation. . . ." *Iqbal*, 556 U.S. at 678.  A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. at 555.

The allegations against Mayor Regalado are strikingly similar to those found insufficient against John Ashcroft in *Iqbal* where Ashcroft was described as the "principal architect" of a discriminatory policy.  Here, according to the complaint: "[a]ided by Rundle and the SAO, Regalado was also scheming to control the

Commission," (Compl. ¶ 111); Mayor Regalado and State Attorney Rundle, with the assistance of Mr. Scruggs and Mr. Fielder conspired to arrest Ms. Spence-Jones in order to remove Mayor Regalado's political opponent from elected office, (*id.* ¶ 140); "Regalado was the driving force behind the scheme to fabricate false charges to remove Spence-Jones from office. . . ." (*Id.* ¶ 141).

Other than assertions of conspiracy, there is no factual allegation that the Mayor played any role in either the initiation of charges against Ms. Spence-Jones or her suspension by the Governor. He is not alleged to have been involved in the questioning of Commissioner Carey-Shuler or Armando Codina, the probable cause affidavit, the arrests, the Closeout Memo, or the press statements.

Of the 757 numbered paragraphs in the Complaint, other than with respect to attending a City Commission meeting about replacing Ms. Spence-Jones – a duty which obviously falls within his Mayoral responsibility – there are only three factual allegations concerning Mayor Regalado.

First, "on information and belief," Plaintiff claims that in August 2009, prior to her November 2009 arrest, Mayor Regalado told union members at a meeting of the South Florida AFL-CIO that "Spence-Jones was going to jail." (*Id.* ¶ 129). Even if true, this hardly points to the Mayor's involvement in a conspiracy against Ms. Spence-Jones. According to the Closeout Memo, the state attorney's investigation had been underway since 2007. Moreover, Reverend Gaston Smith had already been charged with the theft of the FMLK funds and was awaiting trial. And these prosecutions were not the first time allegations of corruption had been made against the Commissioner. Readily available published articles reveal earlier investigations of Ms. Spence-Jones on a variety of

charges unrelated to the Karym or the Codina solicitation. *See, e.g.*, *Spence-Jones Faces Indictment. State Attorney Investigates Ethically Challenged Miami Commissioner*, MIAMI NEW TIMES, (Dec. 13, 2007); *City Hall Stinks*, MIAMI NEW TIMES, (Feb. 14, 2008); *Spence-Jones Cleared in Investigation*, SOUTH FLORIDA BUSINESS JOURNAL, (May 22, 2009) (reporting that Ms. Spence-Jones was cleared of previously made allegations that she accepted bribes and kickbacks and interfered with City Parks and Recreation decisions); *Miami Commissioner Michelle Spence-Jones Beats Corruption Charges*, MIAMI NEW TIMES, (June 4, 2009).  The fact that the Mayor, or anyone else interested in Miami politics, might predict legal problems for Commissioner Spence-Jones, or even opine, incorrectly as it turns out, that she might go to jail does not point to involvement in a conspiracy.

Second, it is alleged that on November 11, 2009, the day before the arrest warrant of Ms. Spence-Jones was filed, and two days before she turned herself in to the authorities, the Governor visited City Hall to attend Mayor Regalado's swearing-in ceremony.  She sought to meet the Governor and have a photograph taken.  The city photographer took a picture of the Governor, Mayor Regalado, and Ms. Spence-Jones. The Mayor later told the photographer to destroy the photograph. (Compl. ¶¶ 153-59). The request was apparently refused.  (*Id.* ¶ 159).  Most elected officials prefer not to be photographed with those under investigation; although, the number of photographs of Florida politicians posing with those later convicted of crimes shows how hard this is to accomplish.  Again, this does not plausibly point to a conspiracy.

Finally, it is alleged that in the summer of 2011, <u>after</u> Ms. Spence-Jones was charged in both cases and <u>after</u> she had been acquitted in the Codina case, Mayor

Regalado visited State Attorney Rundle at the SAO's office.  "In this secret, back-door meeting, Mayor Regalado and State Attorney Rundle discussed how they would continue the fraudulent prosecution against Spence-Jones in order to keep her from regaining her seat on the Commission." (*Id.* ¶¶ 531-34).  This is the only allegation of any communication between Regalado and any of the SAO Defendants.  Other than alleging the fact of the meeting, this allegation does nothing to elucidate any participation by Mayor Regalado in a conspiracy.  Even if Mayor Regalado and State Attorney Rundle "discussed" continuing the prosecution, there is no allegation that they agreed to do so – an essential element of a conspiracy claim.  *See Grider v. City of Auburn*, 618 F.3d 1240 (11th Cir. 2010).  There is no allegation that Mayor Regalado did anything to continue the prosecution.  In fact, the State Attorney's Office dismissed the remaining case against Ms. Spence-Jones on August 24, 2011.  The allegations against Mayor Regalado fall far "short of the line between possibility and plausibility to 'entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

As to the SAO Defendants, for the reasons I have previously stated, they are entitled to absolute and qualified immunity.  Moreover, the intracorporate conspiracy doctrine bars claims of conspiracy between members of the same organization when acting in the scope of their employment, in this case the state attorney's office.  *See Grider*, 681 F.3d at 1261; *Rehberg*, 611 F.3d at 855; *Denney v. City of Albany*, 247 F.3d 1172, 1190-91 (11th Cir. 2001).

### F.  Eighth Claim for Relief: Supervisory Liability Against Rundle

In her eighth claim for relief, Ms. Spence-Jones alleges that State Attorney Rundle knew Mr. Scruggs had a history of documented unlawful, unprofessional, and

48

unethical conduct yet assigned him "to investigate, assist, imprison, and prosecute Spence-Jones notwithstanding, and (on information and belief) because of such misconduct." (Compl. ¶ 658). She also alleges that State Attorney Rundle "knew that Scruggs and Fielder would violate Plaintiff's constitutional rights and failed to stop them from doing so." (*Id.* ¶ 657).

Assuming State Attorney Rundle assigned Mr. Scruggs to prosecute Ms. Spence-Jones, knowing he would violate her constitutional rights, and failed to stop him from doing so, her actions are absolutely immune from suit. This is because "an individual prosecutor's error in the plaintiff's specific criminal trial constitutes an essential element of the plaintiff's claim." *Van de Kamp*, 555 U.S. at 345 (citations omitted) ("Decisions about indictment or trial prosecution will often involve more than one prosecutor within an office."). Particularly in a large office, defending prosecutorial decisions such as the assignment of prosecutors or the handling of particular cases could impose "unique and intolerable burdens upon a prosecutor responsible annually for hundreds of indictments and trials." *Imbler*, 424 U.S. at 425-26. *See also Van de Kamp*, 555 U.S. at 347.

G.  Eleventh Claim for Relief: Retaliatory Inducement to Prosecute

The claims against Mayor Regalado for retaliatory inducement to prosecute are due to be dismissed for two independent reasons.

First, as set forth in greater detail with respect to the allegations relating to Mayor Regalado's participation in a conspiracy to deprive Ms. Spence-Jones of her civil rights, the Complaint fails to state a plausible claim. Its conclusory refrain – Mayor Regalado

"induced" or "continued to induce" – is nothing more than a naked assertion, not entitled to any assumption of truth. (Compl. ¶¶ 683-84, 686-90).

Second, because of the complexity of establishing causation in a claim that a particular prosecution was induced by retaliation, the Supreme Court has held that the absence of probable cause must be pleaded and proven. *Hartman*, 547 U.S. at 265-66. Here, although the Complaint conclusively asserts the lack of probable cause, its specific allegations speak to the contrary.

As set forth in detail in the discussion of the claim for false arrest in the Carey-Shuler case, the probable cause affidavit was reviewed by a state circuit judge who found probable cause that Ms. Spence-Jones did commit the crime of second degree grand theft.  In the Codina case, as the Complaint alleges, (Compl. ¶ 456), Ms. Spence-Jones was indicted by the grand jury on March 3, 2010, and according to Dade County Circuit Court records, her sworn motion to dismiss was denied on October 18, 2010. The Codina case proceeded to trial, (*id.* ¶ 515), and presumably at the close of the State's case, her able counsel unsuccessfully moved for Judgment of Acquittal pursuant to Rule 3.380 of the Florida Rules of Criminal Procedure, arguing that the evidence was insufficient to warrant a conviction.  These independent decisions break the chain of causation between the alleged inducement and negate any claim of the absence of probable cause. *Hartman*, 547 U.S. at 262-63 ("In order to find that a defendant procured a prosecution, the plaintiff must establish 'a chain of causation' linking the defendant's actions with the initiation of criminal proceedings.") (quoting *Barts v. Joyner*, 865 F.2d 1187, 1195 (11th Cir. 1989)).

## H.  Twelfth Claim for Relief: Due Process/Stigma-Plus

The Complaint alleges that Mr. Scruggs and Mr. Fielder made false statements

to Commissioner Carey-Shuler and Mr. Codina, and that State Attorney Rundle made

false statements to the Governor and the press thus causing "the constitutional

violations Spence-Jones suffered, including the multiple suspensions of Spence-Jones

from her public employment as an elected official . . . her loss of livelihood and business

goodwill, her loss of liberty," and the other harms alleged. (Compl. ¶ 697).  While

various common law privileges apply to the allegedly defamatory statements, it is not

necessary to engage in that analysis because under controlling Supreme Court and

Eleventh Circuit precedent, the Complaint fails to allege any constitutional injury.

In *Paul v. Davis*, 424 U.S. 693 (1976), the Supreme Court held that defamation

by government officials standing alone and apart from any governmental action does

not constitute a deprivation of liberty or property under the Fourteenth Amendment.  The

*Davis* Court established what has come to be known as the "stigma-plus" test.  *See also*

*Siegert v. Gilley*, 500 U.S. 226, 233, (1991); *Moore v. Otero*, 557 F.2d 435, 438 (5th Cir.

1977).  A plaintiff claiming a deprivation based on defamation under color of state law

must establish the fact of the defamation "plus" the violation of some more tangible

interest before the plaintiff is entitled to invoke the procedural protection of the due

process clause.  *Paul*, 424 U.S. at 701-02.  *See also Siegert v. Gilley*, 500 U.S. 226,

233, 111 S.Ct. 1789, 1794, 114 L.Ed.2d 277 (1991) ("Defamation, by itself, is a tort

actionable under the laws of most states, but not a constitutional deprivation.").

In keeping with *Paul*, the Eleventh Circuit has succinctly summarized what is

required to satisfy the stigma-plus test: "To establish a liberty interest sufficient to

51

implicate the Fourteenth Amendment safeguards, the individual must not only be
stigmatized but also stigmatized in connection with a denial of a right or status
previously recognized under state law." *Behrens v. Regier*, 422 F.3d 1255, 1260 (11th
Cir. 2005) (quoting *Smith ex rel. Smith v. Siegelman*, 322 F.3d 1290, 1296 (11th Cir.
2003)).  Ms. Spence-Jones asserts that for the "plus" prong of her claim she has
sufficiently alleged two interests: her liberty interest in not being arrested and her
business interest in her livelihood. (Resp. at 72).

The Eleventh Circuit's decision in *Rehberg* is squarely on point.  There the Court
held that the prosecution itself (the indictment and the arrest) could not be used as the
basis for constitutional injury.  *Rehberg*, 611 F.3d at 853.  Citing the Seventh Circuit's
decision in *Buckley*, the Court stated: "a plaintiff who uses a 'stigma plus' approach to
avoid *Paul* and *Seigert* must identify a 'plus' other than the indictment, trial, and related
events for which the defendants possess absolute immunity."  *Rehberg*, 682 F.3d at
853-54 (quoting *Buckley*, 20 F.3d at 798).

Under Florida law, Ms. Spence-Jones' suspension by the Governor would
constitute a "related event."  As has been noted, suspension can only be based upon
indictment or information.  Statements to the media or even to the Governor cannot
trigger suspension.

The Plaintiff presents no authority for the proposition that elective office is a right
or status protected by state law.  *See Snowden v. Hughes*, 321 U.S. 1, 7-8 (1944);
*Wilson v. Birnberg*, 667 F.3d 591, 598 (5th Cir. 2012) ("we continue to hold that public
office does not constitute property within the meaning of the Due Process Clause").  In
any event, Ms. Spence-Jones was never removed from office.  She was suspended and

later reinstated.  The cases finding a violation of a due-process right to engage in a calling all deal with a complete prohibition not some form of brief interruption.  *See Connecticut v. Gabbert*, 526 U.S. 286, 291-92 (1999); *Cypress Ins. Co. v. Clark*, 144 F.3d 1435 (11th Cir. 1998); *Clemons v. Dougherty Cnty., Ga.*, 684 F.2d 1365, 1371, 1374 (11th Cir. 1982); *Ming Wei Liu v. Bd. of Trs. of Univ. of Ala.*, 330 F. App'x 775, 780-81 (11th Cir. 2009).  Ms. Spence-Jones has never been deprived of her ability to run for office.  As she alleges in her Complaint, even after her arrest and suspension, Ms. Spence-Jones ran again for office to re-fill her own seat and "won by a 53% majority in a race with nine candidates." (Compl. ¶¶ 328, 332-33).

Under Florida law, Ms. Spence-Jones remained qualified to hold office during her temporary suspension. *Spence-Jones*, 118 So. 2d at 261.  She only became ineligible to serve as a Commissioner because of the consecutive term limit provision of the Miami City Charter. *Id.* Her stigma-plus claim is due to be dismissed.

I. <u>Ninth, Tenth, Thirteenth, and Fourteenth Claims for Relief: Civil RICO, RICO Conspiracy, and Florida RICO</u>

The Plaintiff's claims for Civil RICO, RICO Conspiracy, and Florida RICO set a high-water mark for creative pleading devoid of substance.  Essentially, the Complaint alleges that the SAO Defendants, State Attorney Rundle, Mr. Scruggs, and Mr. Fielder, perhaps joined by Mayor Regalado,[8] formed an illegal enterprise through a pattern of racketeering activity involving mail and wire fraud[9] for the purpose of removing Ms. Spence-Jones "from elected office through fraudulent means, and keep[ing] her off the Commission as long as possible." (Compl. ¶ 673).  In addition to the irony of attempting

---

[8] (Compl. ¶ 665).
[9] (*Id.* ¶ 669-76).

to use laws written to combat organized crime and racketeering against a prosecutor's office, the Complaint fails to plead a plausible claim.

The Complaint claims a violation of 18 U.S.C. § 1962(c), which requires that a plaintiff prove that a defendant participated in an illegal enterprise "through a pattern of racketeering activity." 18 U.S.C. § 1962(c). "Racketeering activity" is defined to include predicate acts such as mail and wire fraud. *Id.* § 1961(1). "Mail or wire fraud occurs when a person (1) intentionally participates in a scheme to defraud another of money or property and (2) uses the mails or wires in furtherance of that scheme." *Pelletier v. Zweifel*, 921 F.2d 1465, 1498 (11th Cir. 1989).[10] To prove a pattern of racketeering, a plaintiff must show at least two racketeering predicates, that are related, and that amount to or pose a threat of continued criminal activity. *H.J. Inc. v. New Bell Tel. Co.*, 492 U.S. 229, 240, (1989). The "threat of continued criminal activity" has been called the "continuity" requirement. *Id.* "Continuity is both a closed and open ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time." *Id.*

Since Plaintiff's claims are based on an alleged pattern of racketeering consisting of predicate acts of mail and wire fraud, her substantive RICO allegations must comply not only with the plausibility criteria in *Twombly* and *Iqbal*, but also with Federal Rule of Civil Procedure 9(b)'s heightened pleading standard which requires that "[i]n alleging

---

[10]   The mail fraud and wire fraud statutes are "given a similar construction and are subject to the same substantive analysis." *Belt v. United States*, 868 F.3d 1208, 1211 (11th Cir. 1989).

fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." *Am. Dental Ass'n. v. Cigna Corp.*, 605 F.3d 1283, 1291 (11th Cir. 2010). "Pursuant to 9(b), 'a plaintiff must allege: (1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which the statements misled the plaintiff; and (4) what the defendants gained by the alleged fraud.'" *Id.* (quoting *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1380-81 (11th Cir. 1997)).

The Complaint does not allege that the Defendants made any misrepresentation to Ms. Spence-Jones or that she was in any way misled.  To the contrary, in paragraph 667 the Complaint lists sixteen acts, none of which has anything to do with making a material false statement with the intent to deceive or cheat someone out of money or property.  Instead, it is the repetitious litany of fabrication of evidence, filing a false arrest affidavit, timing the arrest, causing and expediting the suspension, filing a false information, refusing to dismiss the indictment, defaming Ms. Spence-Jones, etc. Plaintiff seems to believe that, because Mr. Fielder and Mr. Scruggs "on information and belief" allegedly used email on an out of state trip, their activities are somehow transformed into mail or wire fraud.

During oral argument, Plaintiff's counsel asserted that the material false representations were made not to Ms. Spence-Jones, but to Dr. Carey-Shuler and Mr. Codina for the purpose of eliciting false testimony about Ms. Spence-Jones which could then be used to charge Ms. Spence-Jones with a crime.  Whether or not misleading a witness is actionable, it is certainly not mail or wire fraud. The federal mail fraud statute

is limited in scope to the protection of property rights.  *See Cleveland v. United States*,

531 U.S. 12 (2006) (addressing "property" for purposes of mail fraud statute).

In addition to failing to allege a predicate act, the Plaintiff has failed to allege a

pattern of it.  RICO targets organized criminal activity, rather than sporadic, isolated

criminal acts.  *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1264 (11th Cir. 2004).

A pattern of racketeering activity requires proof beyond the two predicate acts

themselves – continuity – that something is the threat of continuing racketeering

activity.  *Id.* at 1265.

> The continuity element of a pattern of racketeering activity is crucial to a
> valid RICO claim in order to ensure that the crime alleged is the sort of
> offense that RICO is designed to address . . . one that is part of a pattern
> of ongoing, continuing criminality or that involves criminality that promises
> to continue into the future.

*Id.*  This case involves two prosecutions of a single individual over a period of less than

two years.  Assuming that any predicate act is alleged (which I do not believe to be the

case), because of the narrow scope of the alleged activity and the limited time frame,

the Plaintiff fails to meet the closed-in continuity requirement necessary to sustain a

RICO violation.

Moreover, the Plaintiff fails to sufficiently allege standing and damages.  The

RICO statute limits those who may bring civil RICO actions to "[a]ny person injured in

business or property."  18 U.S.C. § 1964(c).  The phrase "injured in business or

property" has been interpreted both as a standing requirement and as an element of the

cause of action.  *See, e.g., Bivens Garden Office Bldg., Inc. v. Barnett Banks of Fla.,

Inc.*, 140 F.3d 898, 906 (11th Cir. 1998); *Grogan v. Platt*, 835 F.2d 844 (11th Cir. 1988).

The causation component of Section 1964(c), whether an alleged RICO injury was

caused "by reason of" a violation of the statute has also been considered a component of standing. *See Beck v. Prupis*, 529 U.S. 494 (2000); *Evans v. City of Chicago*, 434 F.3d 916, 924 (7th Cir. 2006).

In *Grogan*, the Eleventh Circuit stated that "the ordinary meaning of the phrase 'injured in his business or property' excludes personal injuries, including the pecuniary losses therefrom." 835 F.2d at 847. The Court held that plaintiffs cannot recover under RICO for those pecuniary losses, including wages and lost earnings, which are most properly understood as part of a personal injury claim. *Id.* at 848. *See also Pilkington v. United Airlines*, 112 F.3d 1532, 1536 (11th Cir. 1997); *Echeverria v. BAC Home Loans Servicing, LP*, 523 F. App'x 675, 677 (11th Cir. 2013); *Keller v. Strauss*, 480 F. App'x 552 (11th Cir. 2012).

The Plaintiffs' claims in this case are for personal injury – to her individual constitutional rights and to her personal reputation. She argues <u>she</u> was wrongfully arrested, maliciously prosecuted, and defamed. Her damages are not to her "business or property." Ms. Spence-Jones' claim that her temporary suspension from office, thereby "losing wages," gives her standing for a RICO claim is meritless both legally and factually.

As noted above, Eleventh Circuit precedent bars lost wages ancillary to a claim for personal injury. Moreover, she was suspended from office by the Governor, not the Defendants. It is not enough to argue she would not have been suspended but for the prosecutions. Under RICO, a plaintiff must show that a defendant's violation is not only the "but for" cause of injury, but was also the proximate case. *See Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457 (2006); *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S.

258, 266 (1992). "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Anza*, 547 U.S. at 461. Here the answer is no.

And, as a matter of fact, Ms. Spence-Jones did not lose wages by reason of her suspension. As the state court of appeals pointed out on August 24, 2011, the Governor restored Commissioner Spence-Jones to office following her acquittal. "She received full back pay and the emoluments and allowances for the period of her suspension." *Spence-Jones*, 118 So. 2d at 262. I question whether there is any basis for the factual contention of business loss contained in paragraphs 675 and 679 of the Complaint.

The Plaintiff has also failed to state a claim for RICO conspiracy. To support a claim of RICO conspiracy, the Plaintiff must allege an illegal agreement to violate a substantive provision of the RICO statute. *See Jackson*, 372 F.3d at 1269. I have found that the Complaint fails to allege a predicate act, fails to allege an illegal agreement to conduct acts of a sufficiently continuous nature to constitute a pattern of racketeering activity, and fails to allege facts sufficient to confer standing or damages. Paragraph 678's conclusory language that each Defendant "knowingly agreed and conspired" to violate the act adds nothing and therefore, the RICO conspiracy count is likewise unable to survive the Defendants' Motions to Dismiss.

Because Florida courts look to Federal RICO decisions in interpreting and applying the Florida RICO act, the analysis applied to the Plaintiff's federal RICO claim is, for the most part, applicable to her state claim. *Id.* at 1263-64. *See also All Care Nursing Service, Inc. v. High Tech Staffing Servs., Inc.*, 135 F.3d 740, 745 (11th Cir.

1998) ("Florida's RICO statutes have consistently been interpreted using federal RICO claim cases.").

There are two differences between the federal and state laws that have relevance here.

First, Florida RICO lists numerous Florida criminal statutes as constituting criminal activity for purposes of the act.  The Plaintiff cites to two of the criminal statutes enumerated as predicate acts under Florida's RICO statute: tampering with a witness and concealing evidence, in violation of Florida Statutes Sections 914.22(1)(f) and 918.13, respectively.[11]  The Plaintiff asserts that in questioning Dr. Carey-Shuler and Mr. Codina, the Defendants, apparently through Mr. Scruggs, engaged in "misleading conduct" with the intent to cause them to testify untruthfully in an "official investigation" or "official proceeding." (Compl. ¶¶ 707-10).  The tampering with physical evidence is the alleged concealment of the draft of Dr. Carey-Shuler's February 15th letter with "the purpose to impair its verity or availability." (*Id.* ¶ 711).

Unlike mail or wire fraud, these allegations are not subject to the particularized pleading requirement of Rule 9(b).

I am unaware of any precedent for applying the witness tampering statute to a prosecutor questioning a witness – particularly a witness represented by counsel.  The idea that Mr. Scruggs concealed Dr. Carey-Shuler's letter from her, suspecting she would forget its existence, in order to lure her into blaming Ms. Spence-Jones for the diversion of funds is fanciful.  Neither of these claims could survive summary judgment.

---

[11] *See* FLA. STAT. § 772.102(33), (34).

However, for purposes of these Motions, I will assume that Ms. Spence-Jones has stated a claim for the existence of these predicate offenses.

Even assuming that questioning Dr. Carey-Shuler and Mr. Codina or concealing the Carey-Shuler draft letter could constitute criminal violations of witness tampering or concealing evidence for purposes of Florida RICO, however, the claim would still fail for failure to establish continuity. These "wrongs" occurred between September 2009 and January 2010, making the relevant time period four months.  The notion that questioning two witnesses about a single defendant over a four month period could constitute a continuing pattern of criminal activity for purposes of Florida RICO is ludicrous and without substantial fact or legal support.[12]

Finally, although, the Eleventh Circuit has not directly addressed the issue of whether absolute or qualified immunity applies to a RICO claim, its application of immunity with respect to other statutes, and its citation of cases from other circuits strongly suggest that immunity would be found to be available.  In *Tapley v. Collins*, 211 F.3d 1210, 1216 (11th Cir. 2000), while holding that qualified immunity was available as a defense to the Federal Wiretap Act, the Court stated that "the qualified immunity defense is so well rooted in our jurisprudence that only a specific and unequivocal statement of Congress can abolish the defense." *Id.*[13]

---

[12]   This raises the second distinction between state and federal RICO laws.  Pursuant to Florida Statutes Section 772.11, "[t]he defendant is entitled to recover reasonable attorney's fees and court costs in the trial and appellate courts upon a finding that the claimant raised a claim without substantial fact or legal support.  In awarding attorney's fees and costs under this Section, the court shall not consider the ability of the party to pay such fees and costs."  The Defendants are entitled to recover the fees and costs incurred in defending the Florida RICO claims.
[13]   The Eleventh Circuit applied the reasoning of the Supreme Court in *Buckley*, 509 U.S. at 268") (citations and internal quotations omitted) ("Certain immunities were so

The Court relied in part on its decision in *Gonzalez v. Lee Housing Authority*, 161 F.3d 1290 (11th Cir. 1998), where it decided that qualified immunity applied to the Fair Housing Act.  The Court stressed that while it was not deciding the issue with respect to statutes other than the Fair Housing Act, it noted its holding was "consistent with various decisions in which this court and others have held that public officials are entitled to assert the defense of qualified immunity when sued under a federal statute other than Section 1983." *Id.* at 1300.  The Court cited to eleven federal appellate court decisions holding that qualified immunity was available as a defense to claims arising under eight federal statutes. *Id.* at 1300 n.34. *See also Tapley*, 211 F.3d at 1215 n.9.  Among the cases cited in both *Gonzalez* and *Tapley* is the Sixth Circuit decision in *Cullinan v. Abramson*, 128 F.3d 301, 307-12 (6th Cir. 1997), which held that qualified immunity is available for a federal RICO claim. *See also Glick v. Gutbrod*, 782 F.2d 754 (7th Cir. 1985) (applying absolute judicial immunity to RICO claim); *Chappell v. Robbins*, 73 F.3d 918 (9th Cir. 1996) (legislative immunity to RICO claim); *Thillens, Inc. v. Cmty. Currency Exch. Ass'n of Illinois, Inc.*, 729 F.2d 1128 (7th Cir. 1984) (legislative immunity); *Van Beek v. A.G.-Credit Bonus Partners*, 316 F. App'x 554, 555-56 (9th Cir. 2008) (affirming dismissal of RICO claim against judge and prosecutor on basis of immunity); *Parrette v. Virdin*, 173 F. App'x 534, 536 (8th Cir. 2006) (applying absolute immunity where city attorney was performing duties integral to judicial process).[14]

---

well established in 1871 when Section 1983 was enacted, that we presume that Congress would have specifically so provided had it wished to abolish them.

[14]   *See also Connor v. City of Philadelphia*, 1991 WL 102989 (E.D. Pa. June 11, 1991) (holding that "in enacting RICO, Congress did not intend to limit a prosecutor's immunity from civil suit.").

J.   Fifteenth, Sixteenth, Seventeenth, Eighteenth, and Nineteenth
     Claims for Relief: State Common Law Claims

Florida law affords state attorneys broad immunity from suit.  The leading case is

*Office of State Attorney, Fourth Judicial Circuit v. Parrotino*, 628 So. 2d 1097 (Fla.

1993).  There the Florida Supreme Court considered claims brought by a personal

representative whose decedent had been killed by an abusive boyfriend.  Prior to her

death, the decedent had asked the state attorney's office for assistance, had reportedly

been assured that steps would be taken, but the office misplaced or misfiled the

pertinent documents.  The court refused to disturb "a well-founded and long standing

immunity accorded to state attorneys."  *Id.* at 1100.  The court stated that a strict

guarantee of immunity was necessary to preserve the effectiveness and impartiality of

the office.  *Id.* at 1098.  A prosecutor's immunity, said the court, existed apart from

sovereign immunity, had an independent basis in law and policy, and has not been

waived.  *Id.* at 1099.  While sympathetic to the circumstances that had led to the

decedent's death, the court concluded that any erosion of the immunity "would allow

state attorneys to be sued in many other disparate contexts, resulting in serious

disruptions of the office."  *Id.* at 1100.  "Such a slippery slope must be avoided both as a

matter of law and for reasons of public policy."  *Id.  See also Berry v. State*, 400 So. 2d

80, 84 (Fla. 4th DCA 1981) ("[T]he conduct of a state attorney in the exercise of his

prosecutorial duties qualifies as a discretionary government function the performance of

which is not affected by the statute waiving sovereign immunity."); *Weston v. State*, 373

So. 2d 701, 703 (Fla. 1st DCA 1979) ("It is necessary to the judicial process in the

enforcement of the criminal laws of the state that the state attorney be free from any

apprehension that he or she may subject the state for liability for acts  performed in the exercise of the discretionary duties of the office.").

As a result of prosecutorial immunity under Florida law, and absent waiver of sovereign immunity, the Florida common law claims against the SAO Defendants must be dismissed.[15]

**V.   Conclusion**

This case, brought by a disgruntled criminal defendant, lacks merit and vividly demonstrates the reasons underlying prosecutorial immunity.  Public corruption is difficult to prosecute.  Defendants often have a public following, and charges sometimes have public consequences apart from the individual office holders.  Partisan politics can engender charges of favoritism.  It is often necessary for a jury to decide whether cronyism, politics-as-usual, and influence peddling have crossed the line between unsavory or ethically challenged behavior and theft or bribery.  Victims are loath to step forward when they must regularly seek favor from elected officials.  The shifting testimony and motivations of witnesses is frequently problematic.

The decision whether or not to bring charges or, as happened in this case, to dismiss charges when a case cannot be proven beyond a reasonable doubt must be made without regard to personal legal consequences.  And the unseemly conduct involved in this case unquestionably deserved the prosecutors' attention.  At oral argument, I asked how an elected official could ever think it appropriate to use city staff to solicit contributions to a charity in which she had an interest from those appearing

---

[15]  For the reasons previously stated, no plausible claim is asserted against Mayor Regalado with respect to the Florida state law claim for intentional infliction of emotional distress.

before her on city business.  Apart from the legal principles that govern disposition of this case, the unavoidable truth is that given her own behavior, Ms. Spence-Jones cannot reasonably claim to have been treated unjustly.

For the foregoing reasons, it is hereby

**ORDERED** and **ADJUDGED** that the Motions (DEs 60, 61, 62, 73, & 74) are **GRANTED**.  The Amended Complaint is **DISMISSED WITH PREJUDICE**, and all motions not resolved by this Order are **DENIED AS MOOT**.  The Clerk of Court shall **CLOSE** this case.

**DONE** and **ORDERED** in Chambers at West Palm Beach, Florida this 20th day of December, 2013.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

Copies to:    Counsel of Record